# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>  *ex rel.* Christopher Frey, Relator | Civil Action No:<br>3:19-cv-00920-B |
| STATE OF ARKANSAS<br>  *ex rel.* Christopher Frey, Relator | |
| STATE OF CALIFORNIA<br>  *ex rel.* Christopher Frey, Relator | *JURY TRIAL DEMANDED* |
| STATE OF COLORADO<br>*ex rel.* Christopher Frey, Relator | |
| STATE OF CONNECTICUT<br>*ex rel.* Christopher Frey, Relator | |
| STATE OF DELAWARE<br>  *ex rel.* Christopher Frey, Relator | |
| DISTRICT OF COLUMBIA<br>  *ex rel.* Christopher Frey, Relator | |
| STATE OF FLORIDA<br>  *ex rel.* Christopher Frey, Relator | |
| STATE OF GEORGIA<br>  *ex rel.* Christopher Frey, Relator | |
| STATE OF INDIANA<br>  *ex rel.* Christopher Frey, Relator | |
| STATE OF IOWA<br>  *ex rel.* Christopher Frey, Relator | |
| STATE OF LOUISIANA<br>  *ex rel.* Christopher Frey, Relator | |
| STATE OF MARYLAND<br>  *ex rel.* Christopher Frey, Relator | |

STATE OF MASSACHUSETTS
  *ex rel.* Christopher Frey, Relator

STATE OF MICHIGAN

  *ex rel.* Christopher Frey, Relator

STATE OF MINNESOTA
  *ex rel.* Christopher Frey, Relator

STATE OF NEVADA
  *ex rel.* Christopher Frey, Relator

STATE OF NEW JERSEY
  *ex rel.* Christopher Frey, Relator

STATE OF NEW MEXICO

  *ex rel.* Christopher Frey, Relator

STATE OF NEW YORK
  *ex rel.* Christopher Frey, Relator

STATE OF NORTH CAROLINA

  *ex rel.* Christopher Frey, Relator

STATE OF OKLAHOMA
  *ex rel.* Christopher Frey, Relator

STATE OF RHODE ISLAND

  *ex rel.* Christopher Frey, Relator

STATE OF TENNESSEE
  *ex rel.* Christopher Frey, Relator

STATE OF VIRGINIA
  *ex rel.* Christopher Frey, Relator

v.

HEALTH MANAGEMENT
SYSTEMS, INC.,

Defendant.

## FALSE CLAIMS ACT FIRST AMENDED COMPLAINT
## AND DEMAND FOR JURY TRIAL

The United States of America (the "United States") and the Plaintiff States (the United States and Plaintiff States are collectively referred to herein as the "Government"), by and through their *qui tam* Relator Christopher Frey (the "Relator"), allege:

## PRELIMINARY STATEMENT

1.      This is a civil action brought on behalf of the Government under the Federal False Claims Act, 31 U.S.C. § 3729 – 3733 (the "False Claims Act" or "FCA") and the false claims acts of the respective Plaintiff States[1] to recover treble damages sustained by and civil

---

[1] The state statues are the: (1) Arkansas Medicaid Fraud False Claims Act, Ark. Code Ann. §§ 20-77-901 – 911 (as amended by 2017 Arkansas Laws Act 978 (S.B. 564)); (2) California False Claims Act, Cal. Gov't Code §§ 12650 – 12656; (3) Colorado Medicaid False Claims Act, Colo. Rev. Stat. Ann. §§ 25.5-4-303.5 – 4-310; (4) Connecticut False Claims and Other Prohibited Acts Under State-Administered Health or Human Services Programs Act, Conn. Gen. Stat. Ann. §§ 4-274 – 289; (5) Delaware False Claims and Reporting Act, Del. C. Ann. tit. 6, §§ 1201 – 1211; (6) District of Columbia Medicaid Fraud Enforcement and Recovery Amendment Act of 2012, D.C. Code Ann. §§ 2-381.01 – 381.10; (7) Florida False Claims Act, Fla. Stat. Ann. §§ 68.081 – 68.092; (8) Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 – 4-168.6; (9) Indiana False Claims and Whistleblower Protection Act, Ind. Code Ann. §§ 5-11-5.5-1 – 5.5-18; (10) Iowa False Claims Act, Iowa Code Ann. §§ 685.1 – 685.7; (11) Louisiana Medical Assistance Programs Integrity Law, La. Stat. Ann. §§ 437.1 – 440.16; (12) Maryland False Claims Act, Md. Code Ann. Health-Gen. §§ 8-101 – 111; (13) Massachusetts False Claims Law, Mass. Gen. Laws Ann. ch. 12, §§ 5A – 5O; (14) Michigan Medicaid False Claim Act, Mich. Comp. Laws Ann. §§ 400.601 – 400.615; (15) Minnesota False Claims Act, Minn. Stat. Ann. §§ 15C.01 – 15C.16; (16) Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. Ann. §§ 357.010 – 357.250; (17) New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1 – 32C-18; (18) New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-14-1 – 14-15; (19) New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. §§ 44-9-1 – 9-14; (20) New York False Claims Act, N.Y. Fin. Law §§ 187 – 194; (21) North Carolina False Claims Act, N.C. Gen. Stat. Ann. §§ 1-605 – 618; (22) Oklahoma Medicaid False Claims Act, Okl. Stat. Ann. tit. 63, §§ 5053 – 5054; (23) Rhode Island State False Claims Act, R.I. Gen. Laws Ann. §§ 9-1.1-1 – 1.1-9; (24) Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101 – 108; (25) Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 – 185; and (26) Virginia Fraud Against Tax Payers Act, Va. Code Ann. §§ 8.01-216.1 – 216.19.

penalties and restitution owed to the Government as a result of various unlawful and improper

practices by Health Management Systems, Inc. ("HMS" or "Defendant") in performing

services for the Medicaid agencies (and in some cases, Medicaid Managed Care Organizations

(MCOs)) of the Plaintiff States.  Relator believes that the damages, penalties and restitution

that should be owed to the government and the Plaintiff States under this case will likely be in

the billions of dollars.

2.      HMS promotes itself as the nation's leading provider of cost containment

services including, specifically, third party liability services to state Medicaid agencies and

MCOs and other government healthcare agencies across the country.  Third party liability

services, also referred to as "TPL Services", include the identification and recovery of

expenditures made under the Medicaid program that were actually the responsibility of

another liable third party such as an insurance carrier.

3.      Upon information and belief, HMS has or had contracts with more than 40

state Medicaid agencies and MCOs)[2] — including those of the Plaintiff States referenced in

this complaint  — to serve as their provider of TPL Services.  In a few cases, HMS is a

subcontractor to a principal contractor but nonetheless provides its services to the state.

4.      Relator was employed by HMS from approximately September 2006 to May

2013 and prior to that time was employed by a TPL company that HMS acquired in a merger.

5.      During most of his employment with HMS, Relator was a  Vice President or

Regional Vice President (RVP) with responsibility for managing HMS's relationships with

_____

[2] MCOs are private entities contracted by some states to provide Medicaid services to patients in exchange for a fee or premium from the state.

state health agencies in his territory, which initially was comprised of several states.  His role essentially was that of a sales and client manager and developer of proposals for prospective new clients, with primary responsibility for helping HMS obtain new business clients in his particular territory, as well as helping HMS's relationships with existing clients in his territories to grow "organically." Relator had no responsibility or authority relating to HMS's operations, legal or contractual compliance, or client billing.  Relator has always been highly regarded within the industry and has over 20 years of relevant industry experience.

6.      During his more than 16 year tenure with HMS (and its predecessor by merger), Relator made important contributions to the organization's growth, success and revenues. He grew HMS's Idaho, Nevada and Alaska markets essentially from scratch, and then quadrupled the Texas market from $3 million to $14 million in annual revenues in a very short time. He played key proposal development roles in attracting some of HMS's most important clients and landing some of its largest contracts, and also recruited and hired key staff who went on to be successful at HMS.

7.      But in the midst of his many significant contributions to HMS's success, Relator came to realize that HMS was a company beset with many sins.  He became aware of numerous improper practices and violations of law by HMS in performing services under its contracts with state Medicaid agencies.  These included HMS's failure to bill TPL claims timely or at all, and its neglecting to load third party coverage information for Medicaid enrollees onto the Medicaid information systems.  These improper practices violated not only numerous federal and state laws and regulations and HMS's contracts with the relevant state Medicaid agencies, but also – by concealing, avoiding or decreasing the recoveries of

Medicaid funds that the Plaintiff States should have obtained, and concealing, avoiding or decreasing those states' obligations to refund the federal government's share of such funds – violated the federal False Claims Act and the false claims acts of the Plaintiff States.

8.     In addition, with respect to HMS's contract with the State of New York's Medicaid Agency, the New York Office of the Medicaid Inspector General ("NY OMIG"), HMS's improper practices and violations of law included its failure to refund certain policy "add" fees to NY OMIG as it was required to do by contract.  These improper practices violated not only numerous federal and state laws and regulations and HMS's contract with NY OMIG but also – by concealing, avoiding or decreasing an obligation to pay or transmit Medicaid funds back to the State of New York, and in turn the federal government – violated the federal False Claims Act and the New York False Claims Act.

9.     In the course of providing its services, HMS typically provided monthly written reports to, and also had periodic in-person meetings with, the Plaintiff States regarding HMS's performance.  HMS knowingly made false statements in these reports and meetings, consisting of both affirmative misstatements about, and failure to disclose material information about, its recoveries and performance, enabling HMS to conceal, avoid or decrease its own obligations to the Plaintiff States and to cause the Plaintiff States to impair their obligations to the federal government.

10.     Relator brought his concerns about these practices to the attention of senior management of HMS on numerous occasions. He did so in an effort to cause HMS to cease activities that were violations of the federal FCA, the false claims acts of the Plaintiff States and other laws.  Despite Relator's initial hopes that senior management would take corrective

actions to address these violations of law in an effective manner, he found that the problems continued unabated, and he continued to raise his concerns with senior management. HMS senior management not only neglected to take meaningful corrective measures to address the problems that Relator raised concerns about; they decided to punish the whistleblower.  HMS took a series of retaliatory actions against Relator that ultimately culminated in his termination in May 2013.  (However, relator is not making any claim for retaliation in this complaint).  Upon information and belief, HMS's improper practices and violations of law continued past the time of Relator's termination and likely continue today.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the Government's claims pursuant to 28 U.S.C. §§ 1331 and 1345.

12.     This Court may exercise personal jurisdiction over HMS because a substantial part of the acts giving rise to the Government's claims occurred within the State of Texas.

13.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and 1391(c) because HMS transacts business in this District and/or has committed violations of the False Claims Act in this District.

## THE PARTIES

14.     Defendant Health Management Systems, Inc. is a New York corporation with its principal place of business in Dallas County, Texas and offices in several of the Plaintiff States.

15.     Relator Christopher Frey is a resident of Texas.

16.     Relator brings this action on behalf of the Government pursuant to the *qui tam*

provisions of the federal False Claims Act, 31 U.S.C. § 3729 – 3733, and the false claims acts

of the respective Plaintiff States.

## STATUTORY BACKGROUND

**A.  Medicaid and Third Party Liability.**

17.     The Medicaid statute, 42 U.S.C. §§ 1396 et seq., establishes a cooperative

federal-state program under which the federal government partly funds state programs that

provide medical assistance to individuals "whose income and resources are insufficient to

meet the costs of necessary medical services." *Id.* § 1396-1. To participate in the Medicaid

program, a state must submit a plan for medical assistance that conforms to the requirements

of the Medicaid statute. *See id.* § 1396a; 42 C.F.R. § 430.10. Once a state Medicaid plan is

approved, the federal government shoulders a substantial fraction (somewhere between half

and three-quarters, depending on the state) of state Medicaid outlays. *See Arkansas Dept. of*

*Health & Human Services v. Ahlborn,* 547 U.S. 268, 275 (2006).

18.     In some instances, a Medicaid beneficiary will receive coverage through

Medicaid even though a third party is also liable for the costs of the covered medical care or

prescription. This can occur, in but one example, when a child's parents have separated but

the child remains covered by insurance that one parent receives through the workplace. If

the child's other parent is Medicaid-eligible, the child will generally, as a practical matter,

receive coverage through Medicaid.

19.     Medicaid, however, is supposed to be the payor of last resort. See H.R. Conf.

Rep. 109-362, at 308 (2005) ("In general, federal law requires Medicaid to be the payor of

last resort, meaning that all other available third parties must meet their legal obligation to pay claims before the Medicaid program pays for the care of an individual."). A Medicaid-eligible person's private insurance must therefore pay for any covered medical care before Medicaid will foot the bill.   However, a problem arises when a Medicaid beneficiary does not identify himself or herself as the beneficiary of a private insurance plan when he or she seeks medical care or prescription medications.  In those instances, the practice of most state Medicaid agencies and MCOs is to disburse payments for the treatment and later seek reimbursement from any other private parties—known as "liable third parties"—that are responsible for the covered individual's medical expenses. *See* 42 U.S.C. § 1396a(25)(B) (state Medicaid agencies must "seek reimbursement for [their medical] assistance" from liable third parties); 42 C.F.R. § 433.139(d).

20.     Federal regulations require that if a state Medicaid agency learns of the existence of a liable third party, or benefits otherwise become available from a third party, after a claim has been paid with Medicaid dollars, the state agency must seek recovery or reimbursement within 60 days after the end of the month in which it learns of the existence of the liable third party, or in which third party benefits have become available.  *See* 42 C.F.R. §433.139.

21.     Federal regulations also require state Medicaid plans to provide for the legal liability of liable third parties to pay for the reasonable costs of medical care or services provided to a beneficiary through the Medicaid program.  *See generally* 42 C.F.R. §§ 433.135, 433.139.  Thus, the Medicaid plans of the Plaintiff States establish an obligation on the part of a liable third party to reimburse the Plaintiff State for these funds.

### B. The False Claims Act.

22.    In relevant part, the FCA at 31 U.S.C. § 3729(a)(1)(G) establishes treble

damages liability to the United States for any individual or entity that:

> knowingly conceals or knowingly and improperly avoids or decreases an
> obligation to pay or transmit money to the Government.

This particular liability to the United States, known as a "reverse false claim," results not from

improper payment by the government to the defendant, but instead results in no payment to the

government when a payment is obligated. *Hicks v. D.C.*, 183 F. Supp. 3d 159, 160–61 (D.D.C.

2016). Following the 2009 amendments to the False Claims Act, it is no longer imperative for

a plaintiff to identify a false record or statement in order to prevail on a reverse false claim

theory of liability. *United States v. Crumb,* No. CV 15-0655-WS-N, 2016 WL 4480690, at *15

(S.D. Ala. Aug. 24, 2016); *see also* Handwerker et. al*., Congress Declares Checkmate: How the*

*Fraud Enforcement and Recovery Act of 2009 Strengthens the Civil False Claims Act and*

*Counters the Courts,* 5 J. Bus. & Tech. L. 295, 312 (2010) at 312 (explaining that the second

prong of the revised Section 3729(a)(l)(G) does not require creation or use of a false record for

liability).[3]

23.    In 2011, the Fifth Circuit clarified that the obligation to the government need

not be an obligation of the defendant; rather, the defendant's causing a third party to

conceal, avoid or decrease the third party's obligations to remit money to the government

also constitutes a reverse false claims violation. *U.S. v. Caremark, Inc.,* 634 F.3d 808, 817

---

[3] Even though a false statement is no longer required for liability under this prong of the FCA, Relator nonetheless alleges that HMS continuously made numerous types false statements to the government, as described below.

(5th Cir. 2011).  *See also United States ex rel. Landis v. Tailwind Sports Corp.,* 160 F. Supp. 3d 253, 260 (D.D.C. 2016).  The *Caremark* case refers to this as an "indirect reverse false claim".  *See Caremark,* 634 F.3d 808 at 815.

      24.    As mentioned above, the states have a legal duty to seek reimbursement from a third party for individuals whose medical care or prescription has been paid by Medicaid but who are also covered by other insurance. 42 U.S.C. § 1396a(a)(25)(A) (requiring the states to "take all reasonable measures to ascertain the legal liability of third parties" and to seek reimbursement for medical assistance to the extent of any third party's legal liability). The federal regulations governing Medicaid TPL also obligate the states to return to the federal government the federal share of funds that are recovered from third parties.  42 C.F.R. § 433.140  ("If the State receives FFP in Medicaid payments for which it receives third party reimbursement, the State must pay the Federal government a portion of the reimbursement ...."). As the Fifth Circuit has explained, these requirements impose an obligation on the states to the federal government.  *See Caremark,* 634 F.3d at 817.  Causing another party to impair its obligations to the federal government is a violation of the False Claims Act under 31 U.S.C. § 3729(a)(1)(G).  *Id.*  Accordingly, causing a state to keep federal Medicaid funds to which it would not otherwise be entitled impairs the state's obligations to the federal government and is a violation of the federal False Claims Act.  *See id.*

      25.    As one federal court has pointed out, the indirect reverse false claims analysis in the *Caremark* opinion is not merely dicta but is the holding of a court.  *See, e.g., United States ex rel. Landis v. Tailwind Sports Corp.,* 51 F. Supp. 3d 9, 60 (D.D.C. 2014), *on*

*reconsideration in part,* 160 F. Supp. 3d 253 (D.D.C. 2016*), and clarified on denial of*

*reconsideration,* No. 1:10-CV-00976 (CRC), 2016 WL 3197550 (D.D.C. June 8, 2016).

Other federal courts have cited *Caremark's* indirect reverse false claims analysis with

approval and have applied it to other situations in which the defendant was alleged to have

caused a third party to impair or decrease its obligation to the government. *See, e.g, Landis*

*v. Tailwind Sports Corp.,* 51 F. Supp. 3d 9, at 60 ("Congress's use of the indefinite article

certainly supports the interpretation that the scope of the statute is not limited to instances

where the person seeks to 'conceal, avoid or decrease' his own obligation, as opposed to any

obligation."); *U.S. ex rel. Spay v. CVS Caremark Corp.,* 913 F. Supp. 2d 125, 172 (E.D. Pa.

2012) (referring to the *Caremark* holding on indirect reverse false claims as a "highly

persuasive decision"); *United States ex rel. Wallace v. Exactech, Inc.,* No. 2:18-CV-01010-

LSC, 2020 WL 4500493, at *21 (N.D. Ala. Aug. 5, 2020) ("As the Fifth Circuit has

recognized, the language of § 3729(a)(1)(G) does not require that the [false] statement

impair the defendant's obligation; instead, it requires that the statement impair an obligation

to pay or transmit money or property to the government. This Court is persuaded by the

Fifth Circuit's reasoning and finds that such indirect reverse false claims may give rise to

liability.") (internal quotation marks and citation omitted).

26.     The points from *Caremark's* application of the indirect reverse false claims

analysis in the Medicaid context can be summarized as follows:

- The states have a legal duty to return federal Medicaid funds if they are able
  to recover from third parties.

FALSE CLAIMS ACT FIRST AMENDED COMPLAINT – Page 12 OF 64

- The states also have a legal duty to seek reimbursement from a third party for individuals who have other coverage.

- These requirements impose an obligation on the states to the federal government.

- A person's false statements or wrongful acts that prevent the states from fulfilling either or both of those obligations cause the states to keep federal Medicaid funds to which they would not otherwise be entitled and thus impairs the states from fulfilling their obligation to the government.

*See Caremark,* 634 F.3d at 817.

27.     As a subcontractor to the Plaintiff States, HMS was responsible to carry out the Plaintiff States' obligation to the federal government to seek or obtain reimbursement from a liable party in accordance with the TPL regulations, when Medicaid funds have been expended.  HMS's knowing failure to bill claims timely or at all, as described further below, caused the Plaintiff States to impair this obligation to the federal government.  Further, HMS's knowing failure to bill TPL claims timely or at all caused  the Plaintiff States to impair their obligations to refund Medicaid funds to the federal government that should have been recovered from liable third parties but that were not recovered.

28.     HMS's knowing failure to bill hundreds of thousands of TPL claims timely or at all also violated its contracts with the Plaintiff States, and concealed, avoided and decreased its obligations to obtain recoveries of Medicaid funds and transmit them to the Plaintiff States.

29.     HMS's knowing failure to upload coverage information to the MMIS timely or at all, as described further below, also caused the Plaintiff States to impair their obligation to the federal government to seek or obtain reimbursement from a liable party in accordance with the TPL regulations when Medicaid funds have been expended.  Further, HMS's knowing failure to upload coverage information to the MMIS timely or at all caused the Plaintiff States' to impair their obligations to refund Medicaid funds to the federal government that should have been recovered from liable third parties but that were not recovered.

30.     Further, an obligation to the government arises under 31 U.S.C.  § 3729(a)(1)(G) when a party knows it has received funds to which it was not entitled and retains the funds instead of returning them. *United States ex rel. Stepe v. RS Compounding LLC,* 325 F.R.D. 699, 709 (M.D. Fla. 2017).  More specifically, as the Patient Protection and Affordable Care Act provides, any person who has received an overpayment from Medicaid and knowingly fails to report and return it within 60 days after the date on which it was identified has committed a reverse False Claims Act violation. *Kane ex rel. U.S. v. Healthfirst, Inc.,* 120 F. Supp. 3d 370, 381, 389 (S.D.N.Y. 2015) (noting that this is an "unforgiving rule"); *see* 42 U.S.C. § 1320a–7k(d).  HMS's knowing failure, as described further below, to refund to the State of New York policy "add" fees to which HMS knew it was not entitled violated the False Claims Act.  In addition, HMS's knowingly billing twice for providing the same coverage information in the State of Tennessee and some other Plaintiff States, as described further below, was a "double dip" into Medicaid funds to which

HMS knew it was not entitled, and its knowing failure to return the funds that were doubly charged violated the False Claims Act.

31.     HMS's knowing failure to refund policy add fees when it was required to do so also violated its contract with NY OMIG and the New York False Claims Act.  Courts interpret the New York False Claims Act "by closely tracking judicial interpretation of its federal counterpart."  *Swanson v. Battery Park City Auth.,* 2016 WL 3198309, at *2 (S.D.N.Y. June 8, 2016).

32.     HMS's knowing failure to refund the Medicaid funds that it doubly billed in the State of Tennessee violated the Tennessee Medicaid False Claims Act.  Courts interpret the Tennessee Medicaid False Claims Act in a manner similar to the federal False Claims Act.  *See generally United States v. Chattanooga-Hamilton Cty. Hosp. Auth.,* 958 F. Supp. 2d 846, 864 (E.D. Tenn. 2013).

33.     Within the meaning of the FCA, "knowing" and "knowingly" are defined to include reckless disregard and deliberate ignorance; specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(A).  By so defining these words, Congress has greatly expanded common dictionary definitions of those terms.  *Kane ex rel. U.S. v. Healthfirst, Inc.,* 120 F. Supp. 3d 370, 385 (S.D.N.Y. 2015).

34.     In addition to treble damages, the FCA also provides for assessment of a civil penalty for each violation or each false claim.

35.     Each of the Plaintiff States has enacted statutes that are parallel to the legislative scheme embodied in the FCA.

## FACTUAL ALLEGATIONS

A.      **Overview of HMS and Its Third Party Liability ("TPL") Business.**

36.     HMS is a leading provider of cost containment solutions that are purported to benefit government and commercial healthcare programs. One of the core areas of HMS's business — upon information and belief, responsible for approximately 50% to 75% of HMS's revenues over the last several years – is the provision of TPL Services to state Medicaid agencies and Medicaid MCOs.

37.     TPL refers to the legal obligation of third parties such as group health plans, self-insured plans, managed care organizations, pharmacy benefit managers, workers' compensation, long-term care insurance and Medicare, to pay part or all of the expenditures for healthcare services furnished to an enrollee in a state Medicaid plan. By law, Medicaid is a "payer of last resort," meaning that all other available third party resources must meet their legal obligation to pay claims before the Medicaid program pays for the care of an individual eligible for Medicaid. Accordingly, federal law requires the government agencies administering state Medicaid plans to take measures to ascertain the legal liability of third parties to pay for care and services available under their state's plan.

38.     TPL Services, in turn, consist of activities involved in identifying and verifying alternative forms of coverage available to Medicaid enrollees, updating the state Medicaid agency's eligibility file and automated claims adjudication systems for "cost avoidance" purposes (i.e., to ensure that the future claims properly covered by third-party payers are prospectively denied), and  recovering from liable third parties amounts previously, but erroneously, paid by Medicaid, often referred to as reclamation claims. The

ultimate benefit of these efforts is the ability to use states' limited funds to grant access to Medicaid to more individuals.

39.    Federal law generally allows for the pursuit of reclamation claims from a liable third party for up to 36 months from the date of service to the patient. Federal law and regulations further require that if a state agency learns of the existence of a liable third party, or benefits otherwise become available from a third party, after a claim has been paid with Medicaid dollars, the state agency must seek recovery or reimbursement within 60 days after the end of the month in which it learns of the existence of the liable third party, or in which third party benefits have become available.  *See* 42 C.F.R. §433.139.

40.    A handful of state Medicaid programs conduct TPL efforts on their own or enter into data matching agreements directly with third party contractors.  However, the vast majority of state Medicaid agencies and MCOs choose to employ a single TPL contractor to complete the required matches and to perform all related TPL Services. HMS currently serves as a TPL contractor for approximately 40 to 45 of the Medicaid programs of the 50 states, the District of Columbia, and Puerto Rico.

41.    HMS's services to a state Medicaid agency are governed by a detailed written contract.  Such a contract typically is worth tens of millions of dollars to HMS, and those with the larger state Medicaid agencies such as New York and New Jersey, over $100 million, to HMS.  Under these contracts, HMS typically receives a contingency fee in the amount of a certain percentage of the funds recovered for the state.  In addition, in the State of New York HMS also received an "add" fee each time that it identified a Medicaid patient with newly discovered other coverage.

FALSE CLAIMS ACT FIRST AMENDED COMPLAINT – Page 17 OF 64

**B.**    **HMS's Failure to Bill Claims Timely or At All.**

42.     Relator discovered during the course of his employment with HMS that despite the fact that federal regulations require that TPL claims to a liable third party be submitted within 60 days after the end of the month in which existence of the coverage is identified – a responsibility that HMS assumed under its contracts to provide TPL Services to state Medicaid agencies and MCOs – HMS failed to submit many such claims timely, or at all, to the liable third party.  Relator determined that this practice was ongoing, widespread (likely nationwide)  and voluminous, with Relator estimating that it involved hundreds of thousands of claims and millions if not billions of dollars of Medicaid funds.

43.     Relator learned that this failure by HMS to bill such claims timely was a result of many factors, including an overwhelming volume of claims data to handle (resulting from HMS's growth and its dominance/monopoly of the industry); aged and inadequate IT systems;[4] a lack of competition which results in fewer incentives for HMS to perform its work efficiently and in compliance with federal and state laws and its contractual requirements; a desire to curry favor with insurance carriers, upon whom HMS depends for obtaining coverage data; a desire to manage HMS's workload and revenues (i.e., to keep revenues relatively even from quarter to quarter); and simply a sense of industry or "big

---

[4] There were only so many jobs HMS's mainframe computer could handle at one time, especially if claims for a large state were in the queue. The claims for other states/clients would get put off for weeks if not months, and this often resulted in claims not going out timely or at all.  In addition, sometimes the jobs being run would be plagued by an error and have to be re-run, resulting in further backups and delays.  HMS's CIO informed CEO Bill Lucia that HMS needed to spend $40 million to upgrade the company's systems to meet demand and honor its contractual commitments. However, Mr. Lucia refused to make an expenditure of that size, and HMS's contractual compliance, revenues and recoveries suffered as a result.

business" arrogance and a disregard for the applicable law and regulations, as well as general incompetence. Relator believes that these factors often have mitigated and even overcome what would otherwise be an incentive for HMS to maximize TPL claim recoveries due to its being compensated on a contingency basis.

44.     Relator came to know that HMS also had incentive to bill claims electronically rather than on paper, because costs that HMS incurs for postage, printing and paper reduce HMS's profit under most state agency contracts. Relator learned that most insurance carriers also prefer electronic submissions of claims and discourage hard copy submissions. However, as Relator learned, HMS does not have the IT infrastructure and carrier interfaces needed to enable it to bill many of these claims electronically. Thus, rather than send claims timely to the carriers on paper (which typically results in complaints from the carriers to HMS and which causes HMS to incur more costs), HMS accommodated the carriers' requests to hold claims until they had been put into electronic format and then submit them late, or failed to submit them at all.

45.     Relator also became aware of the fact that in a lesser number of cases, a carrier's own limitations did not allow for the electronic billing of reclamation claims. In those situations, HMS should print the claims on paper and deliver them to the carrier in order to meet its regulatory and contractual obligations to bill claims timely. However, rather than undergoing this effort, HMS in many instances chose simply to put these claims "on hold," sometimes indefinitely or perpetually. Relator learned that HMS Staff/Programmer Peter Vornlocker had found "buckets" of claims, and millions of dollars, that had fallen through the cracks and that HMS had never billed.

FALSE CLAIMS ACT FIRST AMENDED COMPLAINT – Page 19 OF 64

46.     Relator discovered that HMS's billing operations department in fact had affirmative processes in place (sometimes called "carrier holds") for holding claims to certain carriers that should have been billed, which kept entire batches of claims, and millions of dollars, from being ever billed out.

47.     In New York, for example, there were at least two large pharmacy benefit managers (PBMs) for which HMS put thousands of claims "on hold" – Express Scripts and Advanced Paradigm.  Over time, due to carriers' deadlines for filing of claims, these claims eventually become unrecoverable, even if they were eventually billed late in contravention of federal regulations. According to documentation possessed by Relator, at one time in 2010 HMS had "open" claims to two PBMs alone in New York in the aggregate amount of nearly $179 million.  Open claims can include (i) claims submitted but not paid or denied, (ii) claims submitted but not received by the carrier, (iii) claims never billed, and (iv) claims put on hold.  Although it is possible that many claims classified as open at that time were eventually billed and paid, Relator believed that large numbers of these claims were never billed timely, never billed at all and/or put on indefinite hold, costing the State of New York tens of millions of dollars and the entire class of Plaintiff States billions of dollars.

48.     Plaintiff States were rarely if ever informed of these holds.  Because "carrier holds" typically occur after the generation of the billing cycle, this caused HMS's reports of its claims activity that accompanied or were delivered in connection with its invoices to state Medicaid agency clients to be inaccurate and fraudulent – because the reports represented that certain claims had gone out, yet these claims were subsequently made subject to carrier holds.

49.     One illustration of how HMS's failure to bill claims timely or at all was done knowingly is in its handling of claims for the Florida Agency for Health Care Administration ("Florida AHCA"), which was a very large state Medicaid agency client for HMS.  At one point, the contract with Florida AHCA was up for re-bid, and HMS was very surprised to learn that the new contract was awarded to one of HMS's competitors, Affiliated Computer Services, Inc. ("ACS").  (Relator believed that HMS's lackluster performance in billing and collecting claims for Florida AHCA, and its failure to be straightforward with the State of Florida, played a significant role in its loss of the new contract).

50.     Before the term of the then-current contract with Florida AHCA ran out in 2009, HMS kicked into high gear to identify and bill as many third party claims as possible that were not yet stale. This sudden surge in diligence on HMS's part generated tens of millions, if not over $100 million, in recoveries for Florida AHCA and millions of dollars in contingency fees for HMS. HMS's ability to pursue claims to generate contingency fees for itself before its time ran out, and hence to deny these recovery opportunities to its competitor ACS when ACS's contract took effect, underscores how HMS's previous lack of diligence in pursuing claims for its state agency client was knowing on the part of HMS.[5]

---

[5] HMS later used its sudden surge of attentiveness to collecting claims for Florida AHCA, and the resulting reduction of claims recovery opportunities that were left for ACS, to criticize ACS's performance for Florida AHCA compared to its own. With the use of lobbyists before the State of Florida and other persuasive measures, HMS was then able to force ACS to subcontract much of the work back to HMS.

51.     Moreover, it also came to Relator's attention that TPL claims that were not billed timely or at all were not captured or included in the periodic reports that HMS was required to provide to its state Medicaid agency clients.  Under its contracts with most state Medicaid agency clients, HMS is required to formally notify the client if it cannot bill a claim to a carrier.   Relator was concerned about the fact that not only did HMS disregard its obligations to notify state Medicaid agencies and MCOs of its failure to bill claims timely or at all, but it also routinely affirmatively misrepresented to representatives of state Medicaid agency clients – in both written reports and periodic in-person status meetings – that it had billed *all* identified claims on a timely basis.  As mentioned above, HMS's regular engaging in carrier holds caused practically all of its monthly reporting to state Medicaid agency clients to be inaccurate.  HMS did not correct or amend these reports to reflect subsequent carrier holds, and it concealed from state Medicaid agency clients the existence of the requests it received from carriers, and the decisions that it made internally, to perform carrier holds.[6]

52.     As Relator discovered, related to HMS's failure to bill claims timely or at all was its failure also to follow up with carriers to ensure claim payments, to provide additional information requested by carriers so that they can process a claim, and to appeal denied claims that are meritorious.  HMS's contracts with state Medicaid agency clients typically

---

[6] HMS's misrepresentations to Plaintiff State clients that it was timely and effectively billing all identified claims and properly handling all carrier information requests and appeals of denied claims made it more difficult for competitors to vie for providing better TPL services to these Plaintiff State clients and helped HMS obtain a virtual monopoly in this field, which further enabled HMS to continue its mismanagement and wrongdoing in its services for Plaintiff State clients.

require HMS to cooperate to provide additional information regarding a claim whenever requested by the carrier, and to follow the carrier's process for appealing denials of claims by the carrier.  However, Relator realized that HMS usually did not exert the effort to provide requested additional information to carriers or to appeal denied claims.

53.     Relator learned that many claims with carriers were denied for failure to meet the carrier's claim filing deadline.  In some situations where a denied claim actually was submitted timely and in accordance with law and the denial was in error, the denial can be appealed by providing the carrier evidence of the timeliness of the filing.  However, HMS did not have the technical ability to prove timely filing even when it did actually occur. Moreover, HMS failed to disclose to state Medicaid agency clients its lack of capability to appeal these denials and collect the money rightly owing to the clients in these circumstances.  The states were thus unaware of the lost recovery opportunities that HMS's technical and procedural shortcomings produced.

54.     HMS typically did not supplement or correct its reports to state Medicaid agency clients that indicated that these claims had been successfully billed, rebilled or appealed.  Moreover, HMS affirmatively misrepresented to state Medicaid agency clients that it was properly and adequately responding to carrier information requests and appealing wrongly denied claims, and that its processes for doing so was state of the art.  HMS falsely made it appear to state Medicaid agency clients that it was maximizing all potential recoveries when in fact it was falling materially short of doing so.

55.     Relator raised concerns about HMS's failure to bill TPL claims timely or at all, its false reporting to state Medicaid agency clients concerning its billing of TPL claims,

FALSE CLAIMS ACT FIRST AMENDED COMPLAINT – Page 23 OF 64

and its failure to appeal improperly denied TPL claims throughout the time of his employment with HMS, with numerous members of senior management, including Executive Vice President Ron Singh, Executive Vice President and Chief Business Officer Maria Perrin, Vice President of Operations Elena Moiseenko, Senior Vice President Kim Glenn, Vice President David Dawson, and COO Sean Curtin.

56.     In the course of its knowing failure to bill Medicaid reclamation claims timely or at all, its failure to provide carriers requested follow-up information and to appeal improperly denied claims, and its false and fraudulent reporting to the Plaintiff States that it was timely billing, rebilling and appealing these claims, HMS concealed, avoided and decreased its obligations under the TPL regulations to obtain recoveries for the Plaintiff States of Medicaid funds that had been expended for these patients.  Further, this caused the Plaintiff States to suffer a decrease in the recoveries of Medicaid funds that they should have obtained, caused the Plaintiff States to impair their obligations to pay or transmit to the federal government these funds that should have been recovered, and caused the federal government to suffer a decrease in its share of these funds that it would have received to the tune of billions of dollars over the last decade.

**C.     HMS's Failure to Upload Insurance Coverage Information to the Medicaid Management Information System (MMIS).**

57.     When HMS identifies the existence of insurance coverage for a Medicaid enrollee through, for example a data match, federal regulations require that the individual's insurance coverage information be loaded onto the Medicaid information systems that the state agencies are required to maintain (known as the Medicaid Management Information

System, or MMIS). Federal regulations require that this information must be loaded within 45 days from the time that the insurance coverage is discovered.

58.     The same duty to upload coverage information to the MMIS within 45 days also arose when HMS periodically performed credit balance audit for state Medicaid agency clients.  In a credit balance audit, HMS is engaged to review a state agency client's Medicaid payment history to a certain provider of services for a defined previous period of time, usually 36 months, to identify situations where the provider was paid by two or more payers (such as a group health insurance plan and Medicaid) for the same service.  Because of the high number of Medicaid providers in each state, credit balance audits typically target large providers such as acute care hospitals.  Multiple payments to the provider for the same service result in a "credit balance" on the provider's books.  HMS is then required to pursue a refund of the Medicaid payment from the provider, and receives a percentage of any amount recovered. As with a TPL data match, credit balance audits thus identify situations where a Medicaid enrollee is covered by other insurance (previously unknown to the state) such as a group health plan, and this coverage information must be uploaded to the MMIS within 45 days.

59.     In both the TPL data match and the credit balance audit scenarios, loading identified coverage  information to the MMIS is important not only so that the Medicaid dollars that have already been spent on the patient are recovered, but also so that additional Medicaid dollars will not be spent in the future on a patient who is covered by insurance.  As the party responsible for handling this function for each of its state Medicaid agency clients, HMS was required to follow the federal regulations requiring MMIS upload of applicable

coverage information within 45 days. A data match for a large state agency client typically will reveal a high volume of "leads," usually more than 100,000, for potential third party coverage.  HMS must then have the resources and capability to validate, format, and upload this information to the MMIS timely in accordance with the law.  However, due to its virtual monopoly over the TPL industry and the sense of impunity that came along with it, HMS knowingly failed to allocate the proper resources to comply with the law on behalf of Plaintiff States.

60.     It came to Relator's attention that when performing data matches and credit balance audits for state Medicaid agency clients, HMS failed to perform these functions and load the insurance carrier liability information onto the MMIS for thousands of patients within the 45 day timeframe required, and in many cases never loaded it at all.  Relator determined that HMS's ongoing and nationwide failure to upload coverage information to the MMIS timely or at all violated the terms of HMS's contracts with its various state Medicaid agency clients.

61.     The federal government provides hundreds of millions of dollars to states to help them develop systems such as the MMIS that are intended to be functional for saving taxpayer funds.  As a condition to receiving these funds, states must certify to the federal government that the systems are operating properly and in accordance with the law.  As a vendor performing TPL services for most of the states, HMS makes certification to the states that it is complying with the law on their behalf, and the states rely on these certifications in order to make their own certifications to the federal government.  HMS regularly certified or

reported falsely to state agency clients that third party coverage information that it had newly identified was timely loaded onto the MMIS.

62.     By its knowing failure to upload coverage information to the MMIS timely or at all, and its regular false certifications and reporting to state Medicaid agency clients that it actually was timely uploading all such information, HMS concealed, avoided and decreased its obligations under the TPL regulations to obtain recoveries for the Plaintiff States of Medicaid funds that had been expended for these patients.  This caused the Plaintiff States to suffer a decrease in the recoveries of Medicaid funds that they should have obtained, caused the Plaintiff States to impair their obligations to pay or transmit to the federal government these funds that should have been recovered, and caused the federal government to suffer a decrease in its share of these funds that it would have received.  In addition, HMS's failure caused, in Relator's estimation, tens of millions of dollars of additional Medicaid funds to be spent by state Medicaid agencies and MCOs unnecessarily on patients who are covered by insurance.  This later enabled HMS to collect contingency fees for filing (or in many cases, merely claiming to have filed) claims for these expenditures with liable third parties.

63.     Relator expressed his concerns about HMS's failure to upload coverage information to the MMIS to Senior Vice President Kim Glenn, Executive Vice President Ron Singh and Vice President David Dawson, among others.

        **D.      HMS's Failure to Refund Policy "Add" Fees Under Contract with State of New York.**

64.     The contract that HMS had with the NY OMIG, known as the Medicaid Match and Recovery Contract, that was in effect until early 2009, provided, among other

things, that HMS would receive a $40 "add" fee each time that HMS identified a Medicaid patient with newly discovered other coverage.  The contract also required that HMS refund this add fee to NY OMIG in the event that HMS obtained a recovery from the responsible third party.  This avoided double payments to HMS because when HMS obtained a recovery, it would be paid a percentage of the money recovered from the responsible third party.   In many thousands of cases, HMS did obtain a recovery for NY OMIG from the responsible third party.  However, Relator believed that HMS routinely and knowingly failed to refund the add fee to NY OMIG in such situations, or to even attempt to identify circumstances in which the add fee should be refunded.

66.     These acts violated the requirements of HMS's contract then in effect with NY OMIG.  Knowing that it was violating this contract requirement, HMS nonetheless failed to refund these fees to NY OMIG.  Moreover, HMS's numerous periodic reports that it was required to provide NY OMIG under the contract were false, because HMS knowingly failed to disclose in the reports that while HMS was making recoveries on many of the relevant insurance policies, that it was not refunding the "add" fees that it owed to the state.  These knowing and wrongful acts enabled HMS to keep overpayments of Medicaid funds that it owed to NY OMIG, a portion of which, if recovered by OMIG, were required to be shared with the federal government.

66.     Relator discovered that when HMS's next contract with NY OMIG was finalized, the "add" policy refund provision was no longer included, amounting essentially to a contract price increase benefitting HMS because it allowed HMS to begin keeping policy add fees in situations where HMS obtained a recovery.  Relator believed that HMS

senior management may have persuaded the compromised NY OMIG contract administrator, Jeffrey Flora, to drop the refund requirement from the new contract without knowledge or approval from NY OMIG senior management.[7]  Despite this development with the new contract, HMS continued to have a binding legal obligation to refund policy add fees in situations where it had obtained a TPL recovery under the previous contract.  In other words, the new contract did not extinguish the repayment obligations that had already arisen and were outstanding under the previous contract.

67.     Relator raised his concerns about HMS' wrongful retention of policy add fees that it should have refunded to NY OMIG with Senior Vice President Kim Glenn.

68.     In its failure to refund to the State of New York policy add fees in situations where HMS had obtained a recovery, HMS retained Medicaid funds to which it knew it was not entitled and caused NY OMIG to suffer a decrease of millions of dollars in payments or transmittals of money that NY OMIG would have otherwise received.  This in turn caused the federal government to suffer a decrease of hundreds of thousands of dollars in payments or transmittals of money in the form of its share of those funds.

E.     **HMS's Failure to Refund Fees Obtained from Charging Twice for Providing the Same Information Under Its So-Called "Tennessee Model".**

69.     HMS charges its state Medicaid agency clients for providing them information regarding liable third parties relating to Medicaid patients.  A state Medicaid

---

[7] In 2015, NY OMIG and New York's Joint Committee on Public Ethics (JCOPE) found HMS to have violated the New York State Public Officers Law and New York's Lobbying Act by providing lavish entertainment and gifts to Mr. Flora, and offering him a high-level job which he accepted (the offer was withdrawn after news of it was published in the *Albany Times-Union* newspaper), all while Mr. Flora was NY OMIG's administrator over its contract with HMS.

FALSE CLAIMS ACT FIRST AMENDED COMPLAINT – Page 29 OF 64

agency client typically purchases this information from HMS within the first several months of the patient obtaining Medicaid eligibility and being added to the state's Medicaid eligibility file. The possession of this information can aid a state Medicaid agency client in future cost avoidance by helping it not to expend Medicaid funds on a patient who has other insurance coverage. The state Medicaid agency clients in turn share this coverage information with MCOs, which as described above are private entities contracted by some states to provide Medicaid services to patients in exchange for a fee or premium from the state.  However, as Relator discovered, HMS sells the very same third party liability information directly to many of the Medicaid MCOs as well – even though the Medicaid MCOs are already receiving this information from state Medicaid agency clients and thus do not need to pay HMS for it.  Both the state Medicaid agency clients and the Medicaid MCOs pay for the information with Medicaid funds. Thus, Relator determined that HMS is essentially charging the relevant Plaintiff States twice for providing the same information to parties who are already sharing the information.

70.    The selling of this information twice to parties who already share it not only provides an inappropriate windfall to HMS – but it also artificially inflates premiums paid by the states with Medicaid funds (and hence ultimately by the federal government) to MCOs. The states review MCOs' historic cost data in order to set future premium rates that the states pay the MCOs for the MCOs' provision of Medicaid services to patients. Relator believes that the inflated costs that the MCOs show on their books, due to unnecessarily being charged by HMS for information that they are already receiving from the states, has

resulted in higher premiums paid to MCOs by the state Medicaid agency clients with Medicaid dollars.

71.     HMS's "double dipping" from Medicaid dollars in this manner has become so lucrative for HMS that it has even earned a nickname within the company – as the "Tennessee Model" because it is particularly prevalent in the State of Tennessee, where the Bureau of TennCare is HMS's state Medicaid agency client. (Because the State of Tennessee administers its Medicaid program 100% through MCOs, one of HMS's primary sources of revenue from the State of Tennessee is selling third party liability information to the state). Relator conservatively estimates that HMS has been paid more than $30 million from this practice in Tennessee and also profits significantly from this practice in other states.

72.     Relator raised concerns about these issues on a number of occasions with Vice President David Dawson.  Relator also shared his concerns with colleague James Finley, who was a Project Leader for HMS for Tennessee and Georgia, and who appeared to Relator to share his discomfort about the "Tennessee Model."

73.     In its failure to refund to the State of Tennessee the funds it received from billing twice for providing the same information to parties who already shared it, HMS retained Medicaid funds to which it knew it was not entitled and caused the Bureau of TennCare and other relevant Plaintiff States to suffer a decrease of hundreds of thousands of dollars in payments or transmittals of money that they would have otherwise received.  This in turn caused the State of Tennessee and the other relevant Plaintiff States to impair their obligations to pay or pay or transmit these funds to the federal government, and caused the

federal government to suffer a decrease of hundreds of thousands of dollars in payments or transmittals of money in the form of its share of those funds.

F.     **Additional Details of Relator's Whistleblowing Activities.**

74.     One of the first times that Relator expressed concerns to senior management about HMS's failure to bill Medicaid reclamation claims timely or at all was in early 2009, when he approached his supervisor at the time, Executive Vice President Ron Singh.  Mr. Singh encouraged Relator to share his concerns with Executive Vice President and Chief Business Officer Maria Perrin, to whom Mr. Singh reported.  Relator brought these matters up with Ms. Perrin in March 2009 when both were on a car ride from the airport in Albuquerque to Santa Fe, New Mexico, to attend a client meeting.

75.     Relator also raised his concerns about these matters to Vice President of Operations Elena Moiseenko and COO Sean Curtin both before and after his conversation with Ms. Perrin, and over time with every other supervisor Relator had during his employment with HMS, including Senior Vice President Kim Glenn and Vice President David Dawson.  Relator raising his concerns with Ms. Moiseenko, Ms. Perrin and Mr. Singh in particular are documented by emails.  At various times Relator also expressed concern to senior management about the "holds" that HMS was placing on claims to large PBMs (and other carriers such as Tri-Care) in New York and other Plaintiff States.

76.     Following the discussion that Relator had with Ms. Perrin during the car ride to Santa Fe about HMS's billing problems, an email from Ms. Perrin to Relator, on which Mr. Singh was cc'ed, memorialized the fact that this conversation took place.  The email mentioned that Ms. Perrin had since discussed these matters with VP Elena Moiseenko and

Sean Curtin, another HMS executive. The email says that Ms. Moiseenko and Mr. Curtin

acknowledged the billing problems about which Relator was raising concerns and also gave

Relator assurances that they would be addressed.

77.     In addition, some time after Relator raised concerns about these practices

with Ms. Perrin and Ms. Moiseenko, a large off-site HMS management meeting was held,

during which a video was played for those in attendance.  In the video, Ms. Moiseenko

revealed the findings of research that her team had conducted into these matters after Relator

had brought the matters to her attention.  Ms. Moiseenko actually acknowledged in the video

that claims were not being billed timely or at all, and that this was a nationwide issue

impacting many HMS clients and a large volume of claims.

78.     However, as time passed Relator realized that neither Ms. Moiseenko nor any

other members of senior management ever took significant action beyond the video and the

meeting to rectify these problems. Although in response to Ms. Moiseenko's findings, HMS

may have identified some claims that could still be billed timely and proceeded to bill them,

the problem essentially continued unabated.  Moreover, after learning of these problems,

senior management did not go back to state Medicaid agency clients and disclose to them

that many claims had not been submitted by HMS, and had eventually been forfeited due to

lack of timeliness, despite the company's regular representations to state Medicaid agency

clients that all claims were being billed timely, and the company's failure to disclose to state

Medicaid agency clients that many claims were in fact not being billed timely or at all.

79.     Relator again alerted senior management to the problems about claims not

being filed timely or at all in the 2010 Strategic Plan that Relator prepared.  Although this

FALSE CLAIMS ACT FIRST AMENDED COMPLAINT – Page 33 OF 64

Strategic Plan focused in particular on Relator's territory, which included Texas, the problems that he mentioned were prevalent in all states in which HMS provided TPL services.  This plan was prepared in September 2009 and, as was typical for the strategic plans prepared by all Regional Vice Presidents, would have been reviewed thoroughly by Mr. Singh, Ms. Perrin, Ms. Glenn, and CEO William Lucia.  In fact, it documented that Relator emailed the 2010 Strategic Plan to Mr. Singh and that Mr. Singh forwarded it to other senior management.  Relator also raised these issues in other strategic plans each year.

80.     This Strategic Plan prepared by Relator, among other things, listed a number of recommendations and assumptions for increasing HMS's recoveries and revenue.  In one line item, he recommended, "Ensure all billings are transmitted, received & adjudicated by carriers timely" and commented, "must ensure claims don't fall into black hole."  In another line item, he advised, "Rebill all OPEN claims older than 3 months up to 36 months from DOS" [date of service] and comments, "Must ensure claims are removed from black hole".  This comment related to Relator's concerns about the large number of claims to PBMs in various states that HMS's Yield Management Group was holding in "open" status.

81.     This Strategic Plan also included a recommendation from Relator for a "Full Medco, Caremark, Wellpoint, etc. rebilling" and noted, "Large TX PBMs potentially not fully billed".   Relator was noting his concerns about claims to PBMs not going out timely or at all, and was suggesting that HMS conduct a catch-all billing of all open claims within 36 months from the date of service (the extent which is permitted under the Deficit Reduction Act) for the benefit of HMS's clients.

FALSE CLAIMS ACT FIRST AMENDED COMPLAINT – Page 34 OF 64

82.     Relator also recommended, "Resolve Tri-Care Recovery Issues."  An accompanying comment stated, "Previously a good payer has not [sic] dropped off."  This comment contained a typo in which "not" was intended to read "now."  The fact that recoveries from this carrier had fallen so much was an indicator to Relator that HMS was having serious issues with sending bills to this carrier timely or at all and was thereby out of compliance with federal regulations.  To Relator, Tri-Care was a major recovery opportunity for most states because of its relation to U.S. military service, but millions of dollars went unrecovered for many HMS state Medicaid agency clients.

83.     Finally, this plan included Relator's recommendation to "Ensure all cycle edits to ensure accuracy" and his comment that "Recovery opportunities may be currently cleaned."  "Cleaned" refers to certain claims that do not go out because of automatic edits performed monthly by HMS's computer system – what Relator's comments referred to as "cycle edits".  If the HMS system did not recognize a procedure code or diagnosis code in a claim or line item of a claim, then the claim or line item will be dropped by the system, and the claim will not go out.  Accordingly, the goal of Relator's recommendation was to encourage HMS to review these cycle edits performed by the system and thereby hopefully reduce the number of claims being "cleaned" each month, in order to maximize recoveries for HMS's state Medicaid agency clients and to comply with federal Medicaid regulations. Relator believed that most if not all HMS state Medicaid agency clients were unaware or uninformed about the extent of HMS cleans.

84.     HMS's failure to bill TPL claims timely or at all is also reflected in a variance report that Relator submitted to his then-supervisor, David Dawson, for the first

quarter of 2012.   A variance report was a brief explanation that Relator was required to submit every quarter if there had been a substantial decline in revenue in his territory(ies). As in many similar such reports, Relator attributed the missed revenue to HMS's delays in billing claims.  This particular report indicated, "Large billings finally on the street but delay impacted December & January yield…."  Although this specific observation related to Relator's territory of Texas,[8] the issue was endemic throughout HMS's performance of services to all the Plaintiff States.

85.      Relator's actions and reputation as a whistleblower were well known to every supervisor that he had (including his supervisor at the time of termination, Vice President David Dawson), as well as all other key members of senior management who would potentially have had a say in Relator's termination, including without limitation Executive Vice President and Chief Business Officer Maria Perrin, and Vice President of Operations Elena Moiseenko. The facts that CEO William Lucia had a seemingly close relationship with Relator's last supervisor, David Dawson, that Ms. Perrin (to whom Relator had relayed his concerns during the car ride) reported directly to Mr. Lucia, and that Mr. Lucia refused to grant Relator an audience when Relator requested it, all indicated to Relator that Mr. Lucia also was well aware of Relator's reputation as a whistleblower.

86.      Over time Relator began to realize that some members of senior management not only appeared to be taking insufficient corrective action in response to the concerns he raised, but also were beginning to ostracize and demote him as a result.

---

[8] HMS's services to the State of Texas are not a subject of this particular complaint.

FALSE CLAIMS ACT FIRST AMENDED COMPLAINT – Page 36 OF 64

87.     The fact that HMS's failure to bill TPL claims timely or at all continued to be unrectified is underscored in a 2014 email from Elena Moiseenko, the HMS executive featured in the video and other email mentioned above, to Sean Curtin, who had been HMS's COO.  At this time, both Ms. Moiseenko and Mr. Curtin had left HMS to join competitor Public Consulting Group, Inc. ("PCG").  Relator believed that the purpose of this email was to collaborate on gathering information about HMS and its performance that could be used for PCG's benefit in restarting its TPL business.  From the subject line it is apparent that the email contains a list of items and information that Ms. Moiseenko wanted to "gather".  Included in this list is "Cycle edits – what does HMS clean from billing," which Relator believes refers to the same types of cycle edits and cleans described above that HMS implemented in order to purge from its computer system TPL claims that were not billed timely or at all.

88.     As a result of the knowing and wrongful acts of HMS identified by Relator in HMS's performance of its contracts for the Plaintiff States, the Plaintiff States have suffered a collective decrease of billions of dollars in payments or transmittals of money that such state Medicaid agencies and MCOs would have otherwise received,[9] the Plaintiff States' obligations to pay or transmit the federal government's share of this money have been impaired, and the federal government has suffered a decrease of hundreds of millions,

_____

[9] A 2013 report by the Office of Inspector General of the U.S. Department of Health and Human Services found that the general problem of uncollected TPL claims put $4 billion of Medicaid funds potentially at risk, among a collective 44 states that reported such information.  *Medicaid Third-Party Liabilities Increased, But Challenges Remain,* Department of Health and Human Services Office of Inspector General, OEI-05-11-00130, at 12 (January 2013), *available at* https://oig.hhs.gov/oei/reports/oei-05-11-00130.pdf.

potentially billions, of dollars in payments or transmittals of money that such state Medicaid agencies and MCOs would have been required to share with the federal government.

89.     In addition, as a result of the knowing and wrongful acts identified by Relator with respect to HMS's failure to refund policy add fees when required under its contract with NY OMIG, HMS has failed to fund overpayments of Medicaid funds as required by law; NY OMIG has suffered a decrease of hundreds of thousands of dollars in payments or transmittals of money that NY OMIG would have otherwise received; NY OMIG's obligation to pay or transmit the federal government's share of this money has been impaired; and the federal government has suffered a decrease of hundreds of thousands of dollars in payments or transmittals of money that NY OMIG would have been required to share with the federal government.

90.     Further, as a result of the knowing and wrongful acts identified by Relator with respect to HMS's failure to refund the proceeds of its billing twice for the same coverage information under its "Tennessee Model" in the State of Tennessee and some other Plaintiff States, HMS has failed to refund overpayments of Medicaid funds as required by law; the Bureau of TennCare and the Medicaid agencies of the other relevant Plaintiff States have suffered a decrease of hundreds of thousands if not millions of dollars in payments or transmittals of money that they would have otherwise received; the obligations of the Bureau of TennCare and the Medicaid agencies of the other relevant Plaintiff States to pay or transmit the federal government's share of this money have been impaired; and the federal government has likewise suffered a decrease of hundreds of thousands if not millions of dollars in payments or transmittals of money that the Bureau of TennCare and the

Medicaid agencies of the other relevant Plaintiff States would have been required to share with the federal government.

<u>**COUNT 1**</u>

**VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT:**
**FAILURE TO BILL TPL CLAIMS TIMELY OR AT ALL –**
**DECREASING OBLIGATIONS TO TRANSMIT MONEY TO THE GOVERNMENT**
**31 U.S.C. § 3729(a)(1)(G)**

91.     Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

92.     Relator seeks relief against Defendant under Section 3729(a)(1)(G) of the FCA, 31 U.S.C. § 3729(a)(1)(G).

93.     In providing Medicaid TPL services to the Plaintiff States, HMS failed to bill TPL claims timely or at all, failed to provide carriers requested follow-up information regarding certain filed claims, failed to appeal improperly denied claims, and submitted false and fraudulent reporting to the Plaintiff States, thereby reducing the recovery of Medicaid funds that the Plaintiff States should have recovered from liable third parties, causing the Plaintiff States to decrease their obligation to pay or transmit funds to the federal government that should have been recovered, and preventing the federal government from receiving its share of such funds that should have been recovered.

94.     Accordingly, Defendant knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the federal government, and caused the Plaintiff States to impair their obligations to pay or transmit money to the federal government, in violation of 31 U.S.C. § 3729(a)(1)(G).

<u>FALSE CLAIMS ACT FIRST AMENDED COMPLAINT – Page 39 OF 64</u>

95.     By reason of Defendant's knowing and wrongful actions, the United States has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each violation.

## COUNT 2

**VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT:
FAILURE TO UPLOAD COVERAGE INFORMATION TO MMIS  –
DECREASING OBLIGATIONS TO TRANSMIT MONEY TO THE GOVERNMENT
31 U.S.C. § 3729(a)(1)(G)**

96.     Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

97.     Relator seeks relief against Defendant under Section 3729(a)(1)(G) of the FCA, 31 U.S.C. § 3729(a)(1)(G).

98.     In providing Medicaid TPL services to the Plaintiff States, HMS failed to upload to the MMIS timely or at all the third party coverage information that it had identified, and submitted false and fraudulent certifications to the Plaintiff States, thereby reducing the recovery of Medicaid funds that the Plaintiff States should have recovered from liable third parties, causing the Plaintiff States to impair their obligations to pay or transmit funds to the federal government that should have been recovered, and preventing the federal government from receiving its share of such funds that should have been recovered.

99.     Accordingly, Defendant knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the federal government, including causing the Plaintiff States to impair their obligations to pay or transmit money to the federal government, in violation of 31 U.S.C. § 3729(a)(1)(G).

100.     By reason of Defendant's knowing and wrongful actions, the United States has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each violation.

### COUNT 3

**VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT:**
**FAILURE TO REFUND POLICY "ADD" FEES  –**
**DECREASING OBLIGATIONS TO TRANSMIT MONEY TO THE GOVERNMENT**
**42 U.S.C. § 1320a–7k(d) and 31 U.S.C. § 3729(a)(1)(G)**

101.     Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

102.     Relator seeks relief against Defendant under 42 U.S.C. § 1320a–7k(d) and Section 3729(a)(1)(G) of the FCA, 31 U.S.C. § 3729(a)(1)(G).

103.     In providing Medicaid TPL services to the State of New York, Defendant failed to refund policy "add" fees as required by its contract with the state in situations where it obtained a TPL recovery, a portion of which fees the State of New York would be required to remit to the federal government if recovered.

104.     In its failure to refund to the State of New York policy "add" fees to which Defendant knew it was not entitled, HMS knowingly and improperly caused the State of New York to impair its obligation to pay or transmit money to the federal government in violation of 42 U.S.C. § 1320a–7k(d) and 31 U.S.C. § 3729(a)(1)(G), and thereby preventing the federal government from receiving its share of such funds that should have been recovered.

105.    By reason of Defendant's knowing and wrongful actions, the United States has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each violation.

## COUNT 4

**VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT:
FAILURE TO REFUND FEES OBTAINED
FROM CHARGING TWICE FOR PROVIDING THE SAME INFORMATION –
DECREASING OBLIGATIONS TO TRANSMIT MONEY TO THE GOVERNMENT
42 U.S.C. § 1320a–7k(d) and 31 U.S.C. § 3729(a)(1)(G)**

106.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

107.    Relator seeks relief against Defendant under 42 U.S.C. § 1320a–7k(d) and Section 3729(a)(1)(G) of the FCA, 31 U.S.C. § 3729(a)(1)(G).

108.    Defendant's knowingly billing twice for providing the same coverage information in the State of Tennessee and some other Plaintiff States, as described further below, was a "double dip" into Medicaid funds to which Defendant knew it was not entitled.

109.    Defendant knowingly failed to refund the proceeds of "double dipping" into Medicaid funds from billing the State of Tennessee and certain other Plaintiff States on the one hand, and MCOs on the other hand, twice for the same coverage information that they already shared, a portion of which refunds the State of Tennessee and other Relevant Plaintiff States would be required to remit to the federal government if recovered.

110.    In its failure to refund these double-dipped Medicaid funds to which Defendant knew it was not entitled, Defendant knowingly and improperly caused the State of Tennessee and certain other Plaintiff States to impair the performance of their obligation

to pay or transmit money to the federal government in violation of 42 U.S.C. § 1320a–7k(d) and 31 U.S.C. § 3729(a)(1)(G), and thereby prevented the federal government from receiving its share of such funds that should have been recovered.

111.    By reason of Defendant's knowing and wrongful actions, the United States has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each violation.

## COUNT 5

### VIOLATIONS OF THE ARKANSAS MEDICAID FRAUD FALSE CLAIMS ACT, ARK. CODE ANN. §§ 20-77-901 – 20-77-911

112.    This is a claim for treble damages and civil penalties under the Arkansas Medicaid Fraud False Claims Act, Ark. Code Ann. §§ 20-77-901 – 20-77-911.  Relator realleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

113.    Defendant violated the Arkansas Medicaid Fraud False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly and improperly failing to bill TPL claims timely or at all (and including failure to provide follow-up information requested by carriers and failure to appeal improperly denied claims) under its contract with the State of Arkansas, failing to upload coverage information to the MMIS timely or at all for certain participants in the state's Medicaid program, and knowingly submitting false and fraudulent reporting to the state, all as described herein.

114.    As a result of the misconduct alleged herein, Defendant knowingly concealed or knowingly and improperly avoided or decreased its obligations, and impaired the obligations of liable third parties, to pay or transmit money to the State of Arkansas.

115.    By reason of these decreased payments or transmittals of money, the State of Arkansas has been damaged, and continues to be damaged, in a substantial amount.

## COUNT 6

### VIOLATIONS OF THE CALIFORNIA FALSE CLAIMS ACT, CAL. GOV'T CODE §§ 12650 – 12656

116.    This is a claim for treble damages and civil penalties under the California False Claims Act, Cal. Gov't Code §§ 12650 – 12656.  Relator realleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

117.    Defendant violated the California False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly and improperly failing to bill TPL claims timely or at all (and including failure to provide follow-up information requested by carriers and failure to appeal improperly denied claims) under its contract or subcontract with the State of California, failing to upload coverage information to the MMIS timely or at all for certain participants in the state's Medicaid program, and knowingly submitting false and fraudulent reporting to the state, all as described herein.

118.    As a result of the misconduct alleged herein, Defendant knowingly concealed or knowingly and improperly avoided or decreased its obligations, and impaired the obligations of liable third parties, to pay or transmit money to the State of California.

119.    By reason of these decreased payments or transmittals of money, the State of California has been damaged, and continues to be damaged, in a substantial amount.

## COUNT 7

### VIOLATIONS OF THE COLORADO MEDICAID FALSE CLAIMS ACT, COL. REV. STAT. ANN. §§ 25.5-4-303.5 – 25.5-4-310

120.    This is a claim for treble damages and civil penalties under the Colorado

FALSE CLAIMS ACT FIRST AMENDED COMPLAINT – Page 44 OF 64

Medicaid False Claims Act, Colo. Rev. Stat. §§ 25.5-4-303.5 – 25.5-4-310.  Relator

realleges and incorporates the allegations in the preceding paragraphs as if set forth fully

herein.

121.    Defendant violated the Colorado Medicaid False Claims Act by engaging in

the fraudulent and illegal practices described herein, including knowingly and improperly

failing to bill TPL claims timely or at all (and including failure to provide follow-up

information requested by carriers and failure to appeal improperly denied claims) under its

contract with the State of Colorado, failing to upload coverage information to the MMIS

timely or at all for certain participants in the state's Medicaid program, and knowingly

submitting false and fraudulent reporting to the state, all as described herein.

122.    As a result of the misconduct alleged herein, Defendant knowingly concealed

or knowingly and improperly avoided or decreased its obligations, and impaired the

obligations of liable third parties, to pay or transmit money to the State of Colorado.

123.    By reason of these decreased payments or transmittals of money, the State of

Colorado has been damaged, and continues to be damaged, in a substantial amount.

## <u>COUNT 8</u>

**VIOLATIONS OF THE CONNECTICUT FALSE CLAIMS AND OTHER
PROHIBITED ACTS UNDER STATE-ADMINISTERED HEALTH OR HUMAN
SERVICES ACT ("CONNECTICUT FALSE CLAIMS ACT"),
CONN. GEN. STAT. ANN. §§ 4-274 – 4-289**

124.    This is a claim for treble damages and civil penalties under the Connecticut

False Claims Act, Conn. Gen. Stat. Ann. §§ 4-274 – 4-289.  Relator realleges and

incorporates the allegations in the preceding paragraphs as if set forth fully herein.

125.    Defendant violated the Connecticut False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly and improperly failing to bill TPL claims timely or at all (and including failure to provide follow-up information requested by carriers and failure to appeal improperly denied claims) under its contract with the State of Connecticut, failing to upload coverage information to the MMIS timely or at all for certain participants in the state's Medicaid program, and knowingly submitting false and fraudulent reporting to the state, all as described herein.

126.    As a result of the misconduct alleged herein, Defendant knowingly concealed or knowingly and improperly avoided or decreased its obligations, and impaired the obligations of liable third parties, to pay or transmit money to the State of Connecticut.

127.    By reason of these decreased payments or transmittals of money, the State of Connecticut has been damaged, and continues to be damaged, in a substantial amount.

## COUNT 9

### VIOLATIONS OF THE DELAWARE FALSE CLAIMS AND REPORTING ACT, DEL. C. ANN. TIT. 6, §§ 1201 – 1211

128.    This is a claim for treble damages and civil penalties under the Delaware False Claims and Reporting Act, Del. C. Ann. tit. 6, §§ 1201 – 1211.  Relator realleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

129.    Defendant violated the Delaware False Claims and Reporting Act by engaging in the fraudulent and illegal practices described herein, including knowingly and improperly failing to bill TPL claims timely or at all (and including failure to provide follow-up information requested by carriers and failure to appeal improperly denied claims) under its contract with the State of Delaware, failing to upload coverage information to the

MMIS timely or at all for certain participants in the state's Medicaid program, and knowingly submitting false and fraudulent reporting to the state, all as described herein.

130.    As a result of the misconduct alleged herein, Defendant knowingly concealed or knowingly and improperly avoided or decreased its obligations, and impaired the obligations of liable third parties, to pay or transmit money to the State of Delaware.

131.    By reason of these decreased payments or transmittals of money, the State of Delaware has been damaged, and continues to be damaged, in a substantial amount.

## COUNT 10

### VIOLATIONS OF THE DISTRICT OF COLUMBIA MEDICAID FRAUD ENFORCEMENT AND RECOVERY AMENDMENT ACT OF 2012, D.C. CODE ANN. §§ 2-381.01 – 2-381.10

132.    This is a claim for treble damages and civil penalties under District of Columbia Medicaid Fraud Enforcement and Recovery Amendment Act of 2012, D.C. Code Ann. §§ 2- 381.01 – 2-381.10.  Relator realleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

133.    Defendant violated the District of Columbia Medicaid Fraud Enforcement and Recovery Amendment Act of 2012 by engaging in the fraudulent and illegal practices described herein, including knowingly and improperly failing to bill TPL claims timely or at all (and including failure to provide follow-up information requested by carriers and failure to appeal improperly denied claims) under its contract with the District of Columbia, failing to upload coverage information to the MMIS timely or at all for certain participants in the state's Medicaid program, and knowingly submitting false and fraudulent reporting to the state, all as described herein.

FALSE CLAIMS ACT FIRST AMENDED COMPLAINT – Page 47 OF 64

134.    As a result of the misconduct alleged herein, Defendant knowingly concealed or knowingly and improperly avoided or decreased its obligations, and impaired the obligations of liable third parties, to pay or transmit money to the District of Columbia.

135.    By reason of these decreased payments or transmittals of money, the District of Columbia has been damaged, and continues to be damaged, in a substantial amount.

## COUNT 11

### VIOLATIONS OF THE FLORIDA FALSE CLAIMS ACT, FLA. STAT. ANN. §§ 68.081 – 68.092

136.    This is a claim for treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. Ann. §§ 68.081 – 68.092.  Relator realleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

137.    Defendant violated the Florida False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly and improperly failing to bill TPL claims timely or at all (and including failure to provide follow-up information requested by carriers and failure to appeal improperly denied claims) under its contract with the State of Florida as described herein.

138.    As a result of the misconduct alleged herein, Defendant knowingly concealed or knowingly and improperly avoided or decreased its obligations, and impaired the obligations of liable third parties, to pay or transmit money to the State of Florida.

139.    By reason of these decreased payments or transmittals of money, the State of Florida has been damaged, and continues to be damaged, in a substantial amount.

## COUNT 12

### VIOLATIONS OF THE GEORGIA FALSE MEDICAID CLAIMS ACT, GA. CODE ANN. §§ 49-4-168 – 49-4-168.6

140.     This is a claim for treble damages and civil penalties under Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 – 49-4-168.6.  Relator realleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

141.     Defendant violated the Georgia False Medicaid Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly and improperly failing to bill TPL claims timely or at all (and including failure to provide follow-up information requested by carriers and failure to appeal improperly denied claims) under its contract with the State of Georgia, failing to upload coverage information to the MMIS timely or at all for certain participants in the state's Medicaid program, and knowingly submitting false and fraudulent reporting to the state, all as described herein.

142.     As a result of the misconduct alleged herein, Defendant knowingly concealed or knowingly and improperly avoided or decreased its obligations, and impaired the obligations of liable third parties, to pay or transmit money to the State of Georgia.

143.     By reason of these decreased payments or transmittals of money, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount.

## COUNT 13

### VIOLATIONS OF THE INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT, IND. CODE ANN. §§ 5-11-5.5-1 – 5-11-5.5-18

144.     This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblowers Protection Act, Ind. Code Ann. §§ 5-11-5.5-1 – 5-11-5.5-18.

Relator realleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

145.    Defendant violated the Indiana False Claims and Whistleblowers Protection Act by engaging in the fraudulent and illegal practices described herein, including knowingly and improperly failing to bill TPL claims timely or at all (and including failure to provide follow-up information requested by carriers and failure to appeal improperly denied claims) under its contract with the State of Indiana, failing to upload coverage information to the MMIS timely or at all for certain participants in the state's Medicaid program, and knowingly submitting false and fraudulent reporting to the state, all as described herein.

146.    As a result of the misconduct alleged herein, Defendant knowingly concealed or knowingly and improperly avoided or decreased its obligations, and impaired the obligations of liable third parties, to pay or transmit money to the State of Indiana.

147.    By reason of these decreased payments or transmittals of money, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount.

## COUNT 14

### VIOLATIONS OF THE IOWA FALSE CLAIMS ACT,
### IOWA CODE ANN. §§ 685.1 – 685.7

148.    This is a claim for treble damages and civil penalties under the Iowa False Claims Act, Iowa Code Ann. §§ 685.1 – 685.7.  Relator realleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

149.    Defendant violated the Iowa False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly and improperly failing to bill TPL claims timely or at all (and including failure to provide follow-up information

requested by carriers and failure to appeal improperly denied claims) under its contract with the State of Iowa, failing to upload coverage information to the MMIS timely or at all for certain participants in the state's Medicaid program, and knowingly submitting false and fraudulent reporting to the state, all as described herein.

150.    As a result of the misconduct alleged herein, Defendant knowingly concealed or knowingly and improperly avoided or decreased its obligations, and impaired the obligations of liable third parties, to pay or transmit money to the State of Iowa.

151.    By reason of these decreased payments or transmittals of money, the State of Iowa has been damaged, and continues to be damaged, in a substantial amount.

## COUNT 15
### VIOLATIONS OF THE LOUISIANA
### MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW,
### LA. STAT. ANN. §§ 437.1 – 440.16

152.    This is a claim for treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Stat. Ann. §§ 437.1 – 440.16.  Relator realleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

153.    Defendant violated the Louisiana Medical Assistance Programs Integrity Law by engaging in the fraudulent and illegal practices described herein, including knowingly and improperly failing to bill TPL claims timely or at all (and including failure to provide follow-up information requested by carriers and failure to appeal improperly denied claims) under its contract with the State of Louisiana, failing to upload coverage information to the MMIS timely or at all for certain participants in the state's Medicaid program, and knowingly submitting false and fraudulent reporting to the state, all as described herein.

154.    As a result of the misconduct alleged herein, Defendant knowingly concealed or knowingly and improperly avoided or decreased its obligations, and impaired the obligations of liable third parties, to pay or transmit money to the State of Louisiana.

155.    By reason of these decreased payments or transmittals of money, the State of Louisiana has been damaged, and continues to be damaged, in a substantial amount.

## COUNT 16

### VIOLATIONS OF THE MARYLAND FALSE HEALTH CLAIMS ACT, MD. CODE ANN., HEALTH-GEN. §§ 8-101 – 8-111

156.    This is a claim for treble damages and civil penalties under the Maryland False Health Claims Act, Md. Code Ann., Health-General §§ 8-101 – 8-111.  Relator realleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

157.    Defendant violated the Maryland False Health Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly and improperly failing to bill TPL claims timely or at all (and including failure to provide follow-up information requested by carriers and failure to appeal improperly denied claims) under its contract with the State of Maryland, failing to upload coverage information to the MMIS timely or at all for certain participants in the state's Medicaid program, and knowingly submitting false and fraudulent reporting to the state, all as described herein.

158.    By reason of these decreased payments or transmittals of money, the State of Maryland has been damaged, and continues to be damaged, in a substantial amount.

## COUNT 17

### VIOLATIONS OF THE MASSACHUSETTS FALSE CLAIMS LAW, MASS. GEN. LAWS ANN. CH. 12, §§ 5A – 5O

159.     This is a claim for treble damages and civil penalties under the Massachusetts False Claims Law, Mass. Gen. Laws Ann. ch. 12, §§ 5A – 5O.  Relator realleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

160.     Defendant violated the Massachusetts False Claims Law by engaging in the fraudulent and illegal practices described herein, including knowingly and improperly failing to bill TPL claims timely or at all (and including failure to provide follow-up information requested by carriers and failure to appeal improperly denied claims) under its contract with the Commonwealth of Massachusetts, failing to upload coverage information to the MMIS timely or at all for certain participants in the state's Medicaid program, and knowingly submitting false and fraudulent reporting to the state, all as described herein.

161.     As a result of the misconduct alleged herein, Defendant knowingly concealed or knowingly and improperly avoided or decreased its obligations, and impaired the obligations of liable third parties, to pay or transmit money to the State of Massachusetts.

162.     By reason of these decreased payments or transmittals of money, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in a substantial amount.

## COUNT 18

### VIOLATIONS OF THE MICHIGAN MEDICAID FALSE CLAIM ACT, MICH. COMP. LAWS ANN. §§ 400.601 – 400.615

163.     This is a claim for treble damages and civil penalties under the Michigan Medicaid False Claim Act, Mich. Comp. Laws Ann. §§ 400.601 – 400.615.  Relator

realleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

164.   Defendant violated the Michigan Medicaid False Claim Act by engaging in the fraudulent and illegal practices described herein, including knowingly and improperly failing to bill TPL claims timely or at all (and including failure to provide follow-up information requested by carriers and failure to appeal improperly denied claims) under its contract with the State of Michigan, failing to upload coverage information to the MMIS timely or at all for certain participants in the state's Medicaid program, and knowingly submitting false and fraudulent reporting to the state, all as described herein.

165.   As a result of the misconduct alleged herein, Defendant knowingly concealed or knowingly and improperly avoided or decreased its obligations, and impaired the obligations of liable third parties, to pay or transmit money to the State of Michigan.

166.   By reason of these decreased payments or transmittals of money, the State of Michigan has been damaged, and continues to be damaged, in a substantial amount.

## COUNT 19

### VIOLATIONS OF THE MINNESOTA FALSE CLAIMS ACT, MINN. STAT. ANN. §§ 15C.01 – 15C.16

167.   This is a claim for treble damages and civil penalties under the Minnesota False Claims Act, Minn. Stat. Ann. §§ 15C.01 – 15C.16.  Relator realleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

168.   Defendant violated the Minnesota False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly and improperly failing to bill TPL claims timely or at all (and including failure to provide follow-up

information requested by carriers and failure to appeal improperly denied claims) under its contract with the State of Minnesota, failing to upload coverage information to the MMIS timely or at all for certain participants in the state's Medicaid program, and knowingly submitting false and fraudulent reporting to the state, all as described herein.

169.    As a result of the misconduct alleged herein, Defendant knowingly concealed or knowingly and improperly avoided or decreased its obligations, and impaired the obligations of liable third parties, to pay or transmit money to the State of Minnesota.

170.    By reason of these decreased payments or transmittals of money, the State of Minnesota has been damaged, and continues to be damaged, in a substantial amount.

**COUNT 20**

**VIOLATIONS OF THE NEVADA SUBMISSION
OF FALSE CLAIMS TO STATE OR LOCAL GOVERNMENT ACT,
NEV. REV. STAT. ANN. §§ 357.010 – 357.250**

171.    This is a claim for treble damages and civil penalties under the Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. Ann. §§ 357.010 – 357.250.  Relator realleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

172.    Defendant violated the Nevada Submission of False Claims to State or Local Government Act by engaging in the fraudulent and illegal practices described herein, including knowingly and improperly failing to bill TPL claims timely or at all (and including failure to provide follow-up information requested by carriers and failure to appeal improperly denied claims) under its contract with the State of Nevada, failing to upload coverage information to the MMIS timely or at all for certain participants in the state's

Medicaid program, and knowingly submitting false and fraudulent reporting to the state, all as described herein.

173.    As a result of the misconduct alleged herein, Defendant knowingly concealed or knowingly and improperly avoided or decreased its obligations, and impaired the obligations of liable third parties, to pay or transmit money to the State of Nevada.

174.    By reason of these decreased payments or transmittals of money, the State of Nevada has been damaged, and continues to be damaged, in a substantial amount.

## COUNT 21

### VIOLATIONS OF THE NEW JERSEY FALSE CLAIMS ACT, N.J. STAT. ANN. §§ 2A:32C-1 – 2A:32C-18

175.    This is a claim for treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1 – 2A:32C-18.  Relator realleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

176.    Defendant violated the New Jersey False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly and improperly failing to bill TPL claims timely or at all (and including failure to provide follow-up information requested by carriers and failure to appeal improperly denied claims) under its contract with the State of New Jersey, failing to upload coverage information to the MMIS timely or at all for certain participants in the state's Medicaid program, and knowingly submitting false and fraudulent reporting to the state, all as described herein.

177.    As a result of the misconduct alleged herein, Defendant knowingly concealed or knowingly and improperly avoided or decreased its obligations, and impaired the obligations of liable third parties, to pay or transmit money to the State of New Jersey.

178.     By reason of these decreased payments or transmittals of money, the State of New Jersey has been damaged, and continues to be damaged, in a substantial amount.

## COUNT 22

**VIOLATIONS OF THE NEW MEXICO FRAUD AGAINST TAXPAYERS ACT,**
**N.M. STAT. ANN. §§ 44-9-1 – 44-9-14,**
**AND THE NEW MEXICO MEDICAID FALSE CLAIMS ACT,**
**N.M. STAT. ANN. §§ 27-14-1 – 27-14-15**

179.     This is a claim for treble damages and civil penalties under the New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. §§ 44-9-1 – 44-9-14, and the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-14-1 – 27-14-15.  Relator realleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

180.     Defendant violated the New Mexico Fraud Against Taxpayers Act and the New Mexico Medicaid False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly and improperly failing to bill TPL claims timely or at all (and including failure to provide follow-up information requested by carriers and failure to appeal improperly denied claims) under its contract with the State of New Mexico, failing to upload coverage information to the MMIS timely or at all for certain participants in the state's Medicaid program, and knowingly submitting false and fraudulent reporting to the state, all as described herein.

181.     As a result of the misconduct alleged herein, Defendant knowingly concealed or knowingly and improperly avoided or decreased its obligations, and impaired the obligations of liable third parties, to pay or transmit money to the State of New Mexico.

182.     By reason of these decreased payments or transmittals of money, the State of New Mexico has been damaged, and continues to be damaged, in a substantial amount.

## COUNT 23

### VIOLATIONS OF THE NEW YORK FALSE CLAIMS ACT,
### N.Y. FIN. LAW §§ 187 – 194

183.    This is a claim for treble damages and civil penalties under the New York

False Claims Act, N.Y. Fin. Law §§ 187 – 194.  Relator realleges and incorporates the

allegations in the preceding paragraphs as if set forth fully herein.

184.    Defendant violated the New York False Claims Act by engaging in the

fraudulent and illegal practices described herein, including knowingly and improperly

failing to bill TPL claims timely or at all (and including failure to provide follow-up

information requested by carriers and failure to appeal improperly denied claims) and failing

to refund certain policy "add" fees  under its contract with the State of New York, failing to

upload coverage information to the MMIS timely or at all for certain participants in the

state's Medicaid program, and knowingly submitting false and fraudulent reporting to the

state, all as described herein.

185.    As a result of the misconduct alleged herein, Defendant knowingly concealed

or knowingly and improperly avoided or decreased its obligations, and impaired the

obligations of liable third parties, to pay or transmit money to the State of New York.

186.    By reason of these decreased payments or transmittals of money, the State of

New York has been damaged, and continues to be damaged, in a substantial amount.

## COUNT 24

### VIOLATIONS OF THE NORTH CAROLINA FALSE CLAIMS ACT,
### N.C. GEN. STAT. ANN. §§ 1-605 – 1-618

187.    This is a claim for treble damages and civil penalties under the North

Carolina False Claims Act, N.C. Gen. Stat. Ann. §§ 1-605 – 1-618.  Relator realleges and

incorporates the allegations in the preceding paragraphs as if set forth fully herein.

188.    Defendant violated the North Carolina False Claims Act by engaging in the

fraudulent and illegal practices described herein, including knowingly and improperly

failing to bill TPL claims timely or at all (and including failure to provide follow-up

information requested by carriers and failure to appeal improperly denied claims) under its

contract with the State of North Carolina, failing to upload coverage information to the

MMIS timely or at all for certain participants in the state's Medicaid program, and

knowingly submitting false and fraudulent reporting to the state, all as described herein.

189.    As a result of the misconduct alleged herein, Defendant knowingly concealed

or knowingly and improperly avoided or decreased its obligations, and impaired the

obligations of liable third parties, to pay or transmit money to the State of North Carolina.

190.    By reason of these decreased payments or transmittals of money, the State of

North Carolina has been damaged, and continues to be damaged, in a substantial amount.

## COUNT 25

### VIOLATIONS OF THE OKLAHOMA MEDICAID FALSE CLAIMS ACT, OKL. STAT. ANN. TIT. 63, §§ 5053 – 5054

191.    This is a claim for treble damages and civil penalties under the Oklahoma

Medicaid False Claims Act, Okl. Stat. tit. 63, §§ 5053 – 5054.  Relator realleges and

incorporates the allegations in the preceding paragraphs as if set forth fully herein.

192.    Defendant violated the Oklahoma Medicaid False Claims Act by engaging in

the fraudulent and illegal practices described herein, including knowingly and improperly

failing to bill TPL claims timely or at all (and including failure to provide follow-up

information requested by carriers and failure to appeal improperly denied claims) under its contract with the State of Oklahoma, failing to upload coverage information to the MMIS timely or at all for certain participants in the state's Medicaid program, and knowingly submitting false and fraudulent reporting to the state, all as described herein.

193.    As a result of the misconduct alleged herein, Defendant knowingly concealed or knowingly and improperly avoided or decreased its obligations, and impaired the obligations of liable third parties, to pay or transmit money to the State of Oklahoma.

194.    By reason of these decreased payments or transmittals of money, the State of Oklahoma has been damaged, and continues to be damaged, in a substantial amount.

## COUNT 26

**VIOLATIONS OF THE RHODE ISLAND STATE FALSE CLAIMS ACT,**
**R.I. GEN. LAWS ANN. §§ 9-1.1-1 – 9-1.1-9**

195.    This is a claim for treble damages and civil penalties under the Rhode Island State False Claims Act, R.I. Gen. Laws Ann. §§ 9-1.1-1 – 9-1.1-9.  Relator realleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

196.    Defendant violated the Rhode Island State False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly and improperly failing to bill TPL claims timely or at all (and including failure to provide follow-up information requested by carriers and failure to appeal improperly denied claims) under its contract with the State of Rhode Island, failing to upload coverage information to the MMIS timely or at all for certain participants in the state's Medicaid program, and knowingly submitting false and fraudulent reporting to the state, all as described herein.

197.    As a result of the misconduct alleged herein, Defendant knowingly concealed or knowingly and improperly avoided or decreased its obligations, and impaired the obligations of liable third parties, to pay or transmit money to the State of Rhode Island.

198.    By reason of these decreased payments or transmittals of money, the State of Rhode Island has been damaged, and continues to be damaged, in a substantial amount.

## COUNT 27

### VIOLATIONS OF THE TENNESSEE FALSE CLAIMS ACT, TENN. CODE ANN. §§ 4-18-101 – 4-18-108 AND THE TENNESSEE MEDICAID FALSE CLAIMS ACT, TENN. CODE. ANN. §§ 71-5-181 – 71-5-185

199.    This is a claim for treble damages and civil penalties under the Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101 – 4-18-108, and the Tennessee Medicaid False Claims Act, Tenn. Code. Ann. §§ 71-5-181 – 71-5-185.  Relator realleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

200.    Defendant violated the Tennessee False Claims Act and the Tennessee Medicaid False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly and improperly failing to bill TPL claims timely or at all (and including failure to provide follow-up information requested by carriers and failure to appeal improperly denied claims) under its contract with the State of Tennessee, failing to upload coverage information to the MMIS timely or at all for certain participants in the state's Medicaid program, and knowingly submitting false and fraudulent reporting to the state, all as described herein.

201.    Further, Defendant violated the Tennessee False Claims Act and the Tennessee Medicaid False Claims Act by knowingly billing twice for providing the same

coverage information in the State of Tennessee. Defendant knowingly retained the doubly

charged Medicaid funds to which it knew it was not entitled, and it knowingly failed to

return these funds.

202.     As a result of the misconduct alleged herein, Defendant knowingly concealed

or knowingly and improperly avoided or decreased its obligations, and impaired the

obligations of liable third parties, to pay or transmit money to the State of Tennessee.

203.     By reason of these decreased payments or transmittals of money, the State of

Tennessee has been damaged, and continues to be damaged, in a substantial amount.

## COUNT 28

### VIOLATIONS OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT, VA. CODE ANN. §§ 8.01-216.1 – 8.01-216.19

204.     This is a claim for treble damages and civil penalties under the Virginia

Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 – 8.01-216.19.  Relator

realleges and incorporates the allegations in the preceding paragraphs as if set forth fully

herein.

205.     Defendant violated the Virginia Fraud Against Taxpayers Act by engaging in

the fraudulent and illegal practices described herein, including knowingly and improperly

failing to bill TPL claims timely or at all (and including failure to provide follow-up

information requested by carriers and failure to appeal improperly denied claims) under its

contract with the Commonwealth of Virginia, failing to upload coverage information to the

MMIS timely or at all for certain participants in the state's Medicaid program, and

knowingly submitting false and fraudulent reporting to the state, all as described herein.

206.     As a result of the misconduct alleged herein, Defendant knowingly concealed

or knowingly and improperly avoided or decreased its obligations, and impaired the obligations of liable third parties, to pay or transmit money to the Commonwealth of Virginia.

207.     By reason of these decreased payments or transmittals of money, the Commonwealth of Virginia has been damaged, and continues to be damaged, in a substantial amount.

## **PRAYER FOR RELIEF**

WHEREFORE, Relator requests that judgment be entered against Defendant as follows:

(a)       treble the Government's damages in an amount determined at trial, plus the maximum statutorily-allowed penalty for each false claim submitted in violation of the FCA or State statute set forth above;

(b)       an award of costs and the maximum Relator award allowed pursuant to the FCA and State statutes set forth above; and

(c)       such further relief as is proper.

Dated:  January 12, 2021              Respectfully submitted,

                                               */s/ T. Alan Harris*
                                               T. Alan Harris
                                             alan.harris@harrislawusa.com
                                           HARRIS LAW FIRM PC
                                         P.O. Box 160310
                                       Austin, TX 78716-0310
                                       512-732-7377
                                       Fax: 877-876-8913

                                         ***ATTORNEYS FOR RELATOR***

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing Amended Complaint was served on January 12, 2021 by electronic filing to all users registered to receive ECF notices in this case, and was also served on the following counsel and the Plaintiff States as detailed below:

**By Email to <u>RWalters@gibsondunn.com</u>:**

Robert C. Walters
Gibson, Dunn & Crutcher LLP
2001 Ross Avenue, Dallas, TX 75201

**By U.S. Mail:**

| | |
|---|---|
| United States Acting Attorney General | Honorable Jeffrey A. Rosen<br>Acting Attorney General of the United States<br>950 Pennsylvania Ave. NW, Room 4545<br>Washington, D.C. 20530-001 |
| United States Attorney | Kimberly A. McCoy<br>Assistant U.S. Attorney for the Northern<br> District of Texas<br>1100 Commerce Street, Third Floor<br>Dallas, Texas 75242-1699 |
| Arkansas Attorney General | Leslie Rutledge<br>Attorney General<br>323 Center Street, Suite 200<br>Little Rock, Arkansas 72201 |
| California Attorney General | Xavier Becerra<br>California Attorney General's Office<br>Attn: False Claims Unit<br>455 Golden Gate Ave., Suite 11000<br>San Francisco, CA 94102-7004 |

| | |
|---|---|
| Colorado Attorney General | Phil Weiser<br>Attorney General<br>Colorado Department of Law<br>Ralph L. Carr Judicial Building<br>1300 Broadway, 10th Floor<br>Denver, CO 80203 |
| Connecticut Attorney General | William Tong<br>Attorney General<br>55 Elm Street<br>Hartford, CT 06106 |
| Connecticut Assistant Attorney General | Vanessa Avery<br>Assistant Attorney General<br>State of Connecticut<br>55 Elm Street<br>Hartford, CT 06106-1774 |
| Delaware Attorney General | Kathy Jennings<br>Attorney General<br>Delaware Department of Justice<br>Carvel State Building<br>820 N. French Street<br>Wilmington, DE 19801 |
| Florida Attorney General | Ashley Moody<br>Attorney General<br>The Capitol PL-01<br>Tallahassee, FL 32399-1050 |
| Georgia Attorney General | Christopher M. Carr<br>Attorney General<br>40 Capitol Square, SW<br>Atlanta, GA 30334 |

| Indiana Attorney General | Curtis Hill<br>Attorney General<br>Indiana Government Center South<br>302 W. Washington Street, 5th Floor<br>Indianapolis, IN 46204 |
|---|---|
| Iowa Attorney General | Tom Miller<br>Attorney General<br>Hoover State Office Building<br>1305 E. Walnut Street<br>Des Moines, IA 50319 |
| Louisiana Attorney General | Jeff Landry<br>Attorney General<br>1885 N. Third Street<br>Baton Rouge, LA 70802 |
| Maryland Attorney General | Brian Frosh<br>Attorney General<br>200 St. Paul Place<br>Baltimore, MD 21202 |
| Massachusetts Attorney General | Maura Healey<br>Attorney General<br>One Ashburton Place<br>Boston, MA 02108-1518 |
| Michigan Attorney General | Dana Nessel<br>Attorney General<br>G. Mennen Williams Building, 7th Floor<br>525 West Ottawa Street<br>Lansing, MI 48909 |
| Minnesota Attorney General | Keith Ellison<br>Attorney General<br>445 Minnesota Street, Suite 1400<br>St. Paul, MN 55101 |

| | |
|---|---|
| Nevada Attorney General | Aaron Ford<br>Attorney General<br>100 North Carson Street<br>Carson City, NV 89701 |
| New Jersey Attorney General | Gurbir Singh Grewal<br>Attorney General<br>RJ Hughes Justice Complex<br>25 Market Street<br>Trenton, NJ 08625-0080 |
| New Mexico Attorney General | Hector Balderas<br>Attorney General<br>408 Galisteo Street<br>Villagra Building<br>Santa Fe, NM 87501 |
| New York Attorney General | Letitia James<br>Attorney General<br>Attention: MFCU: False Claims<br>Office of the New York State Attorney General<br>Managing Clerk's Office<br>120 Broadway, 24th Floor<br>New York, NY 10271 |
| North Carolina Attorney General | Josh Stein<br>Attorney General<br>9001 Mail Service Center<br>Raleigh, NC 27699-9001 |
| Oklahoma Attorney General | Medicaid Fraud Control Unit<br>Oklahoma Office of Attorney General<br>313 North East 21st Street<br>Oklahoma City, OK 73105 |
| Rhode Island Attorney General | Peter Neronha<br>Attorney General<br>150 South Main Street<br>Providence, RI 02903 |

CERTIFICATE OF SERVICE – PAGE 4

| Tennessee Attorney General | Herbert Slatery, III<br>Attorney General<br>P.O. Box 20207<br>Nashville, TN 37202-0207 |
|---|---|
| Virginia Attorney General | Office of the Attorney General<br>202 North Ninth Street<br>Richmond, Virginia 23219 |
| Washington, DC Attorney General | Karl A. Racine<br>Attorney General<br>441 4th Street, NW<br>Washington, DC 20001 |

 */s/ T. Alan Harris*
T. Alan Harris
Counsel for Relator