UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* | § | |
| CHRISTOPHER FREY, | § | |
| | § | |
| Plaintiff/Relator, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:19-CV-0920-B |
| | § | |
| HEALTH MANAGEMENT SYSTEMS, | § | |
| INC., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION & ORDER

Before the Court is Defendant Health Management Systems, Inc. ("HMS")'s Motion to Dismiss (Doc. 49) Relator Christopher Frey ("Relator")'s Second Amended Complaint ("SAC") and Relator's Motion for Leave to Pursue Relator's Claims Beyond Employment Termination (Doc. 43). At issue here is whether Relator satisfied the pleading requirements for his indirect reverse false claims brought pursuant to state and federal false claim statutes. For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion and **DENIES** Relator's Motion.

## I.

## BACKGROUND

*A.    Factual Background*[1]

This is a qui tam[2] case about whether a service provider impaired the Plaintiff States'
obligation to remit money to the federal government. *See* Doc. 42, SAC. HMS provides third-party
liability ("TPL") services to many state Medicaid agencies and Medicaid Managed Care
Organizations ("MCOs") of the Plaintiff States. Doc. 42, SAC, ¶¶ 1–2. These services include
identifying and recovering expenditures from responsible third-party insurers. *Id.* ¶ 2. Relator worked
for "HMS from approximately September 2006 to May 2013" and before that for a TPL company
that HMS later acquired. *Id.* ¶ 4. Relator was a Vice President or Regional Vice President during
most of his employment with HMS and was responsible for managing client relations with several
state agencies. *Id.* ¶ 5. Relator alleges that HMS has TPL contracts with at least forty state Medicaid
agencies and MCOs. *Id.* ¶¶ 3, 40.

During his time with HMS, Relator became aware of "HMS's failure to bill TPL claims timely
or at all" and its failure to upload "third[-]party[-]coverage information for Medicaid enrollees [into]
the Medicaid information systems." *Id.* ¶ 7. Crucially, Medicaid is a "payer of last resort," meaning
third-party insurers must pay their claims before Medicaid pays the claims. *Id.* ¶ 37. Furthermore,
Medicaid regulations require an agency to seek "reimbursement within 60 days after the end of the
month it learns of the [third-party liability]." 42 C.F.R. § 433.139(d)(2); Doc. 42, SAC, ¶ 39. Relator

---

[1] The facts are as alleged by Relator in the SAC.

[2] "'Qui tam' is an abbreviation for *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, which
means 'who as well for the king as for himself sues in this matter.'" *United States ex rel. Grubbs v. Kanneganti*,
565 F.3d 180, 184 n.5 (5th Cir. 2009) (quoting Black's Law Dictionary 1262 (7th ed. 1999)).

alleges that HMS's failure to timely bill decreased the amount collected by Plaintiff States. *Id.* ¶¶ 7, 42. This in turn decreased the refund owed by the States to the federal government, totaling millions or billions of dollars. *Id.*

According to Relator, HMS's failure to timely bill resulted from "an overwhelming volume of claims[,]" inadequate computer systems, "a lack of competition[,]" "a desire to curry favor with insurance carriers[,]" and "'big business' arrogance." *Id.* ¶ 43. HMS's obsolete computer systems resulted in claims being put "on hold," leading to "buckets" of claims—worth possibly millions of dollars—never being billed. *Id.* ¶¶ 45, 47. Plaintiff States rarely received notice of these holds because these holds typically occurred after the billing cycle, resulting in "inaccurate and fraudulent reports" that represented claims—subsequently made subject to carrier holds—had gone out. *Id.* ¶¶ 48, 51. Nor did HMS later update the States with the true status of the claims. *Id.* ¶ 54. HMS also allegedly failed to follow up with carriers to obtain payment, appeal denials, and provide the additional information requested by carriers to complete reimbursements. *Id.* ¶¶ 52–53.

Relator makes specific allegations as to HMS's failures relating to the Plaintiff States discussed below. Regarding the State of Florida, Relator alleges one specific example of HMS failing to timely bill claims or to bill at all. *Id.* ¶¶ 49. Relator states that when HMS learned a new contract for the State of Florida went to a competitor, HMS suddenly billed a large number of claims totaling around $100 million. *Id.* This example demonstrates HMS's lack of diligence, according to Relator. *Id.*

Regarding the State of New York, Relator alleges thousands of claims were placed "on hold" until the claims were unrecoverable, costing the State nearly $179 million. *Id.* ¶ 47. HMS also failed to refund several "add" fees in violation of state and federal law. *Id.* ¶ 8. Under a typical contract, HMS will receive a contingency fee in relation to the amount recovered for the state, but in New

York HMS received an additional $40 "add" fee for "identif[ying] a Medicaid patient with newly discovered other coverage." *Id.* ¶¶ 41, 64. Until early 2009, HMS's contract with New York required HMS to refund the "add" fee if HMS obtained a recovery because HMS kept a percentage of the recovery. *Id.* ¶ 64. "This avoided double payments." *Id.* But, Relator believes "HMS routinely and knowingly failed to refund the add fee" under this contract. *Id.* This caused many of the reports provided to New York to contain false or inaccurate information. *Id.* ¶ 65. After early 2009, the new contract did not contain the refund requirement, but this did not extinguish the existing obligation of HMS to refund the collected add fees. *Id.* ¶ 66.

Regarding Tennessee, Relator describes a "Tennessee Model" of double billing Medicaid agencies for providing them the same TPL information. *Id.* ¶ 69. The State of Tennessee relies "100%" on MCOs to run its Medicaid program. *Id.* ¶ 71. Relator claims HMS sells the TPL information to both the state Medicaid agency and the individual MCOs despite the state agency providing the same TPL information to the MCOs. *Id.* ¶ 69. Plaintiff alleges the "Tennessee Model" impairs the State's obligation to the federal government. *Id.* ¶ 73.

Finally, Relator contends HMS failed to upload insurance coverage information into the Medicaid Management Information System ("MMIS") within 45 days as required by federal regulation. *Id.* ¶¶ 57–60. HMS's failure to upload this information "concealed, avoided and decreased its obligations . . . to obtain recoveries for the Plaintiff States," which in turn impaired the States' obligation to the federal government. *Id.* ¶ 62.

Relator states that he raised his concerns throughout his employment to senior management including the Executive Vice President, Executive Vice President/Chief Business Officer, Vice President of Operations, Senior Vice President, Vice President, and Chief Operating Officer. *Id.*

¶¶ 55, 74–87. Relator soon realized that senior management never acted to fix the problems he identified. *Id.* ¶ 78. In the 2010 Strategic Plan made by Relator, he once again tried to bring the issues to the attention of senior management. *Id.* ¶ 79. Relator recommended timely transmitting all billings, rebilling open claims older than three months, not holding claims in the "open" status, resolving issues with TRICARE recovery, and reviewing the "cycle edit" process to reduce the number of claims "cleaned" from the system. *Id.* ¶¶ 80–83.

B.      *Procedural Background*

Relator filed his first complaint on April 16, 2019. Doc. 2, Compl. The Government declined to intervene in this case. Doc. 14, Declination Not. On October 1, 2021, this Court granted in part and denied in part HMS's first motion to dismiss. Doc. 37, Order. Relator filed the operative complaint and a motion to pursue his claims beyond his termination from HMS on November 1, 2021. Doc. 42, SAC; Doc. 43, Relator's Mot. On November 22, 2021, HMS filed the instant motion to dismiss. Doc. 49, Def.'s Mot. The motions are now ripe, and the Court considers them below.

## II.

## LEGAL STANDARDS

A.      *Rule 12(b)(6) Standard*

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) authorizes a court to dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In considering a Rule 12(b)(6) motion to dismiss, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). But the court will

"not look beyond the face of the pleadings to determine whether relief should be granted based on the alleged facts." *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).

In order to survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

B.      Rule 9(b)

A dismissal for failure to plead with particularity in accordance with Rule 9(b) is treated as a Rule 12(b)(6) dismissal for failure to state a claim. *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996). Rule 9(b) provides, in pertinent part, that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). When claims for fraud and negligent misrepresentation are based on the same set of alleged facts, Rule 9(b)'s heightened pleading standard applies. *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 n.3 (5th Cir. 2010) (citing *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003), *modified on other grounds*, 355 F.3d 356 (5th Cir. 2003)); *see Paul v. Aviva Life & Annuity Co.*, 2010 WL 5105925, at *8 (N.D. Tex. Dec. 14, 2010) (applying Rule 9(b) to fraud and negligent misrepresentation claims that arose out of the same set of facts but were contained in separate counts in the complaint).

As a fraud statute, claims under the False Claims Act ("FCA") must comply with Rule 9(b). The amount of particularity required for pleading fraud differs from case to case. *See Benchmark Elecs.*, 343 F.3d at 724; *see also Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997) (noting that "courts have emphasized that Rule 9(b)'s ultimate meaning is context specific"). A traditional fraud claim requires pleading with particularity the "'who, what, when, where, and how' of the alleged fraud." *United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x. 890, 892 (5th Cir. 2013) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)). But "the [common law fraud] standard is not a straitjacket for Rule 9(b)" as "Rule 9(b) is 'context specific and flexible.'" *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009). "[T]o plead with particularity the circumstances constituting fraud for a False Claims Act . . . claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.*

### III.

### ANALYSIS

The purpose of the FCA is "to discourage fraud against the government." *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994). Relator raises indirect reverse false claims pursuant to 31 U.S.C. § 3729(a)(1)(G). This provision imposes liability on:

> any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government . . .

*Id.* Courts refer to claims brought under this paragraph of the statute as a reverse false claim because

the defendant's actions "result[] not in improper payment to the defendant from the Government, but rather no payment [(or reduced payment)] to the Government when payment is otherwise obligated." *United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 329 (5th Cir. 2003). When a defendant makes a false statement to a third party—here, HMS to a state Medicaid agency—this is known as an indirect reverse false claim. *United States v. Caremark, Inc.*, 634 F.3d 808, 815 (5th Cir. 2011).

Section 3729(a)(1)(G) imposes liability for either (1) making, using, or causing to be made or used, a false record or (2) concealing, avoiding, or decreasing an obligation to pay money to the Government.  *See* 31 U.S.C. § 3729(a)(1)(G) (providing two methods of violating the statute). To establish an indirect reverse false claim, a relator must prove either: "(1) a false record or statement; (2) the defendant's knowledge of the falsity; (3) that the defendant made, used, or cause[d] to be made or used a false statement or record; (4) for the purpose to conceal, avoid, or decrease an obligation to pay money to the government; and (5) the materiality of the misrepresentation," *United States ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012) (addressing a reverse false claim); *United States ex rel. Hendrickson v. Bank of America, N.A.*, 343 F. Supp. 3d 610, 632 (N.D. Tex. 2018) (citing *United States ex rel. Ramsey-Ledesma v. Censeo Health, L.L.C.*, 2016 WL 5661644, at *11 (N.D. Tex. Sept. 30, 2016)), or (1) an obligation to pay or transmit money or property to the Government; (2) the defendant concealed, improperly avoided, or decreased this obligation; and (3) defendant acted with knowledge. *See* 31 U.S.C. § 3729(a)(1)(G).

The Court first addresses the motion to dismiss and then addresses Relator's motion to pursue claims beyond the termination of his employment with HMS. The Court begins with whether the statute of limitations bars Relator's claims before turning to whether Relator pleaded his claims with

the particularity required by Rule 9(b). Then, the Court addresses HMS's arguments regarding the substantive provisions of the false claims. Finally, the Court addresses Relator's motion.

A.      *The Statute of Limitations Does Not Bar Relator's Claims*

The FCA's statute of limitations provision reads:

> A civil action under section 3730 may not be brought—
> (1) more than 6 years after the date on which the violation of section 3729 is committed, or
> (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last.

31 U.S.C. § 3731(b). The statute triggers an additional three years—up to ten years total—when "the official" charged to act under the statute gains actual knowledge or reasonably should have known of the material facts supporting the cause of action. *See id.* As previously determined by this Court, "the official" most accurately describes a Department of Justice ("DOJ") official in the context of this case. *United States ex rel. Frey v. Health Mgmt. Sys., Inc.*, 2021 WL 4502275, at *15 (N.D. Tex. Oct. 1, 2021).

The application of this statute to Relator's claims turns on whether the DOJ should have known about Relator's claims because of the HHS-OIG Report. The Inspector General Act of 1978 ("IGA") provides "[i]n carrying out the duties and responsibilities established under this Act, each Inspector General shall report expeditiously to the Attorney General whenever the Inspector General has reasonable grounds to believe there has been a violation of Federal criminal law." 5 U.S.C. app. 3 § 4(d). Based on any suspected violations of federal criminal law, the "DOJ may then bring criminal charges or a civil action under the False Claims Act." *Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 779 n.6 (9th Cir. 2000).

Defendant raises similar statute-of-limitations arguments to those made in its prior motion to dismiss, except this time HMS argues that "the official" described in 31 U.S.C. § 3731(b) "'reasonably should have known' of the facts material to the right of action" because of Health and Human Services ("HHS") Office of Inspector General ("OIG")'s 2013 report, which presented the same allegations. Doc. 50, Def.'s Br., 21–22. HHS-OIG was required to report any suspected violation of Federal criminal law to the DOJ so, according to Defendant, the DOJ should have known of the facts supporting Relator's allegations. *Id.* at 22. HMS relies on *United States ex rel. Frascella v. Oracle Corp.* as an analogous case to demonstrate this point. *Id.* at 22–23 (citing *Frascella*, 751 F. Supp. 2d 842 (E.D. Va. 2010)); Doc. 58, Def.'s Reply, 4. Thus, HMS contends that the statute of limitations bars Relator's claims occurring prior to April 16, 2013. Doc. 50, Def.'s Br., 23–24. Lastly, HMS argues that the extensive HHS-OIG investigation leaves no material facts in dispute and this Court can resolve these arguments at the motion to dismiss stage. Doc. 58, Def.'s Reply, 5.

Relator responds by arguing *Frascella* is distinguishable because that court found that "the official," as described in the FCA, included an employee of the General Services Administration ("GSA") OIG, which is at odds with what this Court found in its prior Order. Doc. 53, Relator's Resp., 16–18. Relator also points out that the *Frascella* court construed the FCA provision in conjunction with the broader provision providing for tort and common law fraud claims against the United States. *Id.* at 18 (noting that the former uses the phrase "the official" and the latter uses the phrase "an official"). Relator points the Court to *United States v. Wells Fargo Bank N.A.* as a more analogous case; in that case, the court denied a motion to dismiss because the determination of

whether "the official" should have known, as a fact-based inquiry, is better resolved at the summary-judgment stage. *Id.* at 19–20 (citing *Wells Fargo Bank*, 972 F. Supp. 2d 593 (S.D.N.Y. 2013)).

HMS's argument hinges on the relationship between the FCA and the IGA[3], specifically what constitutes "reasonable grounds" under the IGA to trigger HHS-OIG's requirement to notify the DOJ of violations of criminal law—and whether that then implies that the DOJ reasonably should have known of the material facts supporting Relator's cause of action as required by the FCA. But the knowledge element for the FCA statute of limitations turns not on the similarities between a government report and a complaint, but on whether the DOJ became aware of a relator's allegations. *See* 31 U.S.C. § 3731(b); *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 474 F. Supp. 2d 75, 85 (D.D.C. 2007) (holding that subsection (b)(2) is measured from the Government's knowledge). Thus, the Court's inquiry is focused first on whether the DOJ had some form of knowledge of Relator's claims and second on the similarities between a report alleged to establish the DOJ's knowledge and Relator's complaint.

The Court finds the *Frascella* case highlighted by HMS instructive, so far as it shows how a court may consider the *breadth of dissemination* of a report when determining whether the DOJ should have known of Relator's claims based on that report. In *Frascella*, the defendant contracted with the GSA "to provide software products to various federal agencies." 751 F. Supp. 2d at 844. Prior to the effective date of the contract, GSA-OIG conducted "a routine pre-award audit of [the defendant's] commercial pricing" and discovered that the defendant's commercial customers received discounts

---

[3] Subsequent amendments to the Act did not modify the "reasonable grounds" language at issue today. *See* Inspector General Act "5 U.S.C. app." Amendments of 1988, Pub. L. No. 100-504, § 109, 102 Stat. 2529 (1988); National and Community Service Trust Act of 1993, Pub. L. No. 103-82, § 202(g)(5)(A), 107 Stat. 890 (1993); Inspector General Reform Act of 2008, Pub. L. No. 110-409, § 7(d)(1)(A), 122 Stat. 4313 (2008); Inspector General Empowerment Act of 2016, Pub. L. No. 114-317, §§ 4(d), 7(d)(2)(A), 130 Stat. 1602, 1606 (2016).

and lower pricing not offered to GSA. *Id.* at 845–46. Relator then brought claims under the FCA regarding the contract and the Government intervened. *Id.* at 846. The defendant sought dismissal of the claims as time-barred because either (1) the GSA-OIG qualified as "the official" under 31 U.S.C. § 3731(b) and knew of the claims, or (2) the DOJ reasonably should have known of the claims due to the wide dissemination of the report. *Id.* at 849, 852. The court avoided the question of whether a GSA-OIG employee qualifies as the responsible official referenced in 31 U.S.C. § 3731(b)(2) because it reached the same conclusion under either analysis. *Id.* at 851.

The HHS-OIG Report, like the GSA-OIG report in *Frascella*, covers much of what Relator alleges in the SAC. *Compare* Doc. 51, Def.'s App'x, Ex. A, *with* Doc. 42, 2d Am. Compl. However, HMS does not present evidence about the dissemination of the HHS-OIG Report or specifically, whether the Report was ever sent to the DOJ. *Cf. Frascella*, 751 F. Supp. 2d at 852 (discussing the wide distribution of the report). Without such evidence, the Court is unable to find that the DOJ "kn[ew] or reasonably should have . . . known" of the facts underlying Relator's FCA claims. *See* 31 U.S.C. § 3731(b)(2). Furthermore, the HHS-OIG Report investigated the allegation of whistleblower retaliation stemming from Relator's termination at HMS, not the veracity of the myriad TPL allegations. Doc. 51, Def.'s App'x, Ex. A. Even though the TPL allegations created the context for the retaliation claim, *see id.* at 3, HHS-OIG did not investigate whether these reports were true except for the "Tennessee Model" claim. *See id.*, 1–2. The Court is unwilling to assume that this limited inquiry by HHS-OIG triggered the requirement for HHS-OIG to notify the DOJ of possible violations of criminal law or that HHS-OIG in fact acted upon this statutory duty. *See* 5 U.S.C. app. 3 § 4(d). Thus, HMS has not established that the DOJ should have known about Relator's claims because of the HHS-OIG Report and that Relator's claims are time-barred.

B.     *Relator's Claims Analyzed Under Rule 9(b)*

HMS argues that the Relator's SAC is devoid of the "particular details or reliable indicia" of HMS's alleged failure "to bill claims 'timely' or 'at all.'" Doc. 50, Def.'s Br., 12. The SAC, per Defendant, omits any information about "actual claims, how much they were for, what states they emanated from, or specifics of when this occurred." *Id.* Next, HMS contends that Relator "selectively relies on certain regulations" while neglecting the full statutory framework. *Id.* Specifically, the 60-day collection period may be waived and "[S]tates have *three years* to pursue TPL claims." *Id.* at 12–13. (first citing 42 C.F.R. § 433.139(e)(1); and then citing 42 U.S.C. § 1396a(a)(25)(I)(iii)); Doc. 58, Def.'s Reply, 6. As such, Relator failed to sufficiently plead "'why' or 'how' the late or non-submission of TPL claims or the late uploads of MMIS information cause[d] a single reverse false claim." *Id.* (citing *Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 696 (5th Cir. 2005)). All these failings warrant dismissal under Rule 9(b), according to HMS. *See* Doc. 50, Def.'s Br., 12–14.

Relator rebuts that HMS "recycles its previous arguments" that this Court rejected from the prior motion to dismiss. Doc. 53, Relator's Resp., 11. Relator contends that the claims sufficiently comply with the pleading standard outlined in *Grubbs*, which the Court applied in the prior Order and found the TPL and MMIS claims sufficiently pleaded. *Id.* at 12.

Before turning to evaluate the individual claims under Rule 9(b), the Court must address HMS's preliminary argument about what standard to apply. HMS cites to *Plotkin* to argue that Relator must plead "the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation why they are fraudulent." 407 F.3d at 696; Doc. 58, Def.'s Reply, 6. Interestingly, this *Plotkin* pleading requirement matches up to the "who, what, when, where, and how" formulation that the Court used in the prior motion to dismiss. *Dorsey*

*v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008) (stating that "Rule 9(b) requires the complaint to set forth 'the who, what, when, where, and how' of the events at issue" after stating HMS's formulation of the Rule 9(b) pleading requirements); *Frey*, 2021 WL 4502275, at *3. The full quote from *Plotkin* reads: "In this court, the Rule 9(b) standards require specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation why they are fraudulent." *Plotkin*, 407 F.3d at 696. Simply put, "the statements (or omissions) considered to be fraudulent" is the "what" from the "who, what, when, where, and how" formulation. *See id.* "[T]he speaker" is the "who." *See id.* "[W]hen and why the statements were made" matches the "when" and "where." *See id.* And "an explanation why they are fraudulent" is the "how." *See id.* Thus, *Plotkin* reinforces the "who, what, when, where, and how" formulation as the standard for pleading under Rule 9(b). *See id.*; *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006); *United States ex rel. Integra Med Analytics, L.L.C. v. Baylor Scott & White Health*, 816 F. App'x 892, 896–97 (5th Cir. 2020) ("[I]t does generally require that a complaint detail 'the who, what, when, and where.'") (quoting *Hart v. Bayer Corp.*, 199 F.3d 239, 247 n.6 (5th Cir. 2000)).

Further, under Rule 9(b) for an FCA claim, Relator does not have to plead the "actual claims, how much they were for, what states they emanated from, or specifics of when this occurred," as HMS contends. *See* Doc. 50, Def.'s Br., 12; *Grubbs*, 565 F.3d at 190 ("[A] plaintiff does not necessarily need the exact dollar amounts, billing numbers, or dates to prove to a preponderance that fraudulent bills were actually submitted."). Requiring such proof "is one small step shy of requiring production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates." *Id.* Relator only needs to

"alleg[e] particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* And as discussed below, Relator has pleaded such a scheme for many of the claims under the traditional "who, what, when, where, and how" analysis.

The Court now turns to analyze the claims under the *Grubbs* standard. The Court begins with the individual State claims because these claims form the basis of the federal claims. The Court then addresses the federal claims.

    1.    <u>Counts 6–15 and 17–28 Under State False Claim Provisions</u>[4]

        i.       *Count 6: Cal. Gov't Code §§ 12650–56*[5]

For allegations specifically pertaining to Count Six (violation of the California false claims statute), Relator alleges that in 2010 there were $67.8 million worth of open claims in California. Doc. 42, SAC, ¶ 47. Additionally, HMS "pursue[d] recovery of associated TPL claims before loading the coverage information to the MMIS, if at all" in violation of "federal regulations [and] HMS's contract with the Department of Health Services." *Id.* ¶ 50. An employee of the California Department of Health Care Services confronted HMS about this after being warned by Relator "to

---

[4] Relator acquiesces to dismissal without prejudice for the Arkansas (Count 5) and Maryland (Count 16) claims because the state statutes "do[] not provide an opportunity for a *qui tam* relator to bring claims on behalf of the state." Doc. 42, SAC, ¶¶ 115, 224. Because Relator cannot assert a claim under these statutes, the Court **DISMISSES** these claims **WITHOUT PREJUDICE**.

[5] The relevant provision of the California False Claims Act reads:

> any person who. . . [k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state or to any political subdivision, or knowingly conceals or knowingly and improperly avoids, or decreases an obligation to pay or transmit money or property to the state or to any political subdivision.

Cal. Gov't Code § 12651(a)(7).

watch out for" this particular behavior. *Id.* This behavior allowed HMS "to collect contingency fees for filing (or in many cases, merely claiming to have filed) TPL claims for these expenditures" while California spent "millions of dollars of additional Medicaid funds . . . on patients who were covered by insurance." *Id.*

Because Relator does not present any evidence of actual false claims, Relator must provide "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *See Grubbs*, 565 F.3d at 190. Relator's California claim relies on many of the allegations describing a scheme by HMS to not bill third-party insurers or upload data into MMIS timely or at all. Doc. 42, SAC, ¶ 116 (incorporating the allegations from the preceding paragraphs). These allegations fail to provide the particularity required under Rule 9(b) for a scheme to defraud the State of California. To start, Relator admits that the $67.8 million worth of open claims might have been recovered. *Id.* ¶ 47 ("[I]t is possible that many claims classified as open . . . were eventually billed and paid."). Also, this number is only an amount for one moment in time—a snapshot—without further context to show the Court whether HMS perpetuated a scheme—over time—to deny the State of California the ability to collect on these TPL claims. Next, Relator does not allege any particularities of the MMIS upload scheme beyond general allegations of billing before uploading the TPL data into MMIS and the collection efforts after identifying TPL. *Id.* ¶ 123. Such vague assertions more closely resemble a lack "of any actual knowledge of any FCA-violating fraud" than a scheme with reliable indicia. *Nunnally*, 519 F. App'x at 893. Particularly lacking are details about the "when" and "how." Relator does not detail when exactly the alleged activity occurred, *see* Doc. 42, SAC, ¶ 122 (alleging a contract with California during Relator's employment with HMS), or how the $67.8 million of open claims (or what proportion) are

fraudulent. Therefore, the Court finds Relator fails to plead facts supporting "a strong inference" of fraud by HMS for the California claim and **DISMISSES** this claim.

        *ii.*        *Counts 7–10, 12–14, 17–19, 24, 26, 28*

Relator makes the same general allegations for the Colorado, Connecticut, Delaware, District of Columbia, Georgia, Indiana, Iowa, Massachusetts, Michigan[6], Minnesota, North Carolina, Rhode Island, and Virginia claims. *See* Doc. 42, Am. Compl., ¶¶ 126–169, 178–210, 225–257, 299–309, 321–331, 340–350. Using the "who," "what," "where," "when," and "how" formulation, he identifies:

> (1) Defendant is the "who"; (2) the "what" is Defendant's failure to bill TPL claims timely or at all and to timely upload coverage information to the MMIS, and providing false reports and certifications as to both; (3) the "where" is through Defendant's periodic reports to the state, in Defendant's offices, and at periodic in-person status update meetings in the offices of Defendant or the state; (4) the "when" is from April 16, 2009 and possibly to the present; and (5) the "how" is failing to properly maintain systems to handle the legal and regulatory obligations of Defendant, through the performance of regular "holds," "cleans," and "cycle edits" that prevented reimbursement of claims, and through the submission of false and inaccurate reports of its TPL billing activity as well as false MMIS compliance certifications.

*Id.* ¶¶ 134, 145, 156, 167, 186, 197, 208, 233, 244, 255, 307, 318, 329, 348. Relator also alleges that these states were considered "small" states because of their smaller Medicaid population compared to New York, Florida, Texas, California, and New Jersey and received "'back burner' treatment" for TPL collections. *Id.* ¶ 50. The only separate State-specific allegations are that Georgia had $35.9 million and North Carolina had $45.3 million of open TPL claims as of 2010, according to Relator. *Id.* ¶ 47.

Despite reciting the "who," "what," "where," "when," and "how" Rule 9(b) formulation for each of the individual State claims, Relator's claims fail to plead with the particularity required under

---

[6] The Michigan Medicaid False Claim Act does not define materiality. Mich. Comp. Laws Ann. § 400.602.

Rule 9(b) for the same reason identified in the Court's prior Order. *Frey*, 2021 WL 4502275, at *6 ("Relator fails to allege what specifically took place in the remaining 21 state FCA claims."). He provides no reliable indicia that would lead the Court to find a strong inference of fraud.

Further, the Court finds this case distinguishable from the case presented by Relator to argue the Court should find identically pleaded claims, where a court found one claim provides enough particularity, sufficiently pleaded to survive a motion to dismiss, *S.E.C. v. Reynolds*, 2009 WL 1065403 (N.D. Tex. April 17, 2009). In *Reynolds*, the plaintiff brought a securities fraud case against the defendant for the fraudulent sale of a penny stock. *Id.* at *1–2. The plaintiff amended its complaint to add additional defendants and a second "virtually identical" claim for another penny stock offering. *Id.* at *3. The Court denied the defendant's motion to dismiss. *Id.* at *6.

The analogy fails because here, unlike in *Reynolds*, Relator provides no specific allegations for each "virtually identical" claim. *See id.* at *1, *3 (providing the name of another penny stock entity and the language from separate disclaimers). The lack of specific allegations leaves the Court without any indication that the alleged scheme took place in these Plaintiff States. And for the State-specific allegations regarding the open TPL claims, these allegations fail for the reasons identified earlier by the Court that these allegations provide a mere snapshot in time of open claims in these States devoid of context to paint a scheme of fraud. Therefore, the Court **DISMISSES** the Colorado, Connecticut, Delaware, District of Columbia, Georgia, Indiana, Iowa, Massachusetts, Michigan, Minnesota, North Carolina, Rhode Island, and Virginia claims.

### iii.    Count 11: Fla. Stat. Ann. §§ 68.081–68.092[7]

For the claim pursuant to the Florida False Claims Act, Relator realleges the previously described scheme. Doc. 42, SAC, ¶ 170. He also alleges that HMS ignored "tens of millions, if not over $100 million" in TPL claims until HMS lost the contract to perform TPL services for Florida in 2009, after which HMS "kicked into high gear" to bill TPL claims and collect the corresponding contingency fees before the new service provider's contract went into effect. *Id.* ¶¶ 49–50. Further, Florida was considered one of the "big" states by HMS for TPL collections because of the large Medicaid population. *Id.* ¶ 50.

These additional details provide enough reliable indicia for the Court to draw a strong inference of fraud. Taking the allegations as true, HMS ignored their obligation to collect the TPL claims until HMS learned of the contract with the new service provider. *Id.* ¶¶ 49–50. Such behavior is indicative of a scheme to not collect on TPL claims. Further, the Court previously found Relator identified the "who, what, where, when, and how" for this claim. *Frey*, 2021 WL 4502275, at *6.

HMS contends that 42 U.S.C. § 1396a(a)(25)(I)(iv) grants HMS three years to satisfy any TPL claim. Doc. 50, Def.'s Br., 12–13. Thus, any "delay" in collecting Florida's claims within sixty days did not impact "the Federal fisc" because HMS collected the claims within the extended three-year collection period. *Id.* at 13.

States participating in Medicaid are required by federal law "to implement a 'third party

---

[7] The relevant provision of the Florida False Claims Act reads:

> Any person who. . . [k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state.

Fla. Stat. Ann. § 68.082(2)(g).

liability' provision that requires the state to seek reimbursement for Medicaid expenditures from third parties who are liable for medical treatment provided to a Medicaid recipient." *Caremark, Inc. v. Goetz*, 480 F.3d 779, 783 (6th Cir. 2007) (citing 42 U.S.C. § 1396a(a)(25)(A)). 42 U.S.C. § 1396a(a)(25)(I) provides:

> [T]hat the State shall provide assurances satisfactory to the Secretary that the State has in effect laws requiring health insurers . . . as a condition of doing business in the State, to . . . (iii) respond to any inquiry by the State regarding a claim for payment for any health care item or service that is submitted not later than 3 years after the date of the provision of such health care item or service; and (iv) agree not to deny a claim submitted by the State solely on the basis of the date of submission of the claim . . . .

42 U.S.C. § 1396a(a)(25)(I). This provision imposes a duty on the States to have laws in place requiring health insurers to pay claims submitted by the State within three years after the time of providing the healthcare item or service. *See id.*

On the other hand, regulations impose a sixty-day period—beginning at the end of the month when a State learns of third-party coverage—for the State to seek reimbursement from a third party. *See* 42 C.F.R. § 433.139(d). Specifically, the regulation reads:

> [I]f the [State] agency learns of the existence of a liable third party after a claim is paid, or benefits become available from a third party after a claim is paid, the agency must seek recovery of reimbursement within 60 days after the end of the month it learns of the existence of the liable third party or benefits become available.

42 C.F.R. § 433.139(d)(2). Thus, reading the statute and regulation in conjunction, a State must seek reimbursement from liable third parties within sixty days of the end of the month that the State learns of third-party coverage and an insurer may not reject the claim if the claim is filed within three years of the provided healthcare item or service. *See id.*; 42 U.S.C. § 1396a(a)(25)(I). Critically, the triggering event is the state Medicaid agency learning of third-party coverage; this gives the agency sixty days—not three years—from the end of that month to seek reimbursement. However, this

sixty-day window can occur at any point within the three-year time frame when an insurer must respond to a claim and the State would not lose money through possible reimbursement. As long as the State becomes aware of the third-party coverage sixty days before the three-year time frame closes, presumably, the State could take the full sixty days allowed by the regulation to seek reimbursement, collect from the insurer, and not fail to remit any money owed to the federal government, thus not deny any money owed to the Government.

Applying this statutory and regulatory framework to Relator's SAC, the Court finds Relator's allegations sufficiently plead a plausible indirect reverse false claim. According to Relator's allegations, HMS knew of TPL claims in Florida to the tune of at least tens of millions of dollars. Doc. 42, SAC, ¶ 49. HMS's alleged collection efforts after losing the TPL collections contract further demonstrate that HMS knew it was required to seek reimbursement for the TPL claims. *See id.* Further, HMS assumed the responsibility of complying with the sixty-day collection requirement through its contract with the Florida Agency for Healthcare Administration. *Id.* ¶¶ 42, 174. The contract obligated HMS to collect on the TPL claims within sixty days of learning of them. Thus, Relator's SAC sufficiently pleads that HMS had an obligation to collect TPL claims and its failure to fulfill this obligation potentially impeded Florida's obligation to reimburse the federal government.

> iv.    *Count 15: La. Stat. Ann. §§ 46:437.1–440.16*[8]

Specific to Louisiana, Relator alleges that the State later contracted with a competitor of HMS because of "HMS's low success rate in billing and collecting TPL claims." Doc. 42, SAC, ¶ 50. HMS regarded Louisiana as a "small" state and Louisiana compensated HMS on a fixed fee—as opposed to a contingency fee—which "led HMS to neglect Louisiana . . . [,] violat[ing] HMS's contract and applicable law." *Id.* Relator further alleges that HMS employed the "Tennessee Model" in Louisiana to "knowingly bill[] twice for providing the same coverage information in the state." *Id.* ¶ 220.

These allegations fail to provide the Court with reliable indicia to leave the Court with a strong inference of fraud. While Relator incorporates the "Tennessee Model" allegations into this claim by alleging the same activity took place in Louisiana, Relator fails to support these allegations with reliable indicia. For the "Tennessee Model" claim, Relator alleges that he told Vice President David Dawson and his colleague James Finley about his concerns regarding the State of Tennessee. *See id.* ¶¶ 69–73. None of the allegations provide indicia, much less reliable indicia, that the "Tennessee Model" also occurred in Louisiana as alleged by Relator.  *Id.* ¶ 71 ("Relator believes that HMS also implemented the "Tennessee Model" in Louisiana."); *see id.* ¶¶ 69–73 (describing the "Tennessee Model" with allegations that pertain only to Tennessee). Even though the Tennessee

---

[8] The relevant provision of the Louisiana Medical Assistance Programs Integrity Law reads:

No person shall knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the medical assistance programs, or to knowingly conceal, avoid, or decrease an obligation to pay or transmit money or property to the medical assistance programs.

La. Stat. Ann. § 46:438.3(C).

claim survives under the "who, what, where, when, how" standard, the failure to provide allegations specific to Louisiana proves fatal to the claim. The Court **DISMISSES** the Louisiana claim.

     *v.*     *Count 20: Nev. Rev. Stat. Ann. §§ 357.010–357.250*[9]

Relator worked to grow the Nevada market "essentially from scratch." Doc. 42, SAC, ¶ 6. Relator alleges that at some point in 2010, Nevada had $4.1 million in open claims and HMS gave "back burner" treatment to Nevada because it was not considered a "big" state. *Id.* ¶¶ 47, 50. The Nevada Department of Human Resources was routinely "dissatisfied with HMS's performance under its contract, especially after HMS transferred Relator . . . resulting in Nevada no longer being one of Relator's territories" and "periodically contact[ed] Relator to express their dissatisfaction with HMS." *Id.* ¶ 50.

Once again, Relator fails to provide reliable indicia of a fraudulent scheme to warrant a strong inference of fraud. As stated for other claims, the snapshot of open claims does not indicate that HMS never collected these claims or did so in an untimely manner. The Nevada Department of Human Resources's alleged dissatisfaction with HMS indicates general dissatisfaction, not that HMS failed to timely collect TPL claims or upload the MMIS data. None of these allegations provide reliable indicia that HMS allowed claims to surpass the sixty-day collection period or failed to upload the third-party coverage within forty-five days. The Court **DISMISSES** the Nevada claim.

---

[9] The relevant provision of the Nevada False Claims Act reads:

> [A] person who . . . [k]nowingly makes or uses, or causes to be made or used, a false record or statement that is material to an obligation to pay or transmit money or property to the State or a political subdivision [or] [k]nowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State or a political subdivision.

Nev. Rev. Stat. Ann. § 357.040(1)(f–g).

vi.    *Count 21: N.J. STAT. ANN. §§ 2A:32C-1–18*[10]

Relator specifically alleges that New Jersey "represented one of HMS's largest contracts" with $168.2 million of open claims at some point in 2010. Doc. 42, SAC, ¶¶ 47, 50. The HMS executive/employee in charge of the New Jersey contract, Kevin Lee, maintained "a cozy relationship with the New Jersey Department of Human Services," creating a climate that allowed HMS to let "TPL claims . . . fall through the cracks without ever disclosing problems to the state." *Id.* ¶ 50. HMS processed the claims so poorly that HMS executives joked that Mr. Lee "process[ed] the data for the state from his garage." *Id.* Further, in 2013 the New Jersey Office of the State Auditor found that HMS billed the State for $7.5 million for previously identified and billed third-party coverage. *Id.*

Like the other State claims, Relator does not provide evidence of submitted claims, so Relator must plead "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *See Grubbs*, 565 F.3d at 190. Relator provides more detail to the New Jersey claim than most of the other State claims. However, the allegation regarding the State Auditor findings implies that HMS submitted claims too diligently to the point of *overbilling* the State of New Jersey for TPL claims. *See* Doc. 42, SAC, ¶ 50. Further, the allegation of $168.2 million of open claims provides a snapshot in time of open claims, which does not provide reliable indicia that HMS never billed any of these claims. *See id.* ¶ 47. As Relator admits, a claim stays "open" for a number of reasons and may not mean that HMS never billed or

---

[10]The New Jersey False Claims Act does not define obligation. *See* N.J. Stat. Ann. § 2A:32C-2. The statute also does not include a materiality requirement, so the statute does not define material. *Id.* § 2A:32C-2–3. The relevant provision of the New Jersey False Claims Act reads:

> A person shall be jointly and severally liable to the State for . . . [k]nowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State.

*Id.* § 2A:32C-3.

received reimbursement from the claim. *Id.* The allegation that Mr. Lee allowed claims to fall through the cracks portrays an unsavory environment for properly billing TPL claims, but taking the allegation in conjunction with the other allegations, Relator fails to create a strong inference of fraud to support the New Jersey false claim. Therefore, the Court **DISMISSES** this claim.

     *vii.*  *Count 22: N.M. Stat. Ann. §§ 44-9-1–14*[11]

    For New Mexico-specific allegations, "HMS was a subcontractor to the primary contractor" and New Mexico was considered a "small" state, which resulted in relegating the New Mexico contract to "back burner" status. Doc. 42, SAC, ¶ 50.

    Relator's allegations fail to create a strong inference of fraud. Relator recites the "who, what, where, when, how" formula for pleading fraud and incorporates the other allegations regarding failure to bill TPL claims and upload to MMIS, but these allegations do not pertain specifically to New Mexico. Adding in the New Mexico-specific allegations provides scant indicia of a reverse false claim for HMS's actions under the New Mexico contract. The Court also **DISMISSES** the New Mexico claim.

---

[11] The New Mexico Fraud Against Taxpayers Act does not include a materiality requirement so the statute does not define material. N.M. Stat. Ann. § 44-9-2–3. The statute also does not have a statute of limitations. *Id.* § 44-9-12. The relevant provision of the New Mexico Fraud Against Taxpayers Act reads:

> A person shall not . . . [k]nowingly make or use, or cause to be made or used, a false, misleading or fraudulent record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state or a political subdivision.

*Id.* § 44-9-3(8).

<em>viii.</em>     <em>Count 23: N.Y. State Fin. Law §§ 187–94</em>[12]

Relator's New York claim largely mirrors the allegations from the prior complaint that the Court found sufficiently pleaded according to the "who, what, where, when, how" standard. *Frey*, 2021 WL 4502275, at *2, *6.

HMS contends the New York claim "consists of bare bones accusation[s]" because Relator "never quantifies the alleged add fees." Doc. 50, Def.'s Br., 16. Additionally, the New York contract "changed in early 2009, and . . . Relator never alleges a single fact to show HMS kept any add fees after [the statute of limitations] cutoff." *Id.* at 16–17. Lastly, HMS contends "the pleading fails to connect how New York's receipt of the 'add fees' from HMS would have resulted in payment to the Federal Government." *Id.* at 17.

Relator rebuts that these arguments repeat the previously rejected arguments. Doc. 53, Relator's Resp., 13–14.

HMS is correct that Relator does not compute the total "add fees" for the New York claim, but this does not prove fatal. First, Relator cannot be expected to have information exclusively in the control of HMS. *United States ex rel. Gage v. Davis S.R. Aviation, L.L.C.*, 623 F. App'x 622, 627 (5th Cir. 2015) ("We may relax the pleading requirements of 9(b) if 'facts relating to the fraud are peculiarly within the perpetrator's knowledge.'" (quoting *United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 330 (5th Cir. 2003)); *Hill v. Morehouse Med. Assocs.*, 2003 WL 22019936, at *4 (11th

---

[12] The relevant provision of the New York false claims act reads:

> [A]ny person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government; or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a local government.

N.Y. State Fin. Law § 189(1)(g–h).

- 26 -

Cir. Aug. 15, 2003); *see also Grubbs*, 565 F.3d at 191 (noting defendants will be in possession of the most relevant documents to defend against a false claim). Second, the Court does not see how this total would help HMS defend against the claim. HMS has notice of the particularities of the scheme and when it allegedly occurred, so it can sufficiently defend against Relator's allegations. See Doc. Doc. 42, SAC, ¶¶ 64–68. Lastly, Rule 9(b) does not require Relator to plead the exact amount at this stage of the case. *See Grubbs*, 565 F.3d at 190 (stating that "the exact dollar amounts fraudulently billed will often surface through discovery").

HMS's second contention either misunderstands or misstates Relator's allegations. Relator alleges HMS continued to hold onto "add fees" from the pre-2009 contract after the new contract took effect. Doc. 42, SAC, ¶ 66. The new contract, per Relator, did not extinguish the obligation of HMS to refund the "add fees" collected under the old contract, but HMS continued to retain many of these "add fees." *Id.* And HMS continued to retain these "add fees" beyond the statute of limitations cutoff. *Id.* Thus, Relator does plead that some of the "add fees" from the pre-2009 contract fall within the statute of limitations period. *See id.* ("In other words, the new contract did not extinguish the repayment obligations that had already arisen and were outstanding under the previous contract.").

HMS's last argument that Relator fails to connect the retained "add fees" to an obligation to remit money to the federal government raises a fact question that should be decided at the summary-judgment stage, not the motion-to-dismiss stage. *See Morales v. Motion Indus., Inc.*, 2010 WL 11618060, at *4 (N.D. Tex. July 8, 2010) (denying motion to dismiss because the fact issue was "better suited for a motion for summary judgment"); *e.g. Delhomme v. Caremark Rx Inc.*, 232 F.R.D. 573, 580 (N.D. Tex. 2005) ("[F]actual issue[s] . . . may be more appropriately decided on summary

judgment or at trial."); *Randall v. L-3 Commc'n Corp.*, 2017 WL 2189432, at *9 n.8 (finding summary judgment or trial more appropriate for considering evidence). The failure to remit the "add fees," according to Relator, decreased payments to NY OMIG to the tune of millions of dollars, in turn decreasing the amount remitted to the federal government. Doc. 42, SAC, ¶ 68. Whether the "add fees" came from Medicaid funds that New York had an obligation to reimburse to the federal government if HMS obtained a recovery from a third-party insurer can be easily answered in the initial discovery phase by examining the contract between HMS and the State of New York and any possible agreements between the State of New York and the federal government.

The Court **DENIES** HMS's motion to dismiss the New York claim.

ix.     *Count 25: Okla. Stat. tit. 63, §§ 5053–54*[13]

Relator alleges that Oklahoma had $16.7 million in open claims at one time in 2010. *Id.* ¶ 47. Oklahoma was also considered "a 'small' state with a low Medicaid population." *Id.* ¶ 50. At one point, Relator compared Oklahoma's recovery figures with Idaho's—a smaller Medicaid population state—and noticed HMS recovered more from Idaho than Oklahoma. *Id.* After bringing this to the attention of HMS, the company determined that it "had been pursuing TPL recoveries only [for] persons who were newly Medicaid-eligible, and not the state's entire Medicaid population." *Id.*

Relator's Oklahoma allegations provide reliable indicia that leaves the Court with a strong inference of a failure to timely collect on claims. Particularly telling is the allegation that HMS

---

[13] The relevant provision of the Oklahoma Medicaid False Claims Act reads:

[A]ny person who . . . [k]nowingly makes, uses or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state.

Okla. Stat. tit. 63, § 5053.1(B)(7).

determined it had billed for a small subset of the Medicaid population and not the entire Medicaid population in Oklahoma. *Id.* The allegation also indicates that HMS knew of third-party coverage for these newly-covered individuals, and that this required HMS to collect within sixty days. *See* 42 C.F.R. § 433.139(d). This leads to a strong inference that HMS did not timely bill many claims before learning of this issue, depriving Oklahoma of reimbursement for TPL claims. Based on this reliable indicium, the Court is left with a strong inference that HMS impaired the obligation of Oklahoma to remit payments to the federal government. Accordingly, the Court **DENIES** HMS's motion to dismiss for the Oklahoma claim.

        x.      *Count 26: R.I. Gen. Laws Ann. §§ 9-1.1-1–9*[14]

Specific to Rhode Island, Relator alleges that HMS considered the State a "small" state and gave claim recovery "back burner" status. Doc. 42, SAC, ¶ 50. Relator provides no other State-specific allegations and incorporates the general failure-to-bill and MMIS-upload allegations. *Id.* ¶ 321.

The failure to provide more substance for this claim deprives the Court of reliable indicia to support the allegation as it pertains to Rhode Island. Without reliable indicia, the Court cannot develop a strong inference that HMS impaired Rhode Island's obligation owed to the federal government. Therefore, the Court **DISMISSES** this claim.

---

[14] The relevant provision of the Rhode Island State False Claims Act reads:

[A]ny person who . . . [k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state.

R.I. Gen. Laws Ann. § 9-1.1-3(a)(7).

xi.     *Count 27: Tenn. Code Ann. §§ 71-5-181–185*[15]

With respect to Tennessee, Relator recounts the same allegations from the prior complaint. *Compare* Doc. 19, Am. Compl., ¶¶ 69–73, *with* Doc. 42, SAC, ¶¶ 69–73. Generally, Relator alleges a scheme called the "Tennessee Model" where HMS sold the same TPL information for upload into MMIS to individual MCOs and the state Medicaid agency, thus "double billing" for the same information. Doc. 42, SAC, ¶¶ 69–73. Relator provides additional allegations in the SAC that HMS considered Tennessee a "small" state, garnering "back burner" status and HMS exported the "Tennessee Model" to other states. *Id.* ¶¶ 50, 91.

HMS contends the claim rests on "allegations of the law" creating "an attenuated line [between] overpayments to MCOs . . . to . . . Medicaid premium rates" devoid of "concrete fact-based allegations." Doc. 50, Def.'s Br., 17. Further, TennCare's Director of Program Integrity disagreed that the "double billing" scheme "wasted[d] or abuse[d] Medicaid funds" during an HHS-OIG investigation in 2013, "foreclose[ing] a plausible pleading of materiality." *Id.* at 18 (quoting Doc. 51, Def.'s App'x, 75); Doc. 58, Def.'s Reply, 8. Thus, Relator cannot state a plausible "fraud claim based on the 'Tennessee Model' where the director of the State's own oversight agency found no problem under these facts." *Id.* (citing *Twombly*, 550 U.S. at 559–60).

Relator responds that HMS recycles its argument from the prior motion to dismiss. Doc. 53, Relator's Resp., 13. Relator also contends that the email by the Tennessee official is "more

---

[15] The relevant provision of the Tennessee Medicaid False Claims Act reads:

[A]ny person who . . . [k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money, or property to the state, or knowingly conceals, or knowingly and improperly, avoids, or decreases an obligation to pay or transmit money or property to the state, relative to the medicaid program.

Tenn. Code Ann. § 71-5-182(a)(1)(D).

appropriate for the discovery phase and trial" and the statement was not made under oath, nor was the official cross-examined. *Id.* Further, Relator notes that this Court previously applied the *Escobar* factors to find HMS's statements material. *Id.* at 14.

The Tennessee Medicaid False Claims Act ("TMFCA") defines material as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." Tenn. Code Ann. § 71-5-182(e). And Tennessee courts look to the "words of the statute," not federal caselaw to construe state statutes. *Knox Cnty. ex rel. Env't Termite & Pest Control, Inc. v. Arrow Exterminators, Inc.*, 350 S.W.3d 511, 524 (Tenn. 2011) (interpreting the Tennessee False Claims Act). In the Fifth Circuit, "[w]hen reviewing a motion to dismiss, a district court must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.*, 976 F.3d 585, 589 (5th Cir. 2020) (alteration in original) (internal quotations omitted).

HMS contends the Court may take judicial notice of the email from the Tennessee official as a publicly available record that falls within the ambit of Federal Rule of Evidence 201. Doc. 50, Def.'s Br., 18. A court may take judicial notice of a "fact that is not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned . . . if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(b–c). Presumably, HMS contends the HHS-OIG Report and the appended email from the Tennessee official fall within the latter category for accurate materials that cannot be reasonably questioned, because the report covered activities in Tennessee—outside this Court's territorial

jurisdiction—and does not concern "generally known" facts but the internal administration of the Tennessee Medicaid program. *See id.*; *cf. Petrobras Am., Inc. v. Samsung Heavy Indus. Co.*, 9 F.4th 247, 255 (5th Cir. 2021) (finding the district court improperly took judicial notice of newspaper articles that did not include "generally known" facts). Ultimately, HMS requests the Court to take judicial notice of the email by the Tennessee official but not the existence of the HHS-OIG Report or the ensuing investigation. *See* Doc. 50, Def.'s Br., 18 ("TennCare's statement on the subject . . . forecloses a plausible pleading of materiality.").

From the documents provided, the Court cannot accurately and readily determine whether what the email purports is a fact worthy of judicial notice. *See* Fed. R. Evid. 201(b); *Dasenbrock v. Enenmoh*, 2018 WL 10322174, at *2 (E.D. Cal. Jan. 8, 2018) ("[T]he court may take judicial notice of the fact that such a report was published by the OIG, but not of the facts included within the report."); *Bryan v. Avado Brands, Inc.*, 187 F.3d 1271, 1277–78 (11th Cir. 1999) (limiting judicial notice to the statements in a document but "not to prove the truth of the documents' contents"); *Fed. Deposit Ins. Corp. v. Boggus*, 2014 WL 12479645, at *2 (N.D. Ga. Aug. 25, 2014) ("While the court is free to notice that the OIG Report contains this statement and similar ones, the fact that the FDIC said it does not make it true."); *United States v. Savannah River Nuclear Sols., LLC*, 2016 WL 7104823, at *8 n.7 (D. S.C. Dec. 6, 2016) (limiting judicial notice of an OIG report to "the fact that Defendants advanced those substantive arguments at the time"); *King v. Akima Glob. Servs., LLC*, 775 F. App'x 617, 621 (11th Cir. 2019) (stating that "judicial notice of certain facts in the DHS report, OIG report, and Miami-Herald article was appropriate" but rejecting use of the facts to establish a conclusion of law); *Fuller v. Houston*, 2021 WL 6496742, at *5 n.4 (C.D. Cal. Nov. 19, 2021) ("While it might be appropriate to take judicial notice of the OIG's COVID-19 Report

existence, the Court cannot properly take judicial notice of the facts included in the report, which is what Plaintiff seeks."); *Kappouta v. Valiant Integrated Servs., LLC*, 2021 WL 4806437, at *5 (S.D. Cal. Oct. 14, 2021) (rejecting judicial notice because "the disclosures amount to conclusions of law"); *United States ex rel. Brooks v. Stevens-Henager Coll., Inc.*, 359 F. Supp. 3d 1088, 1102–03 (D. Utah. 2019) (taking judicial notice of the fact that the Government took certain actions, but not to draw an inference from these facts contained in a GAO report); *United States v. Ojai Valley Cmty. Hosp., Inc.*, 2018 WL 6177257, at *1 n.1, *4–5 (C.D. Cal. July 30, 2018) (taking judicial notice of an OIG report for the existence of an investigation); *Outley v. City of Chicago*, 2021 WL 4745393, at *7 (N.D. Ill. Oct. 12, 2021) (denying judicial notice of OIG report as inadmissible hearsay); *Meade v. Bonin*, 2020 WL 5311351, at *3, n.5 (E.D. La. Sept. 4, 2020) (taking judicial notice of OIG report for the existence of a contract); *Bloedow v. Planned Parenthood of the Great Nw. Inc.*, 2013 WL 6631771, *4–5 (W.D. Wash. Dec. 16, 2013) (taking judicial notice of factual findings in an OIG report); *Cnty. of Santa Clara v. Astra USA, Inc.*, 257 F.R.D. 207, 208 n.3 (N.D. Cal. 2009) (taking judicial notice of factual finding in OIG reports); *Bank of Am., N.A. v. Veluchamy*, 535 B.R. 783, 787 & n.2 (N.D. Ill. 2015) (taking judicial notice of factual findings in OIG report); *see also United States ex rel. Woodard v. DaVita, Inc.*, 2011 WL 13196556, at *6 n.6 (E.D. Tex. May 9, 2011) (rejecting parties' conclusion from facts contained in the OIG reports). Thus, the Court may take judicial notice that the Tennessee official sent this email and it said what it said but not make any inferences or conclusions of law flowing from these noticed facts. Accordingly, the Court finds judicial notice of the email improper insofar as HMS requests the Court to conclude as a matter of law that HMS's "double billing" does not violate the Tennessee Medicaid False Claims Act. Having previously found

the Relator sufficiently pleaded the Tennessee claim, *Frey*, 2021 WL 4502275, at *6, the Court **DENIES** HMS's motion to dismiss the Tennessee claim.

> 2.   Count 1: Failure to Bill Timely or at All Under the FCA

For the indirect reverse false claim for the failure to bill timely or at all, Relator claims that HMS "knowingly concealed or knowingly and improperly . . . reduc[ed] the recovery of Medicaid funds" for Plaintiff States "causing the Plaintiff States to decrease their obligation to pay or transmit funds to the federal government." Doc. 42, SAC, ¶¶ 95–96.

This count mirrors the same count from the Relator's prior complaint. *Compare* Doc. 16, Am. Compl., ¶¶ 91–95, *with* Doc. 42, SAC, ¶¶ 93–97. The Court previously found this count sufficiently alleged the "who, what, when, where, and how" and the Court finds the same today. *See Frey*, 2021 WL 5502275, at *6. Alternatively, the Court finds Relator sufficiently pleaded details of a scheme with particularity and reliable indicia to leave the Court with a strong inference of fraud for the same reasons as the Florida claim. *See Grubbs*, 565 F.3d at 190. Thus, the Court **DENIES** the motion to dismiss Count 1.

> 3.   Count 2: Failure to Upload Coverage Information to MMIS

The MMIS-failure-to-upload claim alleges that HMS "failed to upload to the MMIS timely or at all the third[-]party coverage information . . . , and submitted false and fraudulent certifications to the Plaintiff States," reducing Medicaid recoveries and impairing Plaintiff States' obligations to remit funds to the federal government. Doc. 42, SAC, ¶ 100. Further, HMS provided "inaccurate systems compliance certifications" to the Plaintiff States, "caus[ing] the federal government to provide the states millions of dollars in [improper] federal systems enhancement funds." *Id.* ¶ 101.

HMS first argues that the failure-to-upload allegation converts "a breach of contract between HMS and its state Medicaid clients into a reverse false claims claim." Doc. 50, Def.'s Br., 14. Next, HMS contends that the SAC fails to identify "actual reverse false claims," how the failure to upload impacted recovery efforts, and "reliable indicia that strongly infer any MMIS information (timely or at all) would lead to actual collections of third-party claims." *Id.* at 14–15. Relying on the same argument from above, HMS further avers that the cost avoidance is speculative or contingent, which fails to establish the obligation element. *Id.* at 15–16. Finally, HMS argues the "general and non-descript allegations" fail to plead a "legally cognizable" claim of how the failure to upload the information within forty-five days prevents recovery of the claims within the "three-year lookback period." *Id.* at 16.

Relator makes the same arguments from above regarding the failure to bill timely. *See* Doc. 53, Relator's Resp., 11–12.

For HMS's first argument—whether a breach of contract equates to a false claim—the Court finds HMS's alleged breaches constitute a reverse false claim. "Not every breach of a federal contract is an FCA problem." *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 268 (5th Cir. 2010). However, a false claim of compliance with the provisions of a contract may create an actionable false claim. *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 824 (7th Cir. 2011). Courts look to the demanding materiality element to distinguish between "garden-variety breaches of contract or regulatory violations" and false claims. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016). The Court previously addressed the materiality element for MMIS uploads in its prior opinion, *see Frey*, 2021 WL 4502275, at *11–13, so the Court

does not readdress the same issue and finds Relator does not plead a "garden-variety breach[] of contract" claim. *See Escobar*, 579 U.S. at 194.

HMS's second argument attacking the particularity of the allegations fares no better than the first. The Court also already addressed Relator's MMIS failure to upload claim in the prior Order and found Relator sufficiently pleaded the claim with the particularity required of Rule 9(b). *Frey*, 2021 WL 4502275, at *6. HMS offers no new arguments that would change the Court's prior determination. The Court finds the claim well pleaded.

The Court also finds that HMS's contention that the obligation is "contingent" or "speculative" fails for similar reasons as above. *See supra* Section III(B)(1)(iii). Uploading the data to MMIS is not a discretionary act as HMS contends. Doc. 50, Def.'s Br., 15 (citing *Barrick*, 878 F.3d at 1226). It is a requirement of federal regulations. 42 C.F.R. § 433.138(g)(1)(i); Doc. 50, Def.'s Br., 14; Doc. 42, SAC, ¶ 57. Timely uploading of data to MMIS illuminates third-party coverage for Medicaid beneficiaries and possible dual payors (a third-party insurer and Medicaid) of the same claim and triggers the requirements to reject claims or recover reimbursements. 42 C.F.R. § 433.138(g)(1)(i) ("[T]he agency must follow up . . . on such information . . . so the agency may process claims under the third party liability payment procedures specified in § 433.139 (b) through (f)."). HMS fails to identify for the Court what aspect of these regulations creates a contingent or speculative obligation because, as the regulation reads, HMS has an established duty to upload third-party insurance coverage data to MMIS so the claims can be rejected or recovered. *See id.*

HMS's final argument relies on the same three-year recovery period as the TPL claims and fails for the same reasons. *See* Doc. 50, Def.'s Br., 16. As explained in further detail above, the three-year recovery period establishes a statute of limitations for recovery of claims by the States, but

federal regulations still require recovery of a claim within sixty days of learning of the claim. 42 U.S.C. § 1396a(a)(25)(I)(iii); 42 C.F.R. § 433.139(d). More applicably to the MMIS upload claims, the identification of dual coverage after uploading data to MMIS triggers the sixty-day recovery period. 42 C.F.R. § 433.138(g)(1)(i). Thus, while a State can recover up to three-year-old claims, HMS still had a regulatory requirement—an obligation—to seek recovery of claims within sixty days of learning of dual coverage from the MMIS uploads.

The Court therefore rejects HMS's arguments and **DENIES** the motion to dismiss for the MMIS claim.

> 4.     Count 3: Failure to Refund Policy "Add Fees"

This claim largely mirrors the New York claim discussed in more detail above. *See* Doc. 42, SAC, ¶¶ 104–08 (discussing the failure to refund New York "add fees"); *supra* Section III(B)(1)(viii). For the same reasons as the New York claim, the Court finds Relator sufficiently pleaded a scheme along with reliable indicia to leave the Court with a strong inference of fraud. *See supra* Section III(B)(1)(viii); *Grubbs*, 565 F.3d at 190. Further, the Court previously found Relator sufficiently pleaded the more exacting "who, what, where, when, how" standard. *See Frey*, 2021 WL 5502275, at *6. Accordingly, the Court **DENIES** HMS's motion to dismiss the federal New York "add fee" claim.

> 5.     Count 4: Failure to Refund Fees From "Double Billing"

This claim relies mostly on the allegations from the Tennessee claim. *See* Doc. 42, SAC, ¶¶ 109–14 (discussing the Tennessee "double billing" scheme). Relator contends the "double billing" practice also took place in "certain other Plaintiff States," but only provides allegations of this practice taking place in Tennessee and Louisiana. *Id.* ¶¶ 220, 336. Having found the Tennessee claim

but not the Louisiana claim sufficiently pleaded, the Court also finds this federal claim sufficiently pleaded according to the *Grubbs* standard and the traditional "who, what, where, when, how" standard. *See Frey*, 2021 WL 5502275, at *6. The Court **DENIES** the motion to dismiss the federal "double billing" claim.

C.      *Substantive Elements of Relator's Claims*

HMS attacks the obligation, knowledge, and materiality elements of the alleged indirect reverse false claims. The Court addresses each in turn below.

1.      Relator Sufficiently Pleaded an Obligation Exists

As stated above, the obligation element of an indirect reverse false claim requires Relator to prove Defendant acted "to conceal, avoid, or decrease an obligation to pay money to the government." *Matheny*, 671 F.3d at 1222. "Obligation" is defined by the False Claims Act as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3). As interpreted by courts in this circuit, the term "'established' refers to whether there is any duty to pay, while 'fixed' refers to the amount of the duty." *United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*, 843 F.3d 1033, 1037 (5th Cir. 2016). Thus, obligations: "(1) . . . must be 'established dut[ies]'; (2) . . . need not be 'fixed'; and (3) . . . can arise from a list of sources, including statutes and regulations." *Id.* (second alteration in original) (quoting 31 U.S.C. § 3729(b)(3)).

State Medicaid agencies must "take all reasonable measures to ascertain the legal liability of third parties . . . to pay for care and services available under the plan" and "seek reimbursement for such assistance to the extent of such legal liability." 42 U.S.C. §1396a(25)(A–B); 42 C.F.R.

§ 433.139(d) ("[A]n agency must seek recovery of reimbursement from the third party . . . within 60 days."). "If the State receives [federal financial participation] in Medicaid payments for which it receives third party reimbursement, the State must pay the Federal government a portion for the reimbursement . . . ." 42 C.F.R. § 433.140.

HMS argues that the "alleged contractual breaches . . . do not suffice to create an actionable, 'established duty to pay under a reverse false claims act theory" because the breaches are "speculative and contingent." Doc. 50, Def.'s Br., 8. HMS first contends that the nature of the TPL collection process makes transmittal of money to the Government uncertain. *Id.* at 9. For example, HMS avers that States do not have to pursue claims if the recovery costs will exceed the claim and that recovery is never guaranteed. *Id.* Ultimately, the SAC, according to HMS, confuses "HMS's contractual obligations of HMS to pursue third-party payment of claims where appropriate" under the TPL contracts with the FCA's more definitive "established obligation" element. *Id.* at 9–10. Lastly, HMS argues that the alleged obligation in this case is "speculative" and distinguishable from the obligations in *Grubea* and *Caremark*—two cases that this Court relied on in its Order addressing HMS's first motion to dismiss. *Id.* at 10–11.

Relator counters that HMS "rehash[es]" the obligation argument from its prior motion to dismiss. Doc. 53, Relator's Resp., 9. Relator relies on this Court's prior Order in arguing that "federal statute and regulations impose a duty upon [HMS] to seek reimbursement from third parties," which reimbursement is owed to the States, which in turn have an obligation to reimburse the federal government. *Id.* Naturally, Relator also contends that the Court's prior Order correctly analogized the instant case to *Grubea* and *Caremark*. *Id.* at 10.

In *Caremark*, the Government alleged that the defendant avoided payment to state Medicaid agencies by making false statements. *United States v. Caremark, Inc.*, 634 F.3d 808, 815 (5th Cir. 2011). The court held that the defendant's false statements to the state Medicaid agencies caused those agencies to lie to the Government, violating the FCA. *Id.* Because States must seek reimbursement from third parties or dual-eligible individuals and return these funds to the Government, 42 U.S.C. § 1396a(25)(A); 42 C.F.R. § 433.139, false statements by the defendant could impair state Medicaid agencies' obligation to reimburse the Government. *Caremark*, 634 F.3d at 817.

Relator relies on the same code and regulation provisions as did the Government in *Caremark* for his contention that the States must reimburse the Government for identified third-party coverage. *See id.*; Doc. 42, SAC ¶ 19. The *Caremark* court found these provisions "impose an obligation on the States to the Government" and these same provisions impose the same obligation from the States to the Government for Relator's claims. *Caremark*, 634 F.3d at 817. The Court finds nothing speculative about this obligation stemming from HMS's identification of third-party coverage.

Turning to *Grubea*, the defendant submitted false claims to Fannie Mae and Freddie Mac, causing the agencies to reimburse inflated foreclosure costs, which in turn reduced the dividend paid by those agencies to the Treasury. *United States ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.*, 318 F. Supp. 3d 680, 703 (S.D.N.Y. 2018). The court emphasized that "the payment obligation to the Government would not disappear" whether or not Fannie Mae declared a dividend. *Id.* Thus, the court found an obligation existed for Fannie Mae to pay funds to the United States and that the defendant's actions impaired this obligation. *Id.* at 704.

Similarly, here, the States owe a non-discretionary duty to the federal government to reimburse Medicaid costs when they identify third-party coverage. 42 U.S.C. § 1396a(25)(A); 42 C.F.R. § 433.139. Like in *Grubea*, this obligation exists "whether or not there are [identified third-party insurers] available for the payment." *See* 318 F. Supp. 3d at 703. The stock certificates *required* payment of the dividend in *Grubea*, and similarly, the United States Code and regulations *require* the reimbursement of TPL claims. *See id.*; 42 U.S.C. § 1396a(25)(A); 42 C.F.R. § 433.139. If anything, the obligation in *Grubea* was more speculative than the one here because federal statute and regulation impose the obligation here, as opposed to a mere stock certificate.

Specifically, HMS inhibited the States' obligation to collect from third parties and remit this amount to the federal government. *See United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 254–55 (3d Cir. 2016) (finding the obligation existed once the defendant imported their goods). Nothing about the contractual obligation of HMS is "[u]nassessed," "contingent," or "potential," *see* Doc. 50, Def.'s Br., 8, because 42 C.F.R. § 433.139(d) required HMS to seek reimbursement within sixty days of the end of month of learning of TPL coverage for all claims, unless such recovery "is not cost effective." 42 C.F.R. § 433.139(e)(1). The cost effectiveness language within the regulation does not make the contractual obligation of HMS "[u]nassessed," "contingent," or "potential" because HMS's obligation existed for all cost-effective claims. This duty is also not "a future discretionary act" because HMS "*must* seek recovery of reimbursement . . . [if] it learns of the existence of the liable third party or benefits become available." *Id.* § 433.139(d)(2) (emphasis added); *see United States ex rel. Barrick v. Parker-Migliorini Int'l, LLC*, 878 F.3d 1224, 1226 (10th Cir. 2017) ("An established duty is . . . not a duty dependent

on a future discretionary act."). Thus, HMS had an established duty to seek reimbursement for cost effective TPL claims. *See Simoneaux*, 843 F.3d at 1037.

> 2.   Relator Sufficiently Pleaded Knowledge

HMS argues that "Relator alleges—at most—negligent business practices, but not a reckless disregard"—the minimum pleading requirement for the knowledge element. Doc. 50, Def.'s Br., 10. HMS further argues the allegations that "reports lack[] 'carrier hold' information . . . lack[] cognizable allegations of . . . scienter." *Id.* at 14 n.6.

Relator again contends that Defendant repeats "the same arguments . . . it made in its first Motion to Dismiss." Doc. 53, Relator's Resp., 10–11. "[T]he Court previously considered and rejected Defendant's arguments" and Relator argues the Court should do so again. *Id.*

Relator must establish Defendant's "knowledge of the falsity" of the record or statement provided to the Government. *Matheny*, 671 F.3d at 1222. The FCA defines "knowingly" to "mean that a person, with respect to information . . . (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1). The statute "require[s] no proof of specific intent to defraud." *Id.* At a minimum, a relator must plead that the defendant acted in reckless disregard of the truth or falsity of the information. *United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 260 (5th Cir. 2014). "Knowledge need not be pled with particularity under Rule 9(b); it need only be pled plausibly pursuant to Rule 8." *Id.*

For the remaining claims, Relator sufficiently pleaded the knowledge element. HMS fails to provide the Court with any reason why the prior analysis of this issue was inadequate. *See Frey*, WL 4502275, at *9–11. Thus, the Court finds Relator sufficiently pleaded knowledge.

### 3.    Relator Sufficiently Pleaded Materiality

According to HMS, the SAC lacks "sufficient allegation as to materiality" because Relator was required "to plead that HMS knowingly violated a requirement that the '*defendant knows* is material.'" Doc. 50, Def.'s Br., 20 (quoting *Escobar*, 579 U.S. at 181).[16]

Relator points to this Court's prior Order finding the First Amended Complaint adequately pleaded the materiality element by individually examining the *Escobar* factors and urges the Court to reject HMS's arguments once again. Doc. 53, Relator's Resp., 14.

A defendant can "know" a requirement is material if the Government routinely withholds payment when that requirement is not satisfied. *Escobar*, 579 U.S. at 195. The Government withholds payment in the TPL context "if a State is able to recover funds from a third party." *Caremark*, 634 F.3d at 812 (citing 42 C.F.R. § 433.140). Relator adequately pleaded this regulatory framework for TPL recovery. *See* Doc. 42, SAC, ¶ 24. And HMS knew the Government withheld payment from the States because the individual States hired HMS for its TPL services. Doc. 50, Def.'s Br., 7–8, 10, 14, 16, 20 (acknowledging the existence of contracts between HMS and individual States).

This is also not an instance where the Court has evidence that "the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated." *Escobar*, 579 U.S. at 195. Such a showing is better determined at the summary-judgment stage. As the case is at the motion-to-dismiss stage, the Court finds Relator adequately pleaded materiality. *Cf. Frey*, 2021 WL 4502275, at *11–14.

---

[16] The Court addressed the materiality argument concerning the Tennessee claim above in Section III(B)(1)(xi).

D.    *Reliance*

HMS's last argument is that Relator pleaded the States' reliance on HMS's misrepresentations based on "belief," which falls short of the Rule 9(b) pleading standard. Doc. 50, Def.'s Br., 12–14 (citing *Grubbs*, 565 F.3d at 189–90; *Grubea*, 318 F. Supp. 3d at 696 n.10).[17] However, reliance is not an element of a false claim. *Grubbs*, 565 F.3d at 189 ("The False Claims Act, in contrast, lacks the elements of reliance and damages. . . . It is adequate to allege that a false claim was knowingly presented regardless of its exact amount; the contents of the bill are less significant because a complaint need not allege that the Government relied on or was damaged by the false claim."). Relator is only required to adequately plead the presentation of a false record, material statement, or concealment or avoidance or decrease of an obligation owed to the Government, not that the Government—or the individual States—relied on any of the aforementioned. *See* 31 U.S.C. § 3729(a)(1)(G). So Relator was not required to show reliance, much less plead a higher standard than "belief." *Cf. United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir.1997) ("[W]here allegations are based on information and belief, the complaint must set forth a factual basis for such belief."). Thus, the Court rejects HMS's argument and finds Relator sufficiently pleaded the elements of the remaining claims.

---

[17] HMS further argues the allegations that "reports lack[] 'carrier hold' information . . . lack[] cognizable allegations of materiality and scienter" because "Relator is not pleading a reverse false claims case under the 'false reporting' clause." *Id.* at 14 n.6 (citing Doc. 42, SAC, ¶ 22). Relator specifically pleads the second half of 31 U.S.C. § 3729(a)(1)(G) that holds any person liable who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the Government." 31 U.S.C. § 3729(a)(1)(G). The Court agrees with HMS that Relator specifically pleaded a reverse false claim for concealing, avoiding, or decreasing an obligation owed to the Government. Thus, the Court reads the "carrier hold" allegations not as pleading a "false reporting" claim, but further alleging concealment of an obligation. *See* Doc. 42, SAC, ¶ 48 ("Plaintiff States were rarely if ever informed of these holds."). The "carrier hold" allegations, as allegations of the larger claim, do not need to independently establish the elements of materiality and knowledge.

E.    *Motion for Leave to Pursue Relator's Claims Beyond Employment Termination*

In its prior Order, this Court limited Relator's claims "to those occurring after April 16, 2009, and up through Relator's time of employment with HMS." *Frey*, 2021 WL 4502275, at *15. Relator amended his complaint in part by adding the following additional allegations that HMS continued the alleged scheme after Relator's termination:

> • Relator knew that the centralized nature of HMS's systems, in which TPL billing operated the same way nationwide, the limited availability of COBOL programmers, the limited monetary resources that then-CEO Bill Lucia was willing to spend on system upgrades, and the growing pains of HMS's increasing levels of business, all gravitated against making the system changes and improvements that would be needed for HMS to keep up with all the claims it needed to bill timely. HMS colleague Steve Vacarro informed Relator during his employment that there was "only so much they could do" to keep up. Relator realized from this conversation that HMS was strongly incentivized to maintain the status quo by continuing merely to hold the pieces together.
> • HMS executive Rob Dickerson continually denied the requests of Relator and other executives for copies of HMS's electronic billing "Accept/Reject Reports," which would show the degree to which carriers were not accepting improperly formatted or populated claims that HMS actually did send to carriers. These reports would also expose the falsity of the reports HMS presented to the Plaintiff States representing that it was billing claims timely and in a reasonable volume. HMS's ongoing efforts to hide the "Accept/Reject Reports" indicated an intent to continue business as usual in failing to timely pursue many claims with carriers.
> • Relator knew that HMS became involved in a major lawsuit against PCG towards the end of his employment. This lawsuit, in which among other things HMS was alleging that two of its former executives had violated their non-compete and confidentiality agreements by joining PCG, consumed a great deal of HMS's time and resources, left little time or resources for any enhanced attention to regulatory or contractual compliance or systems resources.
> • Relator learned during his employment that as Medicaid Managed Care began to become more prevalent across the Plaintiff States, including Louisiana, HMS management was actively pushing its sales teams to sell the "Tennessee Model" to additional states. In this way, Relator recognized that HMS saw the Tennessee Model's promise as a lucrative income source [for] the foreseeable future.
> • Relator recognized that the presence of thousands of unbilled TPL claims constituted a "cookie jar" from which HMS could extract more revenues at will by intensifying its billing efforts when needed (as it did in the State of Florida as described in paragraph 49) in order to meet Wall Street expectations (as HMS was publicly traded at that time) and to demonstrate slow and steady growth over time.

> In a quarter where prospects for revenues were looking down, HMS could intensify its TPL claims billing to keep revenue on the desire [sic] path. (During the time of his employment Mr. Frey raised concerns with senior management, including Kim Glenn, Ron Singh and David Dawson about the company's manipulation of revenues in these and other ways). Such revenue growth promised to enhance HMS's stock price and facilitate what Relator knew to be then-CEO Bill Lucia's desire to groom HMS for an eventual sale or merger (which in fact was consummated in 2021). Relator knew that HMS was motivated for the foreseeable future to keep the cookie jar intact and available when needed.
>
> • Relator knew that HMS senior management was incentivized to keep business as usual for the long term. Revenues and the company's stock price were growing slowly and steadily over time. HMS had a virtual monopoly in the field, and to the extent state Medicaid agency clients recognized that HMS was serving them poorly and in violation of law and contract, they had no meaningful alternatives to resort to and also did not want to risk incurring the political wrath of HMS. Any acknowledgment by HMS of its systems and business process problems and its failure to comply with laws and contracts would lay bare the billions in taxpayer savings lost, expose HMS to sanctions and competition, and derail the company's progress towards a sale. Relator knew that HMS senior executives had every reason to continue the scheme until a suitor came along with a deal that would provide them golden parachutes and enable them to leave HMS's problems with others. In fact, this is exactly what transpired in the years between Relator's termination and the sale of the company in 2021.

Doc. 42, SAC, ¶ 91. Relator contends that these allegations "provide[] additional details [of] Relator's specific knowledge . . . that plans existed to continue Defendant's scheme after the termination of Relator's employment." Doc. 43, Relator's Mot., 1.

HMS attacks each bullet point as "fail[ing] to conjure any specific knowledge, anything of substance, or anything meeting applicable . . . pleading standards" to pursue claims beyond Relator's termination on May 14, 2013. Doc. 52, Def.'s Opp'n, 4–8.[18]

As the Court stated in the prior opinion, "[r]elator would have to have specific knowledge, acquired during his employment, that the scheme was occurring and that plans existed to continue

---

[18] HMS also argues the motion violates the local rules because Relator's attorney did not confer with HMS's attorneys or file a brief to support his arguments. Doc. 52, Def.'s Opp'n, 3. The Court notes that Local Rule 7.1(h) requires a certificate of conference for the motion, but addresses the substance of the motion in full.

the scheme after the relator's termination of employment." *Frey*, 2021 WL 4502275, at *15 (alteration in original) (quoting *United States ex rel. Colquitt v. Abbott Lab'ys*, 2015 WL 13670916, at *6 (N.D. Tex. July 24, 2015)). Relator's new allegations do not provide the Court with any "*specific knowledge* that plans existed to continue the scheme." *Id.* Most of the allegations are conclusory and devoid of any factual support. Doc. 42, SAC, ¶ 91 (stating HMS "was strongly incentivized to maintain the status quo," "indicated an intent to continue business as usual," "left little time or resources for any enhanced attention to regulatory or contractual compliance or systems resources," "HMS saw the Tennessee Model's promise as a lucrative income source [for] the foreseeable future," "was motivated for the foreseeable future to keep the cookie jar intact and available when needed," and "HMS senior executives had every reason to continue the scheme until a suitor came along"). The allegations amount to an "absence of an indication [the scheme] had stopped," which combined with Relator's observations, are insufficient. *Colquitt*, 2015 WL 13670916, at *6. Thus, the Court **DENIES** Relator's motion to pursue claims beyond his employment termination. Relator's claims are limited to those occurring between April 16, 2009, and May 14, 2013.

F.      *The Court Denies Leave to Further Amend*

        The Court previously granted Relator the opportunity to amend his pleadings to comply with the Court's order addressing HMS's first motion to dismiss. *Frey*, 2021 WL 4502275, at *16. Normally the Court will allow a plaintiff the opportunity to amend where it appears that more careful or detailed drafting might overcome the deficiencies on which dismissal is based. *See McClellon v. Lone Star Gas Co.*, 66 F.3d 98, 103 (5th Cir.1995). But here, the Court finds that allowing further

amendment would be futile. Accordingly, in its discretion, the Court determines that further amendment of the pleadings is not warranted.

IV.

CONCLUSION

The Court **GRANTS IN PART** and **DENIES IN PART** HMS's motion to dismiss (Doc. 49). Specifically, the Court **DENIES** Defendant's motion for claims 1–4, 11, 23, 25, and 27. The Court **GRANTS** Defendant's motion and **DISMISSES WITHOUT PREJUDICE** claims 5–10, 12–22, 24, 26, and 28. The Court also **DENIES** Relator's motion to pursue claims beyond termination of his employment with HMS.

SO ORDERED.

SIGNED: March 31, 2022.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE