UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. CHRISTOPHER FREY, | § § § | |
| Plaintiff/Relator, | § § | |
| v. | § § | CIVIL ACTION NO. 3:19-CV-0920-B |
| HEALTH MANAGEMENT SYSTEMS, INC., | § § § § | |
| Defendant. | § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Health Management Systems, Inc. ("HMS")'s Motion to Dismiss for Lack of Jurisdiction Under Federal Rules of Civil Procedure 12(b)(1) and 12(h)(3). Doc. 94, Mot. Dismiss. The Court held an evidentiary hearing on the issues presented in the Motion on April 5, 2023. *See* Doc. 139, Min. Entry. Having reviewed the Motion and considered the arguments and evidence presented at the hearing, the Court finds that the release at issue does not cover Relator Christopher Frey's current claims. Accordingly, the Motion (Doc. 94) is **DENIED,** and the temporary stay (Doc. 130) is **LIFTED.** The parties are **DIRECTED** to continue briefing the Motions for Summary Judgment (Docs. 118 & 127). Responses to the Motions for Summary Judgment are due twenty-one (21) days from the date of this Order. Additionally, because the Court resolves this jurisdictional issue, HMS's Motion for Leave to File an Amended Answer (Doc. 91) is **DENIED.**

# I.

# BACKGROUND

This is a qui tam suit filed by Relator Christopher Frey against his former employer, HMS, but it is not Frey's first. Before initiating the present federal action in 2019, Frey had previously filed a separate state qui tam action against HMS in Texas state court. *See Texas ex rel. Frey v. HMS Holdings Corp.*, D-1-GN-16-1842 (126th Dist. Ct., Travis County, Tex. Apr. 29, 2016). At the time, HMS was not aware of the state filing because, per normal qui tam procedure, the petition was sealed. *See* Doc. 95, Mot. Dismiss Br., 2; Tex. Hum. Res. Code § 36.102(b). Ultimately, the State of Texas and Frey entered a settlement agreement in which Frey signed a release of claims. *See generally* HMS Hr'g Ex. 1.[1] The key question before the Court is whether that release is broad enough to bar Frey's current federal and state qui tam claims before this Court.

A.  *Background on the Medicaid Program and Third-Party Liability Claims*

The Medicaid program, codified at 42 U.S.C. §§ 1396–1396w-7, "provides joint federal and state funding of medical care for individuals who cannot afford to pay their own medical costs." *Ark. Dep't of Health & Hum. Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006). In short, by opting into the program, states are eligible to receive significant funding from the federal government to administer the program. *See id.* In general, however, "when Medicaid enrollees have other sources of insurance/payment, . . . Medicaid is the payer of last resort." Alison Mitchell et al., Cong. Rsch. Serv., R43357, Medicaid: An Overview 11 (2023). Thus, Medicaid

---

[1] For ease of reference, and because the parties rely on essentially the same set of documents, the Court will cite to HMS's Hearing Exhibits. However, the Court considered the (admitted) exhibits of each party.

-2-

enrollees' private insurance must pay for any covered medical care before Medicaid coverage applies. Doc. 42, Second Am. Compl., ¶ 19.

A problem arises, however, when Medicaid enrollees do not identify themselves as the beneficiaries of private insurance plans, and Medicaid improperly covers the costs. *Id.* In those instances, most state Medicaid agencies and the organizations that help administer the programs, known as managed care organizations ("MCOs"), will disburse payments to providers for the treatment and then later seek reimbursement from the "liable third parties" responsible for the costs. *Id.*; *see* 42 U.S.C. § 1396a(25)(B) (imposing an obligation on the states to "seek reimbursement" when a liable third party is identified). Federal regulations require state Medicaid agencies to seek this reimbursement from the liable third party within a specified period of time. *See* 42 C.F.R. § 433.139(d).

B.  *Texas's Medicaid Contracts with Xerox Corporation and the Xerox Corporation Lawsuit*

To help administer Medicaid programs and meet these federal requirements, states frequently contract with outside parties. In 2003, the State of Texas entered a contract (the "2003 Contract") with Xerox Corporation[2] for assistance in "administrative and claims processing services." HMS Hr'g Ex. 2 at 1. Texas renewed the contract again in 2010 (the "2010 Contract"). *See id.* at 1–2. Under both contracts, Xerox provided the contracted services through a "consortium of subcontractors," *id.*, one of which was HMS, *see* HMS Hr'g Ex. 8, ¶ 21.

In 2012, the State of Texas began investigating Xerox's performance of the administrative and claims processing services provided under the 2003 and 2010 Contracts. HMS Hr'g Ex. 1 at

---

[2] For simplicity, the Court will refer to the defendant in the suit as the "Xerox Corporation" or "Xerox." The suit and subsequent settlement agreement, however, involved various related entities that had also undergone several name changes. *See* HMS Hr'g Ex. 2 at 1.

2. The findings ultimately alleged Xerox had failed in its contractual obligations to "manage the prior authorization program appropriately to determine whether requested orthodontic services were medically necessary," among other things. *Id.* at 2–3. In short, Texas claimed Xerox's failures had resulted in "unscrupulous" orthodontists exploiting the approval process by seeking Medicaid reimbursement for orthodontic services they knew were not medically necessary. *Id.* at 2.

In 2014, the State of Texas sued Xerox under the Texas Medicaid Fraud Prevention Act. *Id.* at 3. It also intervened in several related *qui tam* actions brought on behalf of the state. *Id.* at 3–4. Years of litigation ensued.

C.  *Relator Christopher Frey's Parallel State Qui Tam Suit Against HMS*

In 2016, while the Xerox litigation was pending, a state qui tam action was filed against HMS, a member of Xerox's "consortium of subcontractors" (the "State HMS Lawsuit"). HMS Hr'g Ex. 8. Specifically, HMS provided third-party liability services—identifying potentially liable third parties for reimbursement of improperly paid Medicaid disbursements—for Xerox under its contract with Texas. *See id.* ¶ 20. Relator Christopher Frey, a former employee of HMS, alleged that HMS had failed to bill third-party liability claims "timely or at all," resulting in lost recovery opportunities for the state. *See id.* ¶¶ 25–32. Frey further alleged, among other things, that HMS had failed to upload enrollees' insurance coverage information to the Medicaid computer system, known as the Medicaid Management Information System ("MMIS"), that "state health agencies are required to maintain."[3] *Id.* ¶ 33–37. This failure resulted, Frey estimated, in "millions of

---

[3] The parties dispute the exact nature of a state Medicaid agency's obligation to upload information to the database. *Compare* Doc. 42, Second Am. Compl., ¶ 57, *with* Doc. 119, Def.'s Summ. J. Br., 46 (contesting Frey's theory on what the federal regulations require in terms of MMIS information uploads). That

dollars of additional Medicaid funds . . . spent in Texas unnecessarily on patients who are covered by insurance." *Id.* ¶ 36.

D.    *The State of Texas and Xerox Reach a Settlement Agreement*

In February 2019, with Frey's parallel State HMS Lawsuit still ongoing, the State of Texas and Xerox entered a settlement agreement (the "Xerox Settlement Agreement"). *See generally* HMS Hr'g Ex. 2. The Xerox Settlement Agreement sought to "buy peace and avoid further litigation" regarding the various pending actions and "any other present or future disputes arising out of the 2003 or 2010 Contract." *Id.* at 6. Xerox thus agreed to pay the state nearly $236 million in full settlement of the claims. *Id.* at 9. In exchange, the State of Texas released claims relating to or arising from the "Covered Conduct." *Id.* at 12–13. "Covered Conduct" was defined broadly to include any conduct relating to HMS's performance (or non-performance) of the 2003 and 2010 Contracts generally. *See id.* at 8–9. In other words, the release was not limited to the allegations regarding claim authorizations for orthodontic services. The release further extended not only to Xerox, but also Xerox's subcontractors "for any claims pertaining to their conduct and service relating to the 2003 Contract and the 2010 Contract." *Id.* at 7–8.

In addition to the release, the State of Texas also agreed to settle any other suits arising out of the "Covered Conduct" using the proceeds from the settlement. *Id.* at 14. That is, Texas agreed, with respect to the other qui tam actions "and any other actions initiated by a private person . . . arising out of the Covered Conduct," to be "solely responsible to reimburse any relator or relator's counsel for any amounts in any manner arising from the Covered Conduct." *Id.*

---

dispute, however, is beyond the scope of this Memorandum Opinion and Order. The Court will assume for purposes of this Order that HMS had an obligation to upload the information to the MMIS within a specified period of time.

E.       *The State of Texas Settles Frey's State Qui Tam Action*

On the heels of the Xerox Settlement Agreement, and in accordance with Texas's obligation to settle other private suits arising out of the Covered Conduct, the State of Texas and Frey entered a settlement agreement at the end of February 2019 (the "Frey Settlement Agreement"). *See generally* HMS Hr'g Ex. 1. The Frey Settlement Agreement began by noting that the "Xerox Settlement Agreement resolves the claims brought in the [State] HMS Lawsuit." *Id.* at 1. Frey therefore received $2.25 million from the Xerox Settlement Agreement proceeds. *Id.* at 2. In exchange, Frey signed a broad release of claims. The release provides in relevant part:

> In exchange for the consideration described herein . . . [Frey and his counsel], fully and finally, and to the greatest extent allowed by law, release, discharge, and covenant not to sue the State, the HMS Defendants, or the Defendants in the Xerox Lawsuit for any civil, regulatory, or administrative claim, action, suit, demand, right, cause of action, liability, judgment, damage, or proceeding . . . that [Frey and his counsel] had, have, may have, have asserted, or could assert under any source of law, contract, in equity or other right, arising from the Covered Conduct.

*Id.* at 3.

The scope of the release, therefore, largely turns on the definition of "Covered Conduct." Under the Frey Settlement Agreement, "Covered Conduct" is given a two-prong definition. The Agreement provides,

> The term "Covered Conduct" is defined as the conduct alleged in the [State] HMS Lawsuit and also includes the definition of "Covered Conduct" in the Xerox Settlement Agreement. For avoidance of any doubt, Covered Conduct does not include acts of employment retaliation, which may give rise to an employment retaliation claim under federal law or the laws of a state other than Texas.

*Id.* at 1.

F. *Frey Files a Federal Qui Tam Action Against HMS*

Roughly six weeks after Frey entered the settlement agreement with the State of Texas, he filed another qui tam suit against HMS, this time in federal court (the "Federal HMS Lawsuit"). *See* Doc. 2, Compl. Frey made essentially the same allegations against HMS that he made in the State HMS Lawsuit. *See id.* This time, however, Frey's allegations were not focused on HMS's services to Texas Medicaid. Instead, Frey asserted federal qui tam claims as well as state-law qui tam claims for HMS's alleged failures in performing services for other states' Medicaid agencies. *See id.*

Because HMS was never served with the sealed qui tam petition in the State HMS Lawsuit, HMS was not initially aware of the Frey Settlement Agreement and its release. *See* Doc. 79, Mot. Unseal, ¶ 10; Doc. 95, Mot. Dismiss Br., 3–4. Recently, however, HMS obtained a copy of both the Frey Settlement Agreement and the underlying State HMS Lawsuit, which was necessary for determining the definition of "Covered Conduct" and, in turn, the scope of the release. *See* Doc. 95, Mot. Dismiss Br., 3–4.

G. *HMS Files Two Motions Regarding the Release*

Based on the Frey Settlement Agreement and HMS's reading of the term "Covered Conduct," HMS filed two—somewhat contradictory—motions. First, HMS filed a Motion for Leave to File an Amended Answer based on the Frey Settlement Agreement. Doc. 91, Mot. Leave Amend, 1. It seeks to assert affirmative defenses of (1) release and (2) accord and satisfaction and to add "the additional defense of lack of subject matter jurisdiction." *Id.* at 1–2. Five days later, HMS filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction (Doc. 94). In that Motion, HMS moves under Federal Rule of Civil Procedure 12(b)(1) and 12(h)(3) to

challenge the Court's subject-matter jurisdiction on the grounds that Frey lacks standing. Doc. 94, Mot. Dismiss, 1. Specifically, HMS contends that Frey previously released the bulk of his remaining claims[4] in this action. *Id.* at 3.

## II.

## LEGAL STANDARD

*A.     Reconciling the Relief Sought in HMS's Motions*

The Court begins by reconciling the relief sought in HMS's motions. In explaining the relationship between the two motions, HMS provides that "the purpose of the amended pleading is to give formal notice of the defenses HMS intends to present in the event the subject matter jurisdiction motion is held or denied." Doc. 115, Reply Mot. Leave Amend, 2. HMS nonetheless "maintains that the Court lacks subject matter jurisdiction over the majority of the claims at issue in the lawsuit and files [the reply to the motion for leave to amend] subject to its pending motion to dismiss for lack of subject matter jurisdiction." *Id.* at 2 n.1

HMS's primary contention, therefore, seems to be that Frey lacks standing, and the Court thus lacks subject-matter jurisdiction. *See id.* Indeed, HMS's argument hinges on the notion that Frey, through his agreement with Texas, released the "claims he himself could assert against HMS" in his capacity as a relator more generally. *See* Doc. 135, Reply, 6 (emphasis omitted). In other words, Frey relinquished his right as a partial assignee of the government's damages claims

---

[4] In particular, HMS seeks to dismiss Counts 1 and 2, which relate to HMS's alleged failure to bill third-party liability claims "timely or at all" or to upload insurance information to the MMIS. *See* Doc. 95, Mot. Dismiss Br., 1; Doc. 42, Second Am. Compl., ¶¶ 93–103. HMS also seeks to dismiss portions of Counts 11, 23, 25, and 27, which are state qui tam claims, to the extent those claims are also based on billing third-party liability claims or uploading information to the MMIS. *See* Doc. 95, Mot. Dismiss Br., 1; Doc. 42, Second Am. Compl., ¶¶ 170–77, 292–98, 310–20, 332–39.

against HMS and, in turn, lacks an injury in fact. *See Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 773 (2000) (holding a qui tam relator's injury in fact is rooted in the False Claims Act's "partial assignment of the Government's damages claim").

Other courts in this circuit have similarly analyzed prior releases in qui tam cases as a question of standing. *See United States ex rel. Jackson v. Univ. of N. Texas*, 2015 WL 13744213, at *6 (E.D. Tex. Nov. 18, 2015), *report and recommendation adopted sub nom. United States v. Univ. of N. Texas*, 2016 WL 369693 (E.D. Tex. Feb. 1, 2016) (finding the relator previously released his claims against the defendant and therefore lacked Article III standing to pursue the claims); *United States ex rel. Mitchell v. CIT Bank, N.A.*, 2021 WL 3634012, at *2, 9 (E.D. Tex. Aug. 17, 2021) (treating the enforceability of a prior release in a qui tam action as a question of standing); *United States ex rel. Haight v. RRSA (Com. Div.), LLC*, 2021 WL 1721585, at *2, 7 (N.D. Tex. Apr. 30, 2021) (Scholer, J.) (same).

Accordingly, the Court finds that Frey's release implicates questions of his standing and, in turn, this Court's power to hear the case. The Court—and not a jury—is the proper arbiter of the legal and factual determinations necessary to decide this jurisdictional issue. *See Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981). And while there is an exception to this rule "when the issue of jurisdiction is intertwined with the merits," HMS has not suggested, nor does the Court find, any grounds for that exception applying here. *Cf. In re S. Recycling, L.L.C.*, 982 F.3d 374, 381 (5th Cir. 2020) (providing an example in which the intertwined jurisdictional issue was "whether a government employee 'was acting within the scope of his employment when he committed a tort.'") (internal alterations omitted). Accordingly, HMS's Motion for Leave to File

an Amended Answer (Doc. 91) based on the same underlying facts and arguments is **DENIED.** The Court turns to the release in question to resolve Frey's standing and its jurisdiction.

B.      *The Court Applies the Standard Under Rule 12(b)(1)*

A motion to dismiss for lack of standing is brought under Rule 12(b)(1) as a challenge to the Court's subject-matter jurisdiction. *See, e.g., In re FEMA Trailer Formaldehyde Prod. Liab. Litig. (Miss. Plaintiffs)*, 668 F.3d 281, 286 (5th Cir. 2012) ("Under Rule 12(b)(1), a claim is properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the claim.") (internal quotation omitted). A motion that challenges subject-matter jurisdiction is proper at any time, as Rule 12(h)(3) prolongs the life of the defense beyond the responsive pleading stage. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) ("The objection that a federal court lacks subject-matter jurisdiction may be raised by a party, or by a court on its own initiative, at any stage in the litigation . . . .") (internal citation omitted); *Kontrick v. Ryan*, 540 U.S. 443, 459 (2004) (noting that Rule 12(h)(3) "prolong[s] the life" of a challenge to subject-matter jurisdiction).

When a motion to dismiss for lack of jurisdiction is based on the face of the complaint, the Court accepts all well-pleaded allegations as true and construes those allegations in the light most favorable to the plaintiff. *See Williamson*, 645 F.2d at 412. But when the motion challenges the Court's jurisdiction based on matters outside the complaint, "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short . . . the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* at 413 (quoting *Mortensen v. First Fed. Sav. and Loan Ass'n*,

549 F.2d 884, 891 (3rd Cir. 1977)). Ultimately, the burden of proof rests on the party asserting jurisdiction. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

## III.

## ANALYSIS

The Frey Settlement Agreement is governed by Texas law.[5] *See* HMS Hr'g Ex. 1 at 3. "Under Texas law, a release is a contract and is subject to the rules governing contract construction." *French v. Michaels Stores, Inc.*, 2013 WL 81998, at *6 (N.D. Tex. Jan. 8, 2013) (Lindsay, J.) (citing *Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990)). Accordingly, the Court's primary concern is to "ascertain the true intent of the parties as expressed in the instrument." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). In doing so, the Court "give[s] contract terms their plain and ordinary meaning unless the instrument indicates the parties intended a different meaning." *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009). And the Court examines the contract as a whole in an attempt to give meaning to all provisions. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

Alongside these primary contract principles, however, Texas law also imposes rules specific to releases. For a release to be effective, the release must "mention" the claim to be released, and "claims not clearly within the subject matter of the release are not discharged."

---

[5] Because the Court is sitting in federal-question jurisdiction, the Court applies federal common law choice-of-law principles. *See Haynsworth v. Corp.*, 121 F.3d 956, 962 (5th Cir. 1997). Under federal common law, the Court must give effect to a choice-of-law provision unless a party shows that the clause is "unreasonable under the circumstances." *See id.* at 963 (quoting *Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 10 (1972)). Neither party contests the applicability of Texas law to the contract. Accordingly, the Court applies Texas law in interpreting the Frey Settlement Agreement.

*Victoria Bank & Tr. Co. v. Brady*, 811 S.W.2d 931, 938 (Tex. 1991). General or categorical release clauses are construed narrowly, *id.*, but the parties need not anticipate each potential cause of action for a release to be effective, *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 20 S.W.3d 692, 698 (Tex. 2000). "[A] valid release may encompass unknown claims and damages that develop in the future." *Id.*

If the contract "can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law." *Coker*, 650 S.W.2d at 393. If, however, the language of a contract is "subject to two or more reasonable interpretations, it is ambiguous." *Nat'l Union Fire*, 907 S.W.2d at 520. Only when an ambiguity exists as to the intent embodied in the contract's language may the Court consider "extrinsic evidence of the parties' true intent." *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 765 (Tex. 2018); *see also Gallagher Headquarters Ranch Dev., Ltd. v. City of San Antonio*, 303 S.W.3d 700, 702 (Tex. 2010) (finding a release ambiguous and remanding the case for extrinsic evidence because, even after construing the release narrowly, it was unclear whether the agreement covered the case at hand). Whether a release is ambiguous is a question of law for the Court. *Id.*

Here, the Court begins by considering the language of the release under principles of contract law and release construction. Finding the language ambiguous, the Court then considers extrinsic evidence of the agreement's context and the parties' intent to determine the meaning of the contract. The Court finds, given the circumstances surrounding the release, that "Covered Conduct" does not cover the claims asserted in Frey's Federal HMS Lawsuit.

A.       *The Court Finds the Release Ambiguous as a Matter of Law*

The Court begins with the language of the release. In pertinent part, Frey, "to the greatest extent allowed by law, release[d] . . . the HMS Defendants . . . for any civil [suit] . . . that [Frey and Frey's counsel] . . . may have, have asserted, or could assert under any source of law . . . arising from the Covered Conduct." HMS Hr'g Ex. 1 at 3. Because this is a general release, the Court construes the language narrowly in determining whether the release "mentions" or contemplates the Federal HMS Lawsuit. *See Brady*, 811 S.W.2d at 938; *Keck*, 20 S.W.3d at 698. Ultimately, however, whether Frey's release "mentions" the claims at issue largely turns on the breadth of "Covered Conduct" and whether his claims "arise from" that conduct.

The Frey Settlement Agreement incorporates by reference "the definition of 'Covered Conduct' in the Xerox Settlement Agreement" and the "conduct alleged in the [State] HMS Lawsuit." HMS Hr'g Ex. 1 at 1; *see also, e.g.*, *Bob Montgomery Chevrolet, Inc. v. Dent Zone Cos.*, 409 S.W.3d 181, 189 (Tex. App.—Dallas 2013, no pet.) (noting a contract may incorporate by reference another document or a portion of another document through a clear intent of the parties to do so). Thus, the definition of "Covered Conduct" in the Frey Settlement Agreement has two parts: (1) the definition of "Covered Conduct" provided in the Xerox Settlement Agreement and (2) the "conduct alleged" in the State HMS Lawsuit. Because the Federal HMS Lawsuit does not make allegations relating to performance of services under the 2003 and 2010 Contracts with Texas, the parties' dispute primarily focuses on the second part. Namely, what is the "conduct alleged in the [State] HMS Lawsuit"?

HMS argues that the "conduct alleged" in the State HMS Lawsuit broadly encompasses HMS's failure to file third-party liability claims "timely or at all" or upload the necessary

information to the MMIS, regardless of the state agency. *See* Doc. 95, Mot. Dismiss Br., 9–10. Frey, on the other hand, contends that the "conduct alleged" is specific to HMS's contractual obligations with Texas. Doc. 117, Resp., 14–15. He says the Federal HMS Lawsuit, by contrast, is grounded in HMS's performance of services for other states. *Id.* at 15–16.

The Frey Settlement Agreement could reasonably sustain both readings. By its nature, the term "conduct alleged" implicates a release stretching beyond the pleaded claims to the underlying factual allegations. *See also* HMS Hr'g Ex. 1 at 3 (releasing claims Frey and his counsel could assert under any source of law arising from the "Covered Conduct"). But how broadly those factual allegations actually reach is varied and unclear. Frey's state petition, for example, begins, "Relator has direct and independent personal knowledge that Defendants have committed unlawful acts with respect to the *Medicaid program in Texas*." HMS Hr'g Ex. 8, ¶ 2 (emphasis added). But other portions read more broadly: "HMS failed to disclose *to state agency clients*, including Texas, its lack of capability to appeal these denials . . . ." *Id.* ¶ 32 (emphasis added). Other examples exist. *Compare, e.g.*, *id.* ¶ 25 (alleging that despite the "responsibility that HMS assumed under its contract to provide [third-party liability] [s]ervices to Texas – HMS failed to submit many such claims timely, or at all"), *with id.* ¶ 29 (alleging more generally that HMS's "billing operations department . . . had affirmative processes in place for holding claims to certain carriers that should have been billed"). Ultimately, construing the "conduct alleged" in the State HMS Lawsuit is largely a dead end; both parties can highlight plenty of short phrases or paragraphs to support their respective positions.

Other portions of the Frey Settlement Agreement do not provide additional clarity. During the evidentiary hearing, HMS made arguments about the second sentence of the

provision defining "Covered Conduct" in the Frey Settlement Agreement. That sentence states, "For avoidance of any doubt, Covered Conduct does not include acts of employment retaliation, which may give rise to an employment retaliation claim under federal law or the laws of a state other than Texas." HMS Hr'g Ex. 1 at 1. At first glance, the sentence perhaps suggests that "Covered Conduct" is broad enough that retaliation claims under federal law or states other than Texas need to be carved out. Under that proposed reading, "Covered Conduct" may include conduct outside of HMS's obligations with Texas. But the prefatory clause, "[f]or avoidance of any doubt," largely robs that inference of force. The sentence could reasonably be read as merely ensuring the retaliation claims are not released, even though the parties already understood "Covered Conduct" not to include them.

The Court also inquired about a potential superfluidity in the definition of "Covered Conduct" under Frey's proposed reading. Specifically, if the Court strives to provide meaning to every provision, and the definition of "Covered Conduct" in the Xerox Settlement Agreement already includes claims relating to the State of Texas's 2003 and 2010 Contracts, then perhaps the inclusion of the second prong of the definition—the conduct alleged in the State HMS Lawsuit—indicates a desire to release a broader range of conduct. But several other provisions at least weaken this inference. For example, the preamble, which was incorporated into the main agreement, provides that the "Xerox Settlement Agreement resolves the claims brought in the [State] HMS Lawsuit" and the parties have reached a "reasonable settlement" for those claims. *Id.* This language implies a relationship between the claims settled in the Xerox Settlement Agreement and the claims settled in the Frey Settlement Agreement. That relationship undermines the likelihood that Texas was releasing conduct beyond Texas.

In the end, therefore, the Court finds that the Frey Settlement Agreement is susceptible to two reasonable interpretations. The definition of "Covered Conduct" supports the reading that Frey released his claims against HMS only with regards to its Texas conduct. It also supports a broader reading that Frey essentially released his standing as a relator to sue HMS for failing to file third-party liability claims or upload information to the MMIS. Accordingly, the Court finds the contract ambiguous and looks to extrinsic evidence to discern the parties' true intent.

B.  *Looking to Extrinsic Evidence, the Court Finds the Release Does Not Cover the Present Suit*

In considering extrinsic evidence, the Court seeks to discern the parties' true intent in their release of "Covered Conduct." *See URI, Inc.*, 543 S.W.3d at 765. Based on the parties involved and the circumstances leading to the Frey Settlement Agreement, the Court finds that the release does not cover the claims asserted in Frey's Federal HMS Lawsuit. In short, the Xerox Settlement Agreement and the State of Texas's obligation to buy peace relating to Xerox do not support a broad release of Frey's claims against HMS for conduct beyond Texas.

As a threshold matter, the Court notes the unique posture of the Frey Settlement Agreement. The contracting parties were the State of Texas and Frey—not HMS and Frey. *See* HMS Hr'g Ex. 1 at 1. Accordingly, contrary to the typical scenario in which the party being released presumably negotiates for the broadest release possible, the State of Texas's motivations were different. The State of Texas entered the Frey Settlement Agreement only because of an obligation it had assumed under the Xerox Settlement Agreement to settle claims with Xerox's subcontractors. *See* HMS Hr'g Ex. 2 at 7–8.

The scope of the Xerox Settlement Agreement was limited to Xerox's (and its subcontractors') conduct relating to the 2003 and 2010 Contracts with Texas. *See id.* at 8–9

(defining "Covered Conduct" in the Xerox Settlement Agreement). And although Xerox was the general contractor for Texas, it was not the general contractor—or even involved in—the administration of Medicaid programs for other states. *Compare* HMS Hr'g Ex. 8, ¶ 20 ("[I]n Texas, HMS performs this service for the state as a subcontractor to the primary Texas contractor, Xerox Corporation."), *with* Doc. 42, Second Am. Compl., ¶ 3 ("HMS has or had contracts with more than 40 state Medicaid agencies . . . to serve as their provider of [third-party liability] [s]ervices. In a few cases, HMS is a subcontractor to a principal contractor but nonetheless provides its services to the state."). It would be against Xerox's self-interest, therefore, to "buy peace" for HMS in states where Xerox is not involved.

Similarly, it would make little sense for the State of Texas to settle more claims than necessary under the Xerox Settlement Agreement. Indeed, any funds that Texas used to settle outside claims came directly out its recovery from Xerox. *See* HMS Hr'g Ex. 2 at 14. And because the Xerox Settlement Agreement only covered the 2003 and 2010 Contracts, Texas's subsequent release of subcontractors would presumably be equally limited. In short, the State of Texas's financial interests and Frey's litigation interests were aligned such that both parties would desire a narrower release. Given this important context, the Court finds that the Frey Settlement Agreement's release only covers conduct relating to HMS's performance of services for the State of Texas.

### IV.

### CONCLUSION

In sum, the Court finds the Frey Settlement Agreement ambiguous as to the scope of the release intended by the term "Covered Conduct." The Court therefore considers extrinsic

evidence, namely, the broader context of the agreement and the contracting parties' intent in entering the release. Because the State of Texas and Frey had little motivation to release HMS from claims not arising from its services to Texas, the Court finds that the parties' intent supports a narrower reading of the release. Accordingly, Frey has standing to pursue his federal qui tam claims and claims arising from HMS's obligations to other states' Medicaid agencies. The Motion to Dismiss (Doc. 94) is **DENIED.** The temporary stay (Doc. 130) is therefore **LIFTED**, and the parties are **DIRECTED** to continue briefing the Motions for Summary Judgment (Docs. 118 & 127). Responses to the Motions for Summary Judgment are due twenty-one (21) days from the date of this Order. Additionally, because the Court has resolved the jurisdictional issue, HMS's Motion for Leave to File an Amended Answer (Doc. 91), which is based on the same underlying allegations regarding the release, is **DENIED.**

SO ORDERED.

SIGNED: May 2, 2023.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE