UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. CHRISTOPHER FREY, | § § § | |
| Plaintiff/Relator, | § § | |
| v. | § § | CIVIL ACTION NO. 3:19-CV-0920-B |
| HEALTH MANAGEMENT SYSTEMS, INC., | § § § | |
| Defendant. | § § | |

<u>MEMORANDUM OPINION AND ORDER</u>

The Court previously granted summary judgment in favor of Defendant Health Management Systems, Inc. ("HMS") and dismissed Plaintiff/Relator Christopher Frey's remaining claims. Doc. 260, Mem. Op. & Order. The Court **VACATES** the previous Memorandum Opinion and Order and **REPLACES** it with the following Order. The Court also **VACATES** the previous Final Judgment (Doc. 261).

Before the Court is Plaintiff/Relator Christopher Frey's Amended Motion for Partial Summary Judgment (Doc. 167), Defendant Health Management Systems, Inc. ("HMS")'s Amended Motion for Summary Judgment (Doc. 159), HMS's Motion to Strike Relator's Rebuttal Expert (Doc. 172), Frey's Motion to Strike (Doc. 174), HMS's Motion to Strike Relator's Response (Doc. 217), and HMS's Motion to Strike (Doc. 236). For the following reasons, the Court **GRANTS** HMS's Amended Motion for Summary Judgment and **DENIES** Frey's Amended Motion for Summary Judgment. The Court **DENIES AS MOOT** the parties' Motions to Strike. A final judgment will follow.

# I.

## BACKGROUND

This is a qui tam suit filed by Frey against his former employer, HMS, accusing HMS of failing to seek reimbursements of Medicaid funds. The Medicaid program, codified at 42 U.S.C. §§ 1396–1396w-7, "provides joint federal and state funding of medical care for individuals who cannot afford to pay their own medical costs." *Ark. Dep't of Health & Hum. Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006). By opting into the program, states are eligible to receive significant funding from the federal government to administer the program. *See id.*

"[W]hen Medicaid enrollees have other sources of insurance/payment . . . Medicaid is the payer of last resort." Alison Mitchell et al., Cong. Rsch. Serv., R43357, Medicaid: An Overview 11 (2023). Medicaid beneficiaries do not always identify themselves as the beneficiaries of private insurance plans, which can result in Medicaid improperly covering the costs of a healthcare service. *Id.* In those instances, most state Medicaid agencies and the organizations that help administer the programs, known as managed care organizations ("MCOs"), will disburse payments to providers for the treatment and then later seek reimbursement from the "liable third parties," generally insurance carriers, responsible for the costs. *Id.*; *see* 42 U.S.C. § 1396a(25)(B) (imposing an obligation on the states to "seek reimbursement" when a liable third party is identified). Once the state is reimbursed by the insurance carrier, the federal government is entitled to recover the portions of the service that were paid by the federal government, while the state government keeps the portion that it paid. *See* 42 C.F.R. § 433.140.

To be eligible for Medicaid funding, states must pass laws adopting several requirements for insurance carriers regarding Medicaid reimbursements. As relevant here, insurance carriers must

accept a claim for Medicaid reimbursement as timely if the state submits the claim no later than three years after the beneficiary receives the healthcare service. 42 U.S.C. § 1396a(a)(25)(I)(iv)(I). The Center for Medicare and Medicaid Services ("CMS") has also promulgated a regulation setting requirements for state Medicaid agencies. CMS requires state Medicaid agencies to seek reimbursement from the liable third party within 60 days after the end of the month that the agency learns that a third-party should have paid for the healthcare service ("60-day regulation"). *See* 42 C.F.R. § 433.139(d). For example, if a state agency discovers that a private insurer should have paid for a service on August 20, the state agency must bill the private insurer no later than 60 days after September 1.

A.      *HMS's General Business Practices*

HMS contracts with several state agencies to provide third-party liability ("TPL") services. Doc. 161, Def.'s App'x, 4. HMS identifies TPL claims, i.e., healthcare services that Medicaid improperly paid for. *Id.* at 2–3. Then, HMS bills the insurance carriers to recover the improperly spent Medicaid funds. *Id.* Whenever HMS recovers a TPL claim, HMS receives a contingency fee—HMS is only paid if the insurance carrier reimburses the state. *Id.* at 2.

HMS executives knew that federal regulations required HMS to submit a TPL claim within 60 days after the end of the month they learned of the TPL claim. Doc. 169, Def.'s App'x, 5. But they also believed that a TPL claim would be timely so long as the insurance carrier was billed within three years. Doc. 161, Def.'s App'x, 200–01, 207. One executive testified that the company "most often" submitted the TPL claims within the 60-day window required by the CMS's 60-day regulation, but that "HMS would occasionally have trouble complying with that standard." Doc. 169, Pl.'s App'x, 17.

Insurance carriers would occasionally ask HMS to temporarily pause submitting claims—the parties call this practice a "carrier hold." Doc. 161, Def.'s App'x, 214–15. Insurance carriers would ask for such a hold because the carrier was doing some work on their system, such as addressing internal backlogs or converting a paper system to an electronic system. *Id.* HMS would only agree to the carrier hold if the insurance carrier agreed to honor claims submitted beyond the three-year window required by statute. *Id.*; Doc. 162, Def.'s App'x, 258. If the insurance carrier did not agree to extend the three-year window, HMS would submit the TPL claims before the three-year period had expired. Doc. 161, Def.'s App'x, 209–10.

After HMS submitted a TPL claim to an insurance carrier, HMS designated that claim as an "open claim" until the carrier determined whether it would pay the claim or reject the claim. Doc. 161, Def.'s App'x, 125. Insurance carriers would reject TPL claims for as many as 25 different reasons. Doc. 169, Pl.'s App'x, 17–18. One such reason was that the party who received the service was not covered by the insurer at the time Medicaid paid for the service. Doc. 161, Def.'s App'x, 4. HMS often appealed an initial denial of coverage, and the company received many reimbursements from such appeals. *Id.*

One of HMS's Vice Presidents, Elena Moiseenko, testified that the company once discovered an IT problem that prevented many TPL claims from getting billed. *Id.* at 120. However, HMS promptly fixed the problem and submitted the claims to the insurance carriers. *Id.* at 121.

B.    *HMS's State-Specific Practices*

HMS lost its contract to provide TPL services to Florida in 2008. *Id.* at 31. When Medicaid contractors lose their TPL contracts, the contractors are given a "run-out" period where they may close claims that they have already billed to insurance carriers. *Id.* at 32, 103. However, the

contractors are generally not allowed to bill new claims—they are only allowed to re-bill previously billed claims. *Id.* at 32. When Florida did not renew its TPL contract with HMS in 2008, HMS engaged in substantial efforts to collect on the TPL claims it had previously billed. *Id.*

In 2009, HMS discovered it was only providing TPL services for a small portion of Oklahoma's population receiving Medicaid services. Doc. 161, Def.'s App'x, 201. The parties dispute the cause of this error. HMS argues that it did not cover the entirety of Oklahoma's Medicaid population because HMS was given incomplete data. Doc. 160, Def.'s Br. Mot. Summ. J., 13–14. On the other hand, Frey argues that HMS caused this "internal error." Doc. 168, Pl.'s Br. Mot. Summ. J., 14 (citing Doc. 170, Pl.'s Sealed App'x, 125–26). Regardless, it is undisputed that HMS's TPL recoveries in Oklahoma increased dramatically after this problem was fixed. Doc. 161, Def.'s App'x, 203–04.

In 2010, HMS wrote-off over $250 million of TPL claims for New York, Tennessee, Oklahoma, and Florida (collectively, the "Plaintiff States") that had been open for longer than three years. Doc. 170, Pl.'s Sealed App'x, 82–84. An HMS executive said these were large numbers in an email, and wondered whether the company should have pursued any of these claims further. *Id.* at 89. Another HMS executive stated that the company should not attempt to re-bill every single one of these open claims. *Id.* at 88.

The state agency that oversees the Medicaid program in Tennessee is called TennCare. *Id.* at 11. TennCare contracts with several different MCOs to administer Medicaid in the state. *Id.* The MCOs are required to investigate and pursue potential TPL claims on Tennessee's behalf. *Id.* However, TennCare also pursues TPL claims that the MCOs are unable to bill. *Id.* HMS contracted with both TennCare and the MCOs to provide data for investigating TPL claims. *Id.* at 12, 14. Frey

filed a whistleblower complaint in 2015, accusing HMS of double-billing and misappropriating Medicaid funds by selling data to both Tennessee and to the MCOs. *Id.* at 28. TennCare's Director of Program Integrity, Dennis Garvey, investigated the complaint and concluded that this was not improper double billing that constituted fraud or waste of Medicaid funds. *Id.* at 25.

C.      *The Present Lawsuit*

Frey initiated this litigation in 2019, asserting numerous claims under the False Claims Act ("FCA"), as well as claims under various state-law equivalents of the FCA. This lawsuit covers the period between April 2009 and May 2013. The Court previously dismissed several of Frey's claims—he now has eight false claims remaining. Counts 1, 2, 3, and 4 are reverse false claims brought under 31 U.S.C. § 3729(a)(1)(G), claiming that HMS knowingly concealed, avoided, or decreased an obligation to pay money to the government. Doc. 42, Am. Compl., ¶¶ 93–114. Counts 11, 23, 25, and 27 are state-law claims brought under the Florida, New York, Oklahoma, and Tennessee equivalents of the FCA. *Id.* ¶¶ 170–77, 292–98, 310–20, 332–39. Frey and HMS have each moved for summary judgment and filed several Motions to Strike. The Court considers the Motions below.

## II.

## LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the pleadings and record evidence show that no genuine issue of material fact exists and that, as a matter of law, the movant is entitled to judgment. *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003). On a motion for summary judgment, the burden is on the movant to prove that no genuine issue of material fact exists. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). To determine whether a genuine issue exists for trial, the court must view all of the evidence

in the light most favorable to the non-movant. *See Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 371–72 (5th Cir. 2002).

When the party with the burden of proof is the movant, it must establish each element of its claim as a matter of law. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). If the non-movant bears the burden of proof at trial, the summary judgment movant need not support its motion with evidence negating the non-movant's case. *Latimer v. SmithKline & French Labs.*, 919 F.2d 301, 303 (5th Cir. 1990). Rather, the movant may satisfy its burden by pointing to the absence of evidence to support the non-movant's case. *Id.*; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

Once the movant has met its burden, the burden shifts to the non-movant, who must show that summary judgment is not appropriate. *Little*, 37 F.3d at 1075 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "This burden is not satisfied with some metaphysical doubt as to material facts, . . . by conclusory allegations, . . . by unsubstantiated assertions, or by only a scintilla of evidence." *Id.* (internal citations omitted). A non-moving party with the burden of proof must "identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim," *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004), and "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original) (quoting Fed R. Civ. P. 56(e)).

# III.

# ANALYSIS

The Court begins by concluding that Frey abandoned the FCA and state-law claims he brought under a theory that HMS failed to upload the necessary information to the Plaintiff States' Medicaid Management Information System ("MMIS") because Frey failed to respond to HMS's Motion for Summary Judgment on these claims. Frey likewise abandoned his claims in Counts 3 and 23 alleging that HMS had a duty to refund certain "add fees" to New York.

The majority of Frey's reverse FCA and state-law claims can be divided into four different theories: (1) HMS failed to submit TPL claims "timely or at all" contained under Counts 1, 11, 23, 25, and 27 of the Amended Complaint; (2) HMS wrote off millions of dollars' worth of claims in 2010; (3) HMS only billed TPL claims for a small portion of Oklahoma's Medicaid recipients under Counts 1 and 25 of Frey's Amended Complaint; and (4) HMS impermissibly engaged in double billing by selling the same TPL data to Tennessee and to the MCOs who administered Medicaid in Tennessee ("the Tennessee Model") under Counts 4 and 27 of the Amended Complaint. The Court concludes that HMS is entitled to judgment as a matter of law on each of these claims.

The Court lastly concludes that HMS is entitled to summary judgment on Frey's theory that HMS's "run-out" in Florida proves that HMS failed to submit TPL claims in previous years.

A.    *Frey Abandoned His MMIS and Add Fees Claims.*

Frey abandoned his claims that HMS committed a reverse false claim by failing to upload information to the Plaintiff States' MMIS, and Frey likewise abandoned his claims in Counts 3 and 23 that HMS committed a reverse false claim by failing to refund New York with certain "add fees."

One of the theories asserted in Frey's Amended Complaint was that HMS failed to provide the Plaintiff States with the information they needed to effectively manage their MMIS, which Plaintiff States use to identify TPL claims. Doc. 42, Am. Compl., ¶¶ 29, 57–63, 100, 174, 295–96, 314, 317–18, 335, 337. HMS moved for summary judgment on each of these claims, arguing there was no evidence that HMS failed to provide the states with the information they needed to identify TPL claims. Doc. 160, Def.'s Br. Mot. Summ. J., 45–48. Frey then failed to respond to HMS's Motion for Summary Judgment as to these claims, *see generally* Doc. 184, Pl.'s Resp., and Frey also did not move for summary judgment on any of his MMIS claims, *See generally* Doc. 168, Pl.'s Br. Mot. Summ. J. Accordingly, the Court finds that Frey has abandoned his MMIS claims by failing to respond, and the Court grants HMS's Motion for Summary Judgment as to the MMIS theories contained in Counts 2, 11, 23, 25, and 27 of Frey's Amended Complaint. *See Roberts v. Overby-Seawell Co.*, No. 3:15-CV-1217-L, 2018 WL 1457306, at *11 (N.D. Tex. Mar. 23, 2018) (Lindsay, J.) (concluding that the non-movant abandoned its claims after failing to respond to the moving party's arguments in its motion for summary judgment).

Frey also abandoned his theory that HMS failed to refund certain "add fees" to the State of New York. Frey had alleged that HMS recovered an additional $40 fee whenever HMS identified a Medicaid beneficiary who had separate health insurance. Doc. 42, Am. Compl., ¶ 64. Frey alleged in his Amended Complaint that HMS had a legal obligation to refund this "add fee" to the state of New York but did not do so. *Id.* ¶¶ 106, 295. HMS moved for summary judgment on each of the "add fee" claims. Doc. 160, Def.'s Br. Mot. Summ. J., 10–12. Frey failed to respond to HMS's Motion for Summary Judgment as to these claims, *see generally* Doc. 184, Pl.'s Resp., and Frey also did not move for summary judgment on any of his "add fee" claims, *See generally* Doc. 168, Pl.'s Br.

Mot. Summ. J. Accordingly, the Court finds that Frey has abandoned his "add fee" claims by failing to respond, and the Court grants HMS's Motion for Summary Judgment as to the add fee theories asserted in Counts 3 and 23 of Frey's Amended Complaint. *See Roberts*, 2018 WL 1457306, at \*11.

B.    *There is No Evidence that HMS Knowingly Concealed, Improperly Avoided, or Decreased an Obligation to Transmit Money to the Government by Failing to Bill TPL Claims Timely or At All.*

The Court next addresses Count 1 of Frey's Amended Complaint, claiming that HMS failed to bill TPL claims "timely or at all" and that this failure gives rise to a reverse false claim under the FCA and state-law equivalents of the FCA. Frey asserts several reverse false claims in this lawsuit. A reverse false claim is a suit where the plaintiff alleges that the defendant's actions "result[] not in improper payment to the defendant from the Government, but rather no payment [(or reduced payment)] to the Government when payment is otherwise obligated." *United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 329 (5th Cir. 2003).

31 U.S.C. § 3729(a)(1)(G) imposes liability on anyone who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." The elements of this claim are as follows: (1) an obligation to pay or transmit money or property to the Government; (2) the defendant concealed, improperly avoided, or decreased this obligation; and (3) the defendant acted with knowledge. *See* 31 U.S.C. § 3729(a)(1)(G).[1] Importantly, the first element of a reverse false claim can be satisfied even if the defendant does not have an obligation to pay money to the government. *See United States v. Caremark, Inc.*, 634 F.3d 808, 817 (5th Cir. 2011). Defendants can commit a reverse false claim by knowingly

---

[1] The Florida, New York, Oklahoma, and Tennessee equivalents of the FCA have nearly identical language. FLA. STAT. § 68.082(2)(g); NEW YORK FIN. LAW § 189(h); OKL. STAT. TIT. 63, § 5053.1(B)(7); TENN. CODE § 71-5-182(a)(1)(D). For simplicity's sake, the Court cites the federal FCA when discussing the elements of Frey's claims.

impairing someone else's obligation to pay or transmit money to the government. *Id.* In such a case, the defendant would need to conceal, improperly avoid, or decrease a third party's obligation to pay money to the government to commit a reverse false claim.

The first element of a reverse false claim is satisfied here because the insurance carriers and the Plaintiff States have obligations to pay money to the government. *See* 31 U.S.C. § 3729(a)(1)(G). There has been some confusion over what constitutes the obligation in this lawsuit. While the Court has previously held that HMS has an obligation to bill TPL claims because state agencies are required to investigate and pursue TPL claims, Doc. 64, Mem. Op. & Order, 21, the obligations at issue in the present Motions are the insurance carriers' obligations to reimburse state Medicaid agencies and the Plaintiff States' obligations to then reimburse the federal government with the federal portion of those funds. *See* Doc. 42, Am. Compl., ¶¶ 101–02, 176, 297, 338 (alleging that HMS impaired the states' obligations to remit money to the federal government and that HMS impaired liable third parties' obligations to reimburse the states). Frey argues that by failing to timely bill TPL claims, HMS impaired the insurance carriers' obligations to reimburse Medicaid funds to the Plaintiff States, which in turn impaired the Plaintiff States' obligations to reimburse the federal government. Doc. 168, Pl.'s Br. Mot. Summ. J., 1. Because both the insurance carriers and Plaintiff States have obligations to pay money to the government, the first element of a reverse false claim is satisfied. *See* 31 U.S.C. § 3729(a)(1)(G).

Before discussing the second element of Frey's reverse false claims, the Court notes that the parties use the word "timely" in three different ways. For the reasons discussed below, the Court will reference the statutory three-year deadline to submit a TPL claim when discussing whether a claim was "timely." First, Frey refers to the 60-day regulation and argues that any TPL claim billed after

the 60-day deadline is untimely. *See generally* Doc. 168, Pl.'s Br. Mot. Summ. J. Second, Frey cites

deposition testimony from an HMS employee indicating that HMS sometimes missed an insurance

carrier's internal timeliness policy of six months. *Id.* at 5. Third, HMS argues that any TPL claim

submitted to an insurance carrier within three years is timely because federal law requires insurance

carriers to accept as timely all claims for Medicaid reimbursement that are filed within three years of

the healthcare service being provided. Doc. 160, Def.'s Br. Mot. Summ. J., 26–27.

     As discussed above, a state must pass a law requiring insurance carriers to accept as timely

any TPL claims submitted within three years of the beneficiary receiving the healthcare service to

receive Medicaid funding. 42 U.S.C. § 1396a(a)(25)(I)(iv). And the CMS has promulgated a

regulation[2] that requires state agencies to file a TPL claim within 60 days after the end of the month

that the agency discovers a third party should have paid for a healthcare service. 42 C.F.R.

§ 433.139(d). HMS then agreed to be subject to the state agencies' requirements to pursue TPL

claims. *See* Doc. 164, Def.'s App'x, 357 (hiring HMS to "operate the Florida TPL Program in

accordance with federal and state laws"). Because only the three-year deadline would impact the

government's ability to recover improperly spent Medicaid funds, the Court will refer to the statute's

three-year deadline when discussing whether a TPL claim was timely filed.

     The second element of a reverse false claim is that the defendant concealed, improperly

avoided, or decreased an obligation to pay money to the government. *See* 31 U.S.C. § 3729(a)(1)(G).

HMS argues that Frey has no evidence that HMS concealed, avoided, or decreased anyone's

obligation to pay money to the government by "failing to bill TPL claims timely or at all." Doc. 160,

---

[2] HMS filed a Notice of Supplemental Authority arguing that this 60-day Regulation, as interpreted by Frey, is invalid. Doc. 252, Notice, 1–2. Because the Court is granting HMS's Amended Motion for Summary Judgment on different grounds, the Court need not address this argument.

Def.'s Br. Mot. Summ. J., 22. When, as here, the nonmovant bears the burden of proof on a claim at trial, "the moving party may make a proper summary judgment motion [on that claim] . . . with an allegation that the nonmovant has failed to establish an element essential to that party's case." *Austin v. Kroger Texas, L.P.*, 864 F.3d 326, 335 (5th Cir. 2017). If the movant properly alleges that the nonmovant lacks evidence on an element of his claim, the burden shifts to the nonmovant to "present[] evidence that provides a genuine issue for trial." *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 644 (5th Cir. 1999). While conclusory allegations "that the nonmovant has no evidence to support his case" are insufficient to shift the burden, allegations "that there is no evidence to support a *specific element* of the nonmovant's claim" suffice. *See Austin*, 864 F.3d at 335 n.10 (emphasis in original).

To survive summary judgment on the second element of a reverse false claim, Frey needs to produce evidence creating a genuine issue of material fact that HMS failed to bill TPL claims or failed to timely submit TPL claims resulting in the government not receiving Medicaid reimbursements. In support of his theory that HMS failed to bill TPL claims timely or at all, Frey makes four arguments. First, Frey argues that HMS violated the FCA by failing to submit TPL claims within the 60-day deadline imposed by 42 C.F.R. § 433.139(d). Doc. 168, Pl.'s Br. Mot. Summ. J., 5–6. Second, Frey contends that HMS committed a reverse false claim by failing to submit TPL claims because HMS put some insurance carriers on hold. *Id.* at 8–10. Third, Frey argues that HMS failed to timely bill TPL claims because of the company's technological problems. *Id.* at 6–8. Fourth, Frey argues that HMS's practice of "cleaning and editing" TPL claims caused the company to fail to submit viable TPL claims. Doc. 184, Resp., 11. The Court addresses each argument in turn.

1.  <u>HMS Did Not Commit a Reverse False Claim by Violating the 60-Day Regulation.</u>

HMS did not commit a reverse false claim by failing to comply with the CMS's 60-day Regulation. While the insurance carriers and Plaintiff States had an obligation to pay money to the government, HMS did not impair this obligation by merely failing to submit TPL claims within 60 days because this regulatory infraction did not result in the government failing to recover any money. But even if this regulatory violation did constitute concealing, improperly avoiding, or decreasing an obligation, HMS did not have the scienter necessary to maintain an FCA claim.

> *i. HMS did not conceal, improperly avoid, or improperly decrease any obligation to pay money to the government by violating the 60-day regulation.*

HMS filing a TPL claim after the 60-day deadline is insufficient to constitute concealing, improperly avoiding, or decreasing the insurance carriers' obligation to pay money to the government. Before addressing the evidence proffered by Frey, the Court explains what evidence would be needed to satisfy the second element of the reverse false claim. To meet the second element of his reverse false claim, Frey must produce evidence proving that HMS impaired the insurance carriers' or the Plaintiff States' obligation to pay money to the government. *See Caremark*, 634 F.3d at 817. The Court concludes that two forms of evidence would prove that HMS concealed, improperly avoided, or decreased the carriers' and Plaintiff States' obligations to pay the government. First, evidence that HMS never submitted a TPL claim to the insurance carrier. Second, evidence that HMS submitted a TPL claim after the three-year deadline imposed by statute, resulting in the insurance carrier lawfully denying the claim as untimely. Evidence proving either of these conclusions would establish that the insurance carriers retained money they should have paid the Plaintiff States. However, evidence that only suggests that the government received money later than

contemplated by regulation or statute is insufficient to show that HMS knowingly concealed, improperly avoided, or decreased anyone's obligation to pay or transmit money to the government.

Frey places much emphasis on deposition testimony establishing that HMS would not always file a TPL claim within 60 days, as required by the CMS's 60-day regulation. Doc. 168, Pl.'s Br. Mot. Summ. J., 5–6. However, a regulatory infraction is generally insufficient to establish liability under the FCA. *See United States ex rel. Hendrickson v. Bank of Am., N.A.*, 343 F. Supp. 3d 610, 620 (N.D. Tex. 2018) (Scholer, J.), *aff'd*, 779 F. App'x 250 (5th Cir. 2019) (noting "that mere regulatory violations with nothing more are insufficient to support a finding that the FCA has been violated"). Instead, to survive a motion for summary judgment, Frey must present evidence sufficient to create a genuine issue of material fact that HMS concealed, improperly avoided, or decreased someone's obligation to *pay money* to the government. *See United States ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 381 (5th Cir. 2003) (discussing how FCA liability requires a false claim for payment, not merely "a health care provider's disregard of Government regulations or improper internal policies"). While HMS would be violating a regulation if it did not submit a TPL claim within 60 days, there is nothing to suggest that this regulatory violation would result in the government not receiving money to which it was entitled. Instead, so long as the TPL claim was filed no later than three years after the Medicaid recipient received the healthcare service, an insurance carrier was not allowed to reject the claim as untimely. 42 U.S.C. § 1396a(a)(25)(I)(iv)(I).

HMS missing the 60-day deadline but later submitting the TPL claim before the statutory three-year deadline does not constitute a reverse false claim. If HMS missed the 60-day deadline but still filed the TPL claim before three years had passed, the claim would still be timely, and the government would still receive its Medicaid reimbursements. Thus, HMS missing the 60-day

deadline would not result in HMS concealing, avoiding, or decreasing the insurance carriers' obligations to reimburse Medicaid funds. In other words, this supposed regulatory infraction would not result in the insurance carrier retaining money it was required to pay the government—it would, at worst, result in the government getting reimbursed later than contemplated by the 60-day regulation. In this situation, there may be an argument that HMS's delay resulted in a late payment to the government, but "no false claim arises from mere late payment." *United States ex rel. DiLello v. Hackensack Meridian Health*, No. CV 20-02949 (FLW), 2022 WL 1284734, at *10 (D.N.J. Apr. 29, 2022).

Frey has only produced evidence that HMS would, at times, miss the 60-day deadline which is insufficient to create a genuine issue of material fact that HMS committed a reverse false claim. For example, Hancock testified that "[t]here would be instances where [HMS] wouldn't hit the 60-day time." Doc. 169, Pl.'s App'x, 17. Additionally, Seik testified that HMS did not always submit claims within 60 days of discovering them. *Id.* at 37. However, Frey has not presented any evidence that HMS *never* submitted these claims or that the company submitted these claims *after* the three-year window created by statute. Thus, Frey has only introduced evidence that HMS violated the 60-day regulation, but he has not introduced any evidence that HMS committed a reverse false claim. *See Hendrickson*, 343 F. Supp. 3d at 620. Even reading this evidence in the light most favorable to Frey, there is not a genuine issue of material fact that HMS concealed, improperly avoided, or decreased an insurance carrier's obligation to transmit money to the government because it does not suggest that HMS never submitted TPL claims or that HMS submitted TPL claims after the statute's three-year deadline.

Hancock's testimony that insurance carriers would sometimes deny the TPL claims as untimely also fails to create a genuine issue of material fact. Doc. 168, Pl.'s Br. Mot. Summ. J., 5. Hancock's definition of "untimely" is different from how the Court defined timely above. Hancock testified that if there were delays in filing TPL claims, HMS would sometimes "fall out of timely filing." Doc. 169, Pl.'s App'x, 17. However, Hancock was referencing an insurance "carrier's commercial insurance rules," which sometimes required a "timely filing period of three months to six months" after the healthcare service was provided. *Id.*; *see also* Doc. 185, Pl.'s App'x, 23 (explaining the process of notifying insurance carriers that their internal timely policies did not apply to TPL claims). Missing an insurance carrier's internal three-to-six-month timeliness deadline fails to show that HMS never filed any TPL claims or that HMS ever missed the three-year deadline. Thus, Hancock's testimony only establishes that insurance carriers would sometimes unlawfully deny a claim as untimely, as opposed to showing that HMS concealed, improperly avoided, or decreased the carriers' obligation to pay money to the government.

In sum, Frey has not introduced evidence sufficient to demonstrate there is a genuine issue of material fact that HMS concealed, improperly avoided, or decreased any party's obligation to pay money the government. Accordingly, the Court grants HMS summary judgment as to Frey's theory that violating the 60-day regulation constitutes a reverse false claim that he asserted in Counts 1, 11, 23, 25, and 27 of his Amended Complaint.

> *ii. Even if HMS breached its obligation to pay money, HMS lacked the necessary scienter to support FCA liability.*

Alternatively, even if violating the 60-day regulation was sufficient to satisfy the second element of a reverse false claim, there is no evidence that HMS had the necessary scienter to maintain an FCA claim. The third element of a reverse false claim requires that the defendant must have acted

knowingly. 31 U.S.C. § 3729(a)(1)(G). Knowingly means that the defendant: (1) "has actual knowledge of the information"; (2) "acts in deliberate ignorance of the truth or falsity of the information"; or (3) "acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b). The FCA has a subjective scienter requirement. *See United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749 (2023) ("The FCA's scienter element refers to respondents' knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed."). Thus, Frey must prove that HMS subjectively knew it was concealing, avoiding, or decreasing the carriers' and Plaintiff States' obligations to pay money to the government.

Frey failed to demonstrate a genuine issue of material fact that HMS had the necessary scienter for this reverse false claim. Frey argues that because HMS knew about the 60-day regulation and because it knew it sometimes violated the regulation, HMS has the necessary scienter for his failure to bill timely or at all theory. Doc. 193, Pl.'s Reply, 5–6. Several HMS executives, such as Hancock and Seik, testified that they knew about the 60-day regulation. Doc. 169, Pl.'s App'x, 15, 34. Hancock and Seik also testified that HMS was not always able to meet the 60-day deadline. *Id.* at 17, 37. The Court is not convinced.

Mere knowledge that the company was violating the regulation does not establish that HMS had actual knowledge it was concealing, improperly avoiding, or decreasing any parties' obligations to transmit money to the government. Frey has not identified any record evidence sufficient to create a genuine issue of material fact that HMS knew that missing the 60-day regulation would subsequently result in the government not recovering its third-party reimbursements. Instead, the only evidence before the Court indicates that HMS believed that a TPL claim would be timely so long as it was filed within the three-year deadline created by statute. Doc. 161, Def.'s App'x, 200–

01, 277. Thus, HMS subjectively knew and believed that so long as the company submitted the TPL claims within the three-year deadline, HMS would not be impairing either the insurance carriers' or the Plaintiff States' obligations to pay money to the government. *See SuperValu*, 598 U.S. at 749. Thus, HMS is entitled to summary judgment on the scienter element of Frey's reverse false claim.

Even if violating the 60-day regulation constituted concealing, improperly avoiding, or decreasing an obligation to pay money to the government, there is no evidence that HMS knowingly impaired this obligation. Therefore, Frey also cannot establish the third element of his reverse FCA claim because HMS did not always comply with the 60-day regulation.

### 2. HMS Did Not Commit a Reverse False Claim by Failing to Bill TPL Claims After Putting Carriers on Holds.

Frey next argues that HMS failed to bill TPL claims timely or at all because of HMS's carrier holds. Insurance carriers would, from time to time, ask HMS to temporarily pause submitting claims—HMS called this practice a carrier hold. Doc. 161, Def.'s App'x, 208–09. There would be a few different reasons for this request, sometimes it was because the insurance carrier was experiencing a backlog in claims and wanted to address the backlog before processing a large new set of claims. *Id.* at 209. Other times, the insurance carriers would ask to be put on hold while the carrier made changes to its internal processing system. *Id.* There were times when HMS had put millions of dollars' worth of claims on hold. Doc. 170, Pl.'s Sealed App'x, 72. Even when HMS put a carrier on hold, HMS was usually still able to bill the TPL claims within three years. Doc. 161, Def.'s App'x, 209–10. But in cases where the carrier hold would have resulted in claims passing the three-year deadline, HMS would either get the carrier to agree to honor TPL claims submitted beyond the three-year deadline or HMS would bill the TPL claims despite the carrier's request to be put on hold. *Id.*; *see also* Doc. 162, Def.'s App'x, 258.

HMS's practice of putting some insurance carriers on hold did not result in HMS knowingly concealing, improperly avoiding, or decreasing any obligation to pay money to the government. Because HMS argues there is no evidence that a carrier hold ever resulted in HMS failing to bill a TPL claim or subsequently failing to timely file a TPL claim, Doc. 160, Def.'s Br. Mot. Summ. J., 29, it is Frey's burden to produce evidence sufficient to create a genuine issue of material fact on this element. *See Thomas*, 174 F.3d at 644. Frey fails to meet his burden.

Frey argues that by putting carriers on hold, HMS was unable to bill the TPL claims within the 60-day deadline. Doc. 168, Pl.'s Br. Mot. Summ. J., 9. However, as the Court discussed above, failing to meet the 60-day deadline is insufficient to establish the second element of reverse false claim.

Frey then contends that HMS must have failed to submit TPL claims because of how many claims were subject to carrier holds. *Id.* Specifically, Frey argues "logic would dictate that with TPL claims in the hundreds of millions put on hold with so many carriers, a significant number of these claims would eventually fail to get billed or collected." *Id.* Even if logic dictated his conclusion, the evidence before the Court does not. *See Matsushita*, 475 U.S. at 587 (requiring plaintiffs to "come forward with specific facts showing that there is a genuine issue for trial" to survive summary judgment). Frey failed to identify even a single TPL claim that HMS did not bill because of a carrier hold. And Frey did not present any deposition testimony suggesting that carrier holds would result in HMS never submitting TPL claims.

The only reasonable inference that the Court may draw from HMS's practice of carrier holds is that HMS likely filed TPL claims after the 60-day deadline and that HMS filed some TPL claims more than three years after the Medicaid recipient received the healthcare service. However, the

record evidence also indicates that HMS would only agree to a carrier hold if the insurance carrier agreed to accept these late-filed TPL claims as timely. Doc. 161, Def.'s App'x, 209–10. Thus, the government would still receive its Medicaid reimbursements; it would just receive them later than contemplated by regulation or statute. And, as the Court said previously, "no false claim arises from mere late payment." *Hackensack Meridian Health*, 2022 WL 1284734, at *10. Therefore, there is no genuine issue of fact on Frey's reverse false claim via HMS's carrier holds practice.

    **3.**  <u>HMS's Technical Problems Do Not Give Rise to a Reverse FCA Claim.</u>

       There is no evidence that any issues HMS experienced with its technical capacities caused HMS to commit a reverse false claim. Frey argues that HMS lacked the technical capacity to timely bill TPL claims. Doc. 168, Pl.'s Br. Mot. Summ. J., 6. Hancock testified that HMS's "system could only handle . . . a certain level of output on a monthly basis." Doc. 169, Pl.'s App'x, 16. HMS's Chief of Information Officer also testified that HMS would occasionally experience issues that would delay billing TPL claims by days or weeks. *Id.* at 70. However, none of this evidence even remotely suggests that HMS never submitted TPL claims or that a carrier rejected a TPL claim that HMS submitted after the three-year deadline as untimely. Thus, this argument fails to establish a genuine issue of material fact on the second element of a reverse false claim.

       Frey lastly points to an IT problem HMS experienced to support his theory that HMS failed to bill TPL claims timely or at all. Doc. 168, Pl.'s Br. Mot. Summ. J., 5. Moiseenko testified that she once discovered an IT problem that prevented some TPL claims from being billed to the appropriate insurance carrier. Doc. 169, Pl.'s App'x, 6–7. According to Frey, this delay proves that HMS failed to bill TPL claims timely or at all. Doc. 168, Pl.'s Br. Mot. Summ. J., 5. However, Frey ignores the rest of Moiseenko's testimony where she says that after she fixed the problem, HMS successfully sent

all the TPL bills to the correct insurance carriers. Doc. 161, Def.'s App'x, 121 ("We reviewed the findings of the study and identified that the problem had been resolved and the billings were released."). Thus, this delay did not result in government losing any money.

Frey offers no evidence that HMS failed to submit any TPL claims because of this technical problem, nor does he establish that this error occurred more than once. Therefore, the Court rejects this argument because there is no evidence to suggest HMS had technical problems that resulted in the company concealing, avoiding, or decreasing any party's obligation to pay money to the government.

    4.  <u>HMS Cleaning and Editing its TPL Claims Did Not Result in HMS Failing to Bill TPL Claims.</u>

Before submitting a TPL claim for reimbursement, HMS would generally make sure the claim was "clean." Doc. 161, Def.'s App'x, 5. A TPL claim was considered clean if it had "sufficient information, free of errors or defects that would cause it to be rejected." *Id.* HMS had a similar practice called "edits," which means that "HMS abided by client-specific and carrier-specific requirements and policies when submitting claims for payment." *Id.* Importantly, the Plaintiff States were involved with HMS's practice of cleaning and editing TPL claims. *Id.* The stated purpose of the cleaning and editing process was to increase the likelihood that HMS would collect a claim. *See id.*

HMS argues that Frey has no evidence that HMS failed to bill a TPL claim because of its practice of using edits and cleans. Doc. 160, Def.'s Br. Mot. Summ. J., 42. Because HMS has met its burden by arguing that Frey has no evidence to support the second element of its reverse false claim, Frey must produce sufficient evidence to create a genuine issue of material fact that HMS concealed, improperly avoided, or decreased an obligation to pay money to the government because it used cleans and edits. *See Thomas*, 174 F.3d at 644. The only evidence Frey offers to support this theory

is Moiseenko's deposition testimony that some TPL claims were not billed because of an "identified defect." Doc. 184, Pl.'s Resp. Br., 11. However, Moiseenko also testified that the company fixed this defect and subsequently billed the TPL claims. Doc. 161, Def.'s App'x, 121. Thus, this defect supposedly caused by the edit process did not result in HMS failing to bill any TPL claims, and Frey has failed to identify any evidence that HMS ever failed to timely bill a TPL claim because of its process of cleaning and editing claims before billing them.

Accordingly, the Court grants HMS's Motion for Summary Judgment as to Count 1 of Frey's Amended Complaint, claiming that HMS committed a reverse false claim by failing to bill TPL claims timely or at all.

C.    *HMS Did Not Violate the FCA By Writing Off TPL Claims in 2010.*

Frey next asserts that HMS failed to adequately pursue TPL claims, culminating in the company writing off "a 12-figure dollar amount worth of TPL claims" in 2010. Doc. 168, Pl.'s Br. Mot. Summ. J., 10. In 2010, HMS had roughly $250 million of TPL claims in the Plaintiff States that had been "open" for more than three years. Doc. 170, Pl.'s Sealed App'x, 83–85. An open TPL claim is one that HMS has billed to the insurance carrier, but the insurance carrier has not yet ruled on. Doc. 161, Def.'s App'x, 125. HMS would eventually clear these previously billed claims off the company's account receivables—in 2010, HMS wrote off millions of dollars of unpaid TPL claims. Doc. 170, Pl.'s Sealed App'x, 83. Frey contends that HMS committed a reverse false claim by failing to "follow up on" these open claims. Doc. 193, Pl.'s Reply, 2. The Court disagrees.

HMS did not impair the carriers' or the Plaintiff States' obligations to reimburse the federal government by failing to adequately pursue the open claims. It is not clear how HMS violated federal law with regard to these open claims. The Medicaid statute requires states to take reasonable

measures to identify third parties who are liable for services paid for by Medicaid and to then seek reimbursement. 42 U.S.C. § 1396a(25)(B). Here, HMS identified the liable insurance carriers and subsequently billed them. Thus, HMS complied with its legal obligations.

Frey argues that the fact that HMS had already billed these TPL claims "is a distinction without a difference." Doc. 193, Pl.'s Reply, 2 n.1. However, there is a significant difference between HMS billing the TPL claims, as it is required to by law, and HMS not billing the TPL claims. The outcome of Frey's case is ultimately determined by whether Frey can prove that HMS did not bill their TPL claims, thus impairing the insurance carriers' and the Plaintiff States' obligations to pay money to the government. It is difficult to comprehend how HMS could have concealed, improperly avoided, or decreased an insurance carrier's obligations to reimburse Medicaid funds when HMS submitted the bill to the carrier, thus notifying the carrier of its obligation to pay money to the government. Frey fails to explain what measures HMS was required to take beyond billing the TPL claims.

The FCA is fundamentally a statute aimed at preventing parties from defrauding the government. *See United States ex rel. Gudur v. Deloitte & Touche*, No. 07-20414, 2008 WL 3244000, at *2 (5th Cir. Aug. 7, 2008). A scenario where HMS identified the liable third party, billed the third party, and the third party failed to rule on the claim does not constitute fraud on HMS's part. Thus, the Court rejects this theory of FCA liability.[3]

---

[3] HMS also argues that the claims it wrote off in 2010 fall outside of the relevant period in this lawsuit, thus they are barred by the statute of limitations. Doc. 180, Def.'s Resp., 17. The Court does not address this argument because Frey failed to create a genuine issue of material fact that HMS concealed an obligation to pay money to the government under this theory.

D.   *HMS Did Not Violate the FCA By Only Covering a Small Portion of Oklahoma's Medicaid*
*Population.*

Frey's Oklahoma theory is likewise unavailing. He argues that HMS committed a reverse
false claim by only investigating potential TPL claims for a small portion of Oklahoma's population
receiving Medicaid funding. The parties dispute how to interpret the facts underlying this claim, but
their dispute does not raise a genuine issue of material fact.

According to Frey, HMS made an internal error that resulted in the company only pursuing
TPL claims for a small portion of Oklahoma's Medicaid population. Doc. 168, Pl.'s Br. Mot. Summ.
J., 14. He then argues that after HMS fixed this "internal error," TPL recoveries in Oklahoma
drastically increased, which proves that HMS failed to bill millions of dollars' worth of earlier TPL
claims. *Id.* at 15. Frey points to two emails to establish that HMS was not using all the information
that it was receiving from Oklahoma in its TPL recovery efforts. *Id.* at 14 (citing Doc. 170, Pl.'s
Sealed App'x, 122–23).

HMS, on the other hand, contends that the reason TPL recoveries were lower in Oklahoma
for a couple years was because a third-party vendor did not provide HMS with the information the
company needed to provide its TPL services in Oklahoma. Doc. 160, Def.'s Br. Mot. Summ. J., 13.
According to HMS, Oklahoma's TPL recoveries increased dramatically once the company received
the information it needed. *Id.* (citing Doc. 161, Def.'s App'x, 203–06). Thus, HMS argues it was not
HMS's error that potentially led to Oklahoma not recovering improperly spent Medicaid funds. *Id.*

Even if Frey's characterization of the evidence was true—that an internal error caused by
HMS resulted in Oklahoma not recovering TPL claims—it would still not constitute a reverse false
claim. Even accepting Frey's interpretation of the evidence, HMS did not have the scienter necessary
to support liability under the FCA or Oklahoma analogue's of the FCA. There is no evidence that

HMS had actual knowledge of this supposed internal error before Gress's email discussing how the company was not using complete information on the Oklahoma Medicaid population. *See* 31 U.S.C. § 3729(b)(1). HMS also could not have acted in deliberate ignorance or reckless disregard for this internal error because there is not even evidence suggesting that HMS should have known about this claimed internal error. *See id.*

The evidence as interpreted by Frey tells the following story: HMS unknowingly made an internal error that meant it was not providing TPL services for Oklahoma's entire Medicaid population; HMS discovered the problem and realized it might affect TPL recoveries; HMS promptly fixed the problem; and HMS immediately increased the number of TPL recoveries in Oklahoma. This falls far short of meeting the FCA's scienter requirement. *See U.S. ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 767 (8th Cir. 2002) ("[I]nnocent mistakes and negligence are not offenses under the [FCA]." quoting *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 464–65 (9th Cir.1999)); *see also United States ex rel. Farmer v. City of Hous.*, 523 F.3d 333, 338 (5th Cir. 2008) (holding that negligence and gross negligence are insufficient to establish the FCA's mens rea requirement).

E.    *HMS Did Not Violate the FCA By Failing to Appeal Claim Denials.*

Frey argues that "HMS often failed to put forth the required effort to follow up with carriers on denials and appeals of claims that it should have pursued." Doc. 184, Pl.'s Resp., 9. The Court first notes that it is not entirely clear whether HMS was even required to appeal an insurance carrier denying coverage of a TPL claim. While the Court has previously held that HMS has an obligation to pursue reimbursements, Doc. 64, Mem. Op. & Order, 21, the statute and regulatory scheme do not appear to require an appeal of an insurance carrier denying a claim for reimbursement. *See* 42

U.S.C. § 1396a(a)(25)(I); *see* 42 C.F.R. § 433.139(d). Additionally, the Court is unconvinced that failing to appeal a denial would constitute concealing a carrier's obligation to pay money to the Plaintiff States. HMS had already billed the TPL claim, thus notifying the carrier of their obligation to pay the government. Further, Frey cites no authority in support of his argument and fails to explain what efforts HMS should have undertaken when appealing denials.

Regardless, even if failing to appeal an insurance carrier denying a TPL claim could give rise to a reverse false claim, Frey has introduced no evidence suggesting that HMS failed to appeal the denial of a TPL claim in a manner giving rise to an FCA violation. Moiseenko testified that HMS "had a follow-up team" that handled appealing claim denials that HMS believed should have been accepted. Doc. 161, Def.'s App'x, 126. HMS also appealed denials when "the denial reasons were demonstrably incorrect." *Id.* at 4.

Frey cannot identify a single TPL claim that was not collected because HMS failed to appeal its denial. While Hancock testified that he was "sure" that a claim was not collected because HMS did not appeal it, he did not "know of a specific instance" where this occurred. Doc. 185, Pl's App'x, 22. This speculation is insufficient to create a genuine issue of material fact. *See Moon v. Olivarez*, 26 F.4th 220, 226 (5th Cir. 2022) (noting that a plaintiff "cannot defeat summary judgment with speculation"). Thus, even if the Court accepted Frey's theory that failing to appeal a denial constituted concealing, improperly avoiding, or decreasing the carriers' obligation to pay money to the government, there is no evidence that HMS ever failed to do so. HMS is therefore entitled to summary judgment on this theory.

F.       *HMS Did Not Violate the FCA By Double-Billing the State of Tennessee.*

HMS is also entitled to summary judgment on Frey's next theory: the Tennessee Model. Under the Tennessee Model, Frey alleges that HMS engaged in double-billing by selling the same third-party coverage information to the state of Tennessee and to the MCOs that administered Tennessee's Medicaid program.

TennCare is the Tennessee agency that oversees the state's Medicaid program. Doc. 161, Def.'s App'x, 11. TennCare then contracts with several MCOs to administer Tennessee's Medicaid program. *Id.* The MCOs are required to identify and pursue potential TPL claims on behalf of the state. *Id.* TennCare, however, also serves as a safety net by separately pursuing TPL claims that the MCOs are unable to bill. *Id.* Thus, both the MCOs and TennCare need third-party coverage information to effectively pursue TPL claims.

HMS sold information to the state of Tennessee to help with its TPL efforts, and HMS also sold TPL information to the MCOs individually. *Id.* at 12, 14. Frey argues that HMS was selling the same data to both Tennessee and to the MCOs and that this was impermissible double-billing, which resulted in "HMS retain[ing] Medicaid funds to which it knew it should not have been entitled." Doc. 168, Pl.'s Br. Mot. Summ. J., 16. The Court disagrees.

First, it is not clear how Frey's Tennessee Model theory constitutes a reverse false claim because Frey has not explained how his summary judgment evidence satisfies the elements of a reverse false claim. *See* Doc. 168, Pl.'s Br. Mot. Summ. J., 16–17. He failed to explain what obligation HMS, Tennessee, or the MCOs had to transmit money to the government. He also did not explain how HMS concealed, improperly avoided, or decreased this supposed obligation to transmit money by selling information to both Tennessee and the MCOs. Frey simply argues, without providing any

support, that HMS "[kept] Medicaid funds from the State of Tennessee to which it was not entitled." Doc. 184, Pl.'s Resp., 3. However, Frey does not explain *why* HMS was not entitled to these funds. Frey then fails to explain how HMS had the necessary scienter to commit a reverse false claim by supposedly double billing the state of Tennessee. Thus, Frey has failed to identify a genuine issue of material fact on any of the elements of a reverse false claim pursuant to his Tennessee Model theory.

Second, the record evidence establishes that both TennCare and the MCOs needed third-party coverage information. Doc. 161, Def.'s App'x, 11. And TennCare allowed the MCOs to contract with HMS if it needed assistance pursuing TPL claims. *Id.* at 25. Further, TennCare and the MCOs needed their information on different timelines and in different formats. *Id.* at 13. Thus, Frey has failed to establish that HMS was unlawfully selling the same information to Tennessee and to the MCOs.

As Frey has no evidence to support any element of a reverse false claim under the Tennessee Model, HMS is entitled to summary judgment on Counts 4 and 27 of Frey's Amended Complaint as to his claims pursuant to the Tennessee Model.

G.      *HMS Did Not Commit a Reverse False Claim During Its Run-Out Period in Florida.*

The Court lastly grants HMS summary judgment as to Frey's theory that HMS committed a reverse false claim by collecting a substantial amount of billed claims during HMS's run-out period in Florida. HMS lost its contract to provide TPL services to Florida in 2008. Doc. 161, Def.'s App'x, 31. When Medicaid contractors lose their TPL contracts, the contractors are given a "run-out" period during which they may close claims that they have already billed to insurance carriers. *Id.* at 32, 103. However, the contractors are generally not allowed to bill new claims during this period—instead, they are only allowed to re-bill claims they have previously billed. *Id.* at 32. When Florida did not

renew its TPL contract with HMS in 2008, HMS engaged in substantial efforts to collect on the TPL claims it had previously billed. *Id.*

Frey argues that "[t]here is no dispute that HMS's success in billing and collecting TPL claims in the final months of its contract with the State of Florida confirms that HMS failed in its obligations to timely file and collect TPL claims prior to that time." Doc. 168, Pl.'s Br. Mot. Summ. J., 13. This argument lacks merit. Frey, again, cannot identify a single TPL claim that HMS failed to file. Further, companies can only collect TPL claims they had previously submitted during a run-out. Doc. 161, Def.'s App'x, 32. The fact that HMS was able to recover so much money during this run-out period proves that HMS timely filed *every single claim* that was recovered during the run-out period. Thus, evidence that HMS collected many TPL claims during its run-out period only proves that HMS had already filed many TPL claims in Florida—it does not suggest that HMS concealed, avoided, or decreased any carrier's obligations to reimburse Florida's Medicaid funds. Accordingly, HMS is entitled to summary judgment on Count 1 and Count 11 of Frey's Amended Complaint as to his allegations regarding HMS's conduct in Florida.

H.    *The Court Need Not Address the Parties' Motions to Strike.*

In addition to the pending Amended Motions for Summary Judgment, HMS also filed a Motion to Strike Relator's Rebuttal Expert (Doc. 172), a Motion to Strike Relator's Response (Doc. 217), and a Motion to Strike (Doc. 236). And Frey also filed a Motion to Strike (Doc. 174). Because the Court grants HMS's Amended Motion for Summary Judgment without needing to confront any of the issues raised in these Motions, the Court denies the Motions to Strike as moot.

## IV.

## CONCLUSION

For the reasons discussed above, the Court **GRANTS** HMS's Amended Motion for Summary Judgment (Doc. 159) and **DENIES** Frey's Amended Motion for Partial Summary Judgment (Doc. 167). The Court **DENIES AS MOOT** HMS's Motion to Strike Relator's Rebuttal Expert (Doc. 172), Frey's Motion to Strike (Doc. 174), HMS's Motion to Strike Relator's Response (Doc. 217), and HMS's Motion to Strike (Doc. 236). A final judgment will follow.

**SO ORDERED**.

**SIGNED:** October 18, 2024.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE